**QUINN EMANUEL URQUHART &
SULLIVAN, LLP**
51 Madison Avenue, 22nd Floor
New York, New York 10010
(212) 849-7000

**KLEE, TUCHIN, BOGDANOFF &
STERN LLP**
1999 Avenue of the Stars, 39th Floor
Los Angeles, California, 90067
(310) 407-4000

*Attorneys for Defendants Access Industries, Inc.;
Access Industries Holdings LLC; AI International,
S.à.r.l.; Nell Limited; Len Blavatnik; Lincoln Benet;
Philip Kassin; NAG Investments LLC; and Perella
Weinberg Partners LP*

**UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| ----------------------------------------------- | X | |
| In re: LYONDELL CHEMICAL COMPANY, *et al.*, | : | Case No. 09-10023 (CGM) |
| | : | |
| | : | Chapter 11 |
| | : | |
| Debtors. | : | (Jointly Administered) |
| | : | |
| ----------------------------------------------- | X | |
| EDWARD S. WEISFELNER, AS LITIGATION TRUSTEE OF THE LB LITIGATION TRUST, | : | |
| | : | |
| | : | |
| Plaintiff, | : | Adv. Pro. No. 09-1375 (MG) |
| | : | |
| v. | : | |
| | : | |
| LEONARD BLAVATNIK, *et al.*, | : | |
| | : | |
| Defendants. | : | |
| | : | |
| ----------------------------------------------- | X | |
| EDWARD S. WEISFELNER, AS LITIGATION TRUSTEE OF THE LB LITIGATION TRUST, | : | |
| | : | |
| | : | |
| Plaintiff, | : | Adv. Pro. No. 11-01844 (MG) |
| | : | |
| v. | : | |
| | : | |
| NAG Investments LLC, | : | |
| | : | |
| Defendant. | : | |
| | : | |
| ----------------------------------------------- | X | |

**DEFENDANTS' PRE-TRIAL LEGAL BRIEF**

# TABLE OF CONTENTS

**Page**

TABLE OF CONTENTS .................................................................................................. i

TABLE OF AUTHORITIES ......................................................................................... iv

PRELIMINARY STATEMENT ....................................................................................1

I.    INTENTIONAL FRAUDULENT TRANSFER CLAIM ...................................6

    A.    Overview of Applicable Law ...................................................................6

    B.    Count 2:  Intentional Fraudulent Transfer Claim Against Nell, AI
        Chemical, And Blavatnik ..........................................................................7

        1.    Overview Of Claim ......................................................................7

        2.    Lyondell Had No Property Interest In The Toehold Payments ..................7

        3.    The Trustee Will Not Be Able To Reach The High Bar Set By The
            District Court ................................................................................8

        4.    Dan Smith's Intent Cannot Be Imputed To Basell-Side Entities................8

        5.    The Trustee Has Not Named Proper Defendants........................................11

II.    CONSTRUCTIVE FRAUDULENT TRANSFER CLAIMS ............................11

    A.    Overview Of Applicable Law .................................................................11

        1.    Interest Of The Debtor In Property .........................................12

        2.    Reasonably Equivalent Value ..................................................13

        3.    Requisite Financial Condition..................................................16

        4.    The Role Of Contemporaneous Management Projections........................24

        5.    Valuing Contingent Liabilities................................................28

        6.    Contractual Limitations On Liability.......................................28

    B.    Count 1: Constructive Fraudulent Transfer Claim Against Nell And Len
        Blavatnik ....................................................................................................31

        1.    Overview Of Claim....................................................................31

        2.    The Trustee Cannot Prove All Of The Elements Necessary To
            Prevail On Count 1, Which Is Barred By The Safe Harbor In Any
            Event ..........................................................................................33

        3.    Toehold Payment 1 Was Not A Transfer Of Interest Of A Debtor ..........40

        4.    Proper Application Of Collapsing ...........................................42

        5.    Toehold Payment 1 Was Made In Exchange for Reasonably
            Equivalent Value........................................................................44

6. Neither Len Blavatnik Nor AI Chemical Are Proper Defendants With Respect To This Claim..................................................44

C. Count 11: Constructive Fraudulent Transfer Against Nell And Perella Weinberg.........................................................49

 1. Overview Of Claim..................................................49

 2. The Trustee Must Prove That The Fees Were Not Market Rate ..............49

D. Count 17: Constructive Fraudulent Transfer Against Access...........................50

 1. Overview Of Claim..................................................50

 2. The Claim Cannot Be Sustained Where The Law Of The Case Rejects Its Underlying Premise ..................................................50

E. Counts 1 And 2 Of Amended NAG Complaint: Constructive Fraudulent Transfer And/Or Recovery Against NAG ..........................................51

 1. Overview Of Claims..................................................51

 2. The Trustee Must Avoid The Initial Transfer Made To BIS In Order To Recover From NAG Under Section 550 .................................51

 3. Even If The Trustee Could Establish Each Of The Requisite Elements Of A Constructive Fraudulent Transfer, The Bankruptcy Code's Avoidance Powers Do Not Apply To These Claims.....................54

 4. Count 2 Of The Amended NAG Complaint Seeks To Avoid And Recover A Transfer Of Property In Which No Debtor Had An Interest........................................................62

III. STATUTORY OFFSETS TO FRAUDULENT TRANSFER LIABILITY ....................64

A. The Import of Section 550(d) .................................................64

B. The Import Of Section 548(c) .................................................67

IV. PREFERENCE CLAIM..........................................................69

A. Overview Of Applicable Law .................................................69

B. Overview Of Count 9 Against Access .........................................70

 1. Access Rebutted The Presumption Of Insolvency, And The Trustee Will Not Be Able To Prove This Element At Trial .....................70

 2. The Ordinary Course Of Business Defense Prohibits Avoidance Of The October Repayments.............................................71

 3. Other Liquidity Sources (Which Also Did Not Require Solvency Representations) Were Unavailable At The Time Of The Draw.............79

C. The Policy Behind Section 547 Does Not Support A Determination That The October Repayments Were Preferences .........................................80

V. STATUTORY RIGHTS UNDER SECTION 502(h)....................................81

VI.   LUXEMBOURG LAW CLAIMS ...................................................................83

    A.   Count 6: Mismanagement And Breach Of Duty Claim Under Luxembourg Law Against Len Blavatnik ......................................................................83

    B.   Count 7: Tort Claim Under Luxembourg Law Against Access, Len Blavatnik, Lincoln Benet, And Philip Kassin ...........................................83

        1.   The Trustee Cannot Meet The Legal Requirements To Prove A Tort Claim Against Access And Blavatnik...............................83

        2.   The Trustee Cannot Meet The Legal Requirements To Prove A Tort Claim Against The GP Managers .....................................85

        3.   The Trustee Cannot Meet The Legal Requirements To Prove Claims Against The Supervisory Board Under Articles 59 ¶¶ 1 Or 2...................................................................................................86

    C.   The Trustee's Claimed Damages Are Not Cognizable Under Luxembourg Law; Alternately, If They Are, They Must Incorporate Any Offsetting Benefits Conferred By The Bankruptcy Case ................................................88

VII.  AIDING AND ABETTING LUXEMBOURG BREACHES UNDER TEXAS LAW ...........................................................................................................90

    A.   Overview Of Claim..........................................................................90

    B.   The Trustee Cannot Prove The Elements Of An Aiding And Abetting Claim...............................................................................................91

VIII. BREACH OF CONTRACT UNDER NEW YORK LAW ............................93

    A.   Overview Of Applicable Law ............................................................93

    B.   Overview Of Count 12......................................................................93

    C.   The Trustee Cannot Prove Breach ....................................................94

    D.   Even If The Trustee Can Prove A Breach Of Contract Claim, Damages, If Any, Are Limited To Restitution ...................................................95

IX.   EQUITABLE SUBORDINATION ...........................................................95

    A.   Overview Of Applicable Law ............................................................95

    B.   Overview Of Count 10......................................................................97

    C.   The Requested Remedies In Connection With This Claim Are Improper ...........97

## TABLE OF AUTHORITIES

**Page**

### Cases

*3V Capital Master Fund. Ltd. v. Official Comm. of Unsecured Creditors
(In re TOUSA, Inc.)*,
444 B.R. 613 (S.D. Fla. 2011) ..................................................................29

*80 Nassau Assocs. v. Crossland Fed. Sav. Bank (In re 80 Nassau Assocs.)*,
169 B.R. 832 (Bankr. S.D.N.Y. 1994) ......................................................96

*360Networks Corp. v. Geltzer (In re Asia Global Crossing, Ltd.)*,
404 B.R. 335 (S.D.N.Y. 2009)..................................................................95

*AP Servs. LLP v. Silva*,
483 B.R. 63 (S.D.N.Y. 2012)................................................................38, 39

*ASARCO LLC v. Americas Mining Corp.*,
396 B.R. 278 (S.D. Tex. 2008) ..................................................14, 15, 44

*In re A.W. Lawrence & Co., Inc. v. Burstein (In re A.W. Lawrence)*,
346 B.R. 51 (Bankr. N.D.N.Y. 2006) ...................................................12, 63

*Abovenet, Inc. v. Lucent Techs., Inc. (In re Metromedia Fiber Network, Inc.)*,
No. 04-08564A, 2005 WL 3789133 (Bankr. S.D.N.Y. Dec. 20, 2005) ................77

*Adelphia Recovery Trust v. FPL Group, Inc. (In re Adelphia Commc'ns Corp.)*,
512 B.R. 337 (Bankr. S.D.N.Y. 2014).................................................18, 23, 43, 44

*In re Aeropostale, Inc.*,
No. 16-11275, 2016 WL 4506712 (Bankr. S.D.N.Y. Aug. 26, 2016)....................96

*Airlines Reporting Corp. v. S & N Travel, Inc.*,
58 F.3d 857 (2d Cir. 1995).......................................................................56

*Alfa S.A.B. de C.V. v. Enron Creditors Recovery Corp.
(In re Enron Creditors Recovery Corp.)*,
422 B.R. 423 (S.D.N.Y. 2009).................................................................34

*Andrew Velez Constr., Inc. v. Consol. Edison Co. of N.Y., Inc. (In re Andrew Velez)*,
373 B.R. 262 (Bankr. S.D.N.Y. 2007) ......................................................12

*In re Armstrong*,
259 B.R. 338 (E.D. Ark. 2001),
*aff'd*, 285 F.3d 1092 (8th Cir. 2002).........................................................67

*Baker Botts L.L.P. v. ASARCO LLC*,
135 S. Ct. 2158 (2015)............................................................................52

*Balaber-Strauss v. Sixty-Five Brokers (In re Churchill Mortg. Inv. Corp.)*,
256 B.R. 664 (Bankr. S.D.N.Y. 2000) ......................................................49

*Barclay v. Swiss Fin. Corp. Ltd. (In re Midland Euro Exch. Inc.)*,
   347 B.R. 708 (Bankr. C.D. Cal. 2006) ................................................................................59

*Barnhill v. Johnson*,
   503 U.S. 393 (1992) ............................................................................................................80

*Bayer Corp. v. MascoTech, Inc. (In re AutoStyle Plastics, Inc.)*,
   269 F.3d 726 (6th Cir. 2001) .............................................................................................96

*Beal Sav. Bank v. Sommer*,
   8 N.Y.3d 318, 324-25 (N.Y. 2007) ....................................................................................28

*Benjamin v. Diamond (In re Mobile Steel Co.)*,
   563 F.2d 692 (5th Cir. 1977) .............................................................................................96

*Benz v. Compania Naviera Hidalgo, S.A.*,
   353 U.S. 138 (1957) ............................................................................................................55

*Bierbach v. Wagner*,
   No. 07-CV-0072, 2007 WL 1074473 (M.D. Pa. Apr. 4, 2007) ..........................................78

*Bonded Fin. Servs., Inc. v. European Am. Bank*,
   838 F.2d 890 (7th Cir. 1988) .............................................................................................47

*Brandt v. Samuel, Son & Co. (In Longview Aluminum, L.L.C.)*,
   No. 03 B 12184, 2005 WL 3021173 (Bankr. N.D. Ill. July 14, 2005) .................................26

*Brandt v. Trivest II, Inc. (In re Plassein Int'l Corp.)*,
   405 B.R. 402 (Bankr. D. Del. 2009) ..................................................................................49

*Brooke Inv., Inc. v. CJD & Assocs., LLC (In re Brooke Corp)*,
   536 B.R. 896 (Bankr. D. Kan. 2015) .............................................................................75, 79

*Brown Publ'g Co. Liq'g Trust v. Brown (In re Brown Publ'g Co.)*,
   No. 12-08193, 2015 WL 1009177 (Bankr. E.D.N.Y. Mar. 4, 2015) ..................................48

*Buchwald Capital Advisors, LLC v. Papas (In re Greektown Holdings, LLC)*,
   No. 10-05712, 2015 WL 8229658 (Bankr. E.D. Mich. Nov. 24, 2015) ..............................39

*Burtch v. Opus, LLC (In re Opus East, LLC)*,
   528 B.R. 30 (Bankr. D. Del. 2015) ....................................................................................27

*Butler Aviation Int'l, Inc. v Whyte (In re Fairchild Aircraft Corp.)*,
   6 F.3d 1119 (5th Cir. 1993) ..............................................................................................16

*Cambridge Meridian Grp., Inc. v. Connecticut Nat'l Bank (In re Erin Food Servs., Inc.)*,
   117 B.R. 21 (Bankr. D. Mass. 1990) .................................................................................73

*In re Capmark Fin. Grp. Inc.*,
   438 B.R. 471 (Bankr. D. Del. 2010) .............................................................................28, 29

*Cent. Va. Cmty. College v. Katz*,
   546 U.S. 356 (2006) ............................................................................................................53

*Chartwell Litig. Trust v. Addus Healthcare, Inc. (In re Med Diversified, Inc.)*,
334 B.R. 89 (Bankr. E.D.N.Y. 2005) .................................................................17

*Christian Bros. High Sch. Endowment v. Bayou No Leverage Fund, LLC*
*(In re Bayou Grp.)*,
439 B.R. 284 (S.D.N.Y. 2010) ...................................................................67, 68

*In re Coated Sales, Inc.*,
144 B.R. 663 (Bankr. S.D.N.Y. 1992) ................................................................16

*In re Coburn*,
175 B.R. 400 (Bankr. D. Or. 1994).....................................................................69

*Comm. of Unsecured Creditors v. Motorola, Inc.*
*(In re Iridium Operating LLC)*,
373 B.R. 283 (Bankr. S.D.N.Y. 2007).............................16, 17, 18, 19, 23, 24, 25, 26, 27

*Commercial Union Ins. Co. v. Alitalia Airlines, S.p.A.*,
347 F.3d 448 (2d Cir. 2003)................................................................................9

*Contemporary Indus. Corp. v. Frost*,
564 F.3d 981 (8th Cir. 2009) .............................................................................38

*Credit Managers Ass'n of S. California v. Federal Co.*,
629 F. Supp. 175 (C.D. Cal. 1985) ....................................................19, 20, 21, 25

*Crescent Res. Litig. Trust v. Duke Energy Corp.*,
500 B.R. 464 (W.D. Tex. 2013)..........................................................................36

*In re D.E.I. Sys., Inc.*,
2011 Bankr. LEXIS 1143 (Bankr. D. Utah Apr. 5, 2011) .....................................37

*Daley v. Chang (In re Joy Recovery Tech. Corp.)*,
286 B.R. 54 (Bankr. N.D. Ill. 2002) ..................................................................21

*Danning v. Miller (In re Bullion Reserve of N. Am.)*,
922 F.2d 544 (9th Cir. 1991) .............................................................................47

*Darocy v. Abuildtrup*,
345 S.W.3d 129 (Tex. App. 2011)......................................................................91

*Davidoff v. Farina*,
No. 04 Civ. 2617, 2005 WL 2030501 (S.D.N.Y. Aug. 22, 2005) ..........................26

*Davis v. Clarklift-West, Inc. (In re Quebecor World (USA), Inc.)*,
518 B.R. 757 (Bankr. S.D.N.Y. 2014) ................................................................75

*Del. Open MRI Radiology Assocs., P.A. v. Kessler*,
898 A.2d 290 (Del. Ch. 2006)............................................................17, 18, 25

*Dev. Specialists, Inc. v. Kaplan (In re Irving Tanning Co.)*,
No. 12-1024, -- B.R. -- 2016 WL 4427032 (Bankr. Me. Aug. 9, 2016).................22

*Diesel Props S.r.l. v. Greystone Bus. Credit II LLC*,
    631 F.3d 42 (2d Cir. 2011).................................................................................................93

*Dobin v. Hill (In re Hill)*,
    342 B.R. 183 (Bankr. D.N.J. 2006) ...................................................................................67

*In re Duplan Corp.*
    9 B.R. 921 (S.D.N.Y. 1980)..............................................................................................25

*Dzikowski v. N. Trust Bank of Fla., N.A. (In re Prudential of Fla. Leasing Inc.)*,
    478 F.3d 1291 (11th Cir. 2007) ........................................................................................65

*E.R. Squibb & Sons, Inc. v. Accident & Cas. Ins. Co.*,
    160 F.3d 925 (2d Cir. 1998)..............................................................................................56

*In re Emerging Commc'ns Inc. S'holders Litig., No. Civ. A 16415*,
    2004 WL 1305745 (Del. Ch. June 4, 2004)......................................................................27

*EGP Fuels Co. v. Port of Houston Auth. (In re Enron Corp.)*,
    Adv. Pro. No. 03-92511, 2006 WL 2385194 (Bankr. S.D.N.Y. June 2, 2006) ......................10

*In re Enron Corp.*,
    379 B.R. 425 (S.D.N.Y. 2007)..........................................................................................96

*Enron Creditors Recovery Corp. v. Alfa, S.A.B. de C.V.*,
    651 F.3d 329 (2d Cir. 2011)........................................................................................34, 38

*Enron Creditors Recovery Corp. v. Int'l Fin. Corp.*
    *(In re Enron Creditors Recovery Corp.)*,
    388 B.R. 489, 490 (S.D.N.Y. 2008)..................................................................................52

*Equal Employment Opportunity Comm. v. Arabian Am. Oil Co.*,
    499 U.S. 244, 248 (1991)............................................................................................54, 55

*In re Exide Techs.*,
    303 B.R. 48 (Bankr. D. Del. 2003) ...................................................................................17

*Falb v. Frankel*,
    423 N.Y.S.2d 683 (2d Dep't 1980)...................................................................................31

*Fed. Deposit Ins. Corp. v. Hirsch (In re Colonial Realty Co.)*,
    980 F.2d 125 (2d Cir. 1992)..........................................................................30, 58, 59, 60

*Fidelity Bond and Mortg. Co. v. Brand (In re Fidelity Bond and Mortg. Co.)*
    340 B.R. 266 (Bankr. E.D. Pa. 2006) ...............................................................................22

*First Am. Bank of N.Y. v. Fallova Shredder Co.*,
    587 N.Y.S.2d 119, (1st Dep't 1992) .................................................................................31

*Florsheim Grp. Inc. v. USAsia Int'l Corp. (In re Florsheim Grp. Inc.)*,
    336 B.R. 126 (Bankr. N.D. Ill. 2005) ...............................................................................55

*Fort M Dev. Corp. v. Inland Credit Corp.*,
54 A.D.2d 862 (1st Dep't 1976),
*aff'd*, 43 N.Y.2d 763 (1977) ............................................................................95

*French v. Liebmann (In re French)*,
440 F.3d 145 (4th Cir. 2006) ...............................................................57, 58, 59

*Gabriel Capital, L.P. v. NatWest Fin., Inc.*,
122 F. Supp. 2d 407 (S.D.N.Y. 2000) ..................................................................45

*Gold v. First Tenn. Bank N.A. (In re Taneja)*,
743 F.3d 423 (4th Cir. 2014) .............................................................................67

*Goldberg v. Such (In re Keplinger)*,
284 B.R. 344 (N.D.N.Y. 2002) ............................................................................70

*Gosch v. Burns (In re Finn)*,
909 F.2d 903 (6th Cir. 1990) ........................................................................76, 80

*Gowan v. HSBC Morgt. Corp. (In re Dreier, LLP)*,
No. 10-5456, 2012 WL 4867376 (Bankr. S.D.N.Y. Oct. 12, 2012) .......................81

*Gowan v. The Patriot Grp., LLC (In re Dreier LLP)*,
452 B.R. 391 (Bankr. S.D.N.Y. 2011) ..............................................7, 8, 12, 47, 96

*Grede v. Bank of New York Mellon Corp. (In re Sentinel Mgmt. Grp., Inc.)*,
809 F.3d 958 (7th Cir. 2016) .............................................................................68

*Grede v. FCStone, LLC*,
746 F.3d 244 (7th Cir. 2014) .............................................................................39

*Greenwald v. Latham & Watkins (In re Trans-End Tech., Inc.)*,
230 B.R. 101 (Bankr. N.D. Ohio 1998) ...............................................................53

*HBE Leasing Corp. v. Frank*,
48 F.3d 623 (2d Cir. 1995) ...........................................................................10, 42

*Harman v. First Am. Bank of Md. (In re Jeffrey Bigelow Design Grp., Inc.)*,
956 F.2d 479 (4th Cir. 1992) ........................................................................78, 79

*Hinsley v. Boudloche (In re Hinsley)*,
201 F.3d 638 (5th Cir. 2000) .............................................................................12

*Hoskin v. TPG Capital Mgmt., LP (In re Hellas Telecomm. (Luxembourg) II SCA)*,
524 B.R. 488 (Bankr. S.D.N.Y. 2015) .................................................................61

*IBT Int'l, Inc. v. Northern (In re Int'l Admin. Servs., Inc.)*,
408 F.3d 689 (11th Cir. 2005) ...........................................................................52

*Jacobs v. Matrix Cap. Bank (In re AppOnline.com, Inc.)*,
315 B.R. 259 (Bankr. E.D.N.Y. 2004) .................................................................73

*Jones v. United States Sav. & Loan Ass'n (In re U.S.A. Inns of Eureka Springs, Ark., Inc.)*,
9 F.3d 680 (8th Cir. 1993) .................................................................................77

*Jubber v. SMC Elec. Prods., Inc. (In re C.W. Mining Co.)*,
    798 F.3d 983 (10th Cir. 2015) ........................................................................71, 76

*In re Jumer's Castle Lodge, Inc.*,
    329 B.R. 837 (Bankr. C.D. Ill. 2005) ...............................................................13

*KH Funding Co. v. Escobar (In re KH Funding Co.)*,
    541 B.R. 308 (Bankr. D. Md. 2015) ...................................................71, 76, 77, 78

*Kaiser Steel Corp. v. Charles Schwab & Co.*,
    913 F.2d 846 (10th Cir. 1990) ..........................................................................38

*In re Kaplan Breslaw Ash, LLC*,
    264 B.R. 309 (Bankr. S.D.N.Y. 2001) ...............................................................29

*Kastner v. Jenkens & Gilchrist, P.C.*,
    231 S.W.3d 571 (Tex. App. 2007) .....................................................................91

*Kelley v. McCormack (In re Mitchell)*,
    548 B.R. 862 (Bankr. M.D. Ga. 2016) ..........................................................76, 79

*In re Kenny*,
    75 B.R. 515 (Bankr. E.D. Mich. 1987) ..............................................................96

*Kinzbach Tool Co. v. Corbett-Wallace Corp.*,
    160 S.W.2d 509 (Tex. 1942) ..............................................................................92

*Kipperman v. Onex Corp.*,
    411 B.R. 805 (N.D. Ga. 2009) ...........................................................................24

*Kleven v. Household Bank F.S.B.*,
    334 F.3d 638 (7th Cir. 2003) .............................................................................71

*Koreag, Controle et Revision S.A. v. Refco F/X Assocs., Inc.*
    *(In re Koreag, Controle et Revision S.A.)*,
    961 F.2d 341 (2d Cir. 1992) ..............................................................................60

*Kraken Inv. Ltd. v. Jacobs (In re Salander-O'Reilly Galleries, LLC)*,
    475 B.R. 9 (S.D.N.Y. 2012) ...............................................................................61

*Law v. Siegel*,
    134 S. Ct. 1188 (2014) ......................................................................................52

*Lawson v. Ford Motor Co. (In re Roblin Indus., Inc.)*,
    78 F.3d 30 (2d Cir. 1996) ..............................................................................70, 74

*In re Liberty Livestock Co.*,
    198 B.R. 365 (Bankr. D. Kan. 1996) .................................................................74

*In re Lifschultz Fast Freight*,
    132 F.3d 339 (7th Cir. 1997) .............................................................................96

*Lippe v. Bairnco Corp.*,
    288 B.R. 678 (S.D.N.Y. 2003) ...........................................................................17

*Liq'n. Trust v. Daimler AG (In re Old CarCo LLC)*,
  509 F. App'x. 77 (2d Cir. 2013) ...........................................................................13

*Liq'n. Trust v. Daimler AG (In re Old CarCo LLC)*,
  435 B.R. 169 (Bankr. S.D.N.Y. 2010).............................................................15, 43

*MFS/Sun Life Trust-High Yield Series v. Van Dusen Airport Servs. Co.*,
  910 F. Supp. 913 (S.D.N.Y. 1995) .................................................................. *passim*

*Mastr Adjustable Rate Mortgs. Trust 2006-OA2 v. UBS Real Estate Secs., Inc.*,
  No. 12-cv-7322, 2015 WL 797972 (S.D.N.Y. Feb. 25, 2015) ................................28

*Maxwell Comm'n Corp. PLC v. Societe General PLC*
  *(In re Maxwell Commc'n Corp. PLC)*,
  186 B.R. 807 (S.D.N.Y. 1995)........................................................................55, 58

*Maxwell Commc'n Corp. plc v. Barclays Bank (In re Maxwell Commc'n Corp. plc)*,
  170 B.R. 800 (Bankr. S.D.N.Y. 1994).....................................................................55

*Maxwell Comm'n Corp. plc v. Societe General plc (In re Maxwell Commc'n Corp. plc)*
  93 F.3d 1036 (2d Cir. 1996).........................................................................55, 60

*McClarty v. Gudenau*,
  176 B.R. 788 (E.D. Mich. 1995)..............................................................................93

*McCord v. Venus Foods, Inc. (In re Lan Yik Foods Corp.)*,
  185 B.R. 103 (Bankr. E.D.N.Y. 1995)......................................................................77

*In re McLean Industries, Inc.*,
  132 B.R. 247 (Bankr. S.D.N.Y. 1991),
  *aff'd*, 162 B.R. 410 (S.D.N.Y. 1993) ......................................................................70

*Meadows v. Hartford Life Ins. Co.*,
  492 F.3d 634 (5th Cir. 2007) ...................................................................................91

*Meeks v. Harrah's Tunica Corp. (In re Armstrong)*,
  231 B.R. 723 (Bankr. E.D. Ark. 1999),
  *aff'd*, 260 B.R. 454 (E.D. Ark. 2001) .....................................................................74

*Mellon Bank, N.A. v. Metro Commc'ns*,
  945 F.2d 635 (3d Cir. 1991)........................................................................15, 23

*Metlyn Realty Corp. v. Esmark, Inc.*,
  763 F.2d 826 (7th Cir. 1985) ...................................................................................26

*Misty Mgmt. Corp. v. Lockwood*,
  539 F.2d 1205 (9th Cir. 1976) .................................................................................81

*Moody v. Sec. Pac. Bus. Credit, Inc.*,
  127 B.R. 958 (W.D. Pa. 1991)...........................................16, 19, 20, 21, 22, 23, 24

*Morrison v. Nat'l Australia Bank, Ltd.*,
  561 U.S. 247 (2010)........................................................................................54, 55

*Murphy v. Stein*,
   549 N.Y.S.2d 53 (2d Dep't 1989)...............................................................................93

*NetJets Aviation, Inc. v. LHC Commc'ns, LLC*,
   537 F.3d 168 (2d Cir. 2008)......................................................................................46

*In re NewPage Corp.*,
   No. 13-52520-KG, Docket No. 52 (Bankr. D. Del. Sept. 30, 2016)........................73

*In re Nirvana Rest., Inc.*,
   337 B.R. 495 (Bankr. S.D.N.Y. 2006).......................................................................73

*Nisselson v. Empyrean Inv. Fund, L.P., et al. (In re MarketXT Holdings Corp.)*,
   376 B.R. 390 (Bankr. S.D.N.Y. 2002)..........................................................................7

*Norberg v. Sanchez (In re Chase & Sanborn Corp.)*,
   813 F.2d 1177 (11th Cir. 1987) ...................................................................13, 62, 63

*O'Donnell v. Tristar Esperanza Props., LLC (In re Tristar Esperanza Props., LLC)*,
   488 B.R. 394 (B.A.P. 9th Cir. 2013).........................................................................35

*Official Comm. of Unsecured Creditors v. Chinery  (In re Cybergenics Corp.)*,
   226 F.3d 237 (3d Cir. 2000)......................................................................................30

*Official Committee of Unsecured Creditors v. Citicorp N. Am., Inc.
   (In re TOUSA, Inc.)*,
   422 B.R. 783 (Bankr. S.D. Fla. 2009).........................................................29, 30, 31

*Official Comm. of Unsecured Creditors v. Blomen (In re Hydrogen, L.L.C.)*,
   431 B.R. 337 (Bankr. S.D.N.Y. 2010).......................................................................96

*Official Comm. of Unsecured Creditors v. JP Morgan Chase Bank, N.A.
   (In re M. Fabrikant & Sons, Inc.)*,
   394 B.R. 721 (Bankr. S.D.N.Y. 2008).......................................................................51

*Official Comm. of Unsecured Creditors v. Martin
   (In re Enron Creditors Recovery Corp.)*,
   376 B.R. 442 (Bankr. S.D.N.Y. 2007).................................................................74, 75

*Official Comm. of Unsecured Creditors v. Morgan Stanley & Co.
   (In re Sunbeam Corp.)*,
   284 B.R. 355 (Bankr. S.D.N.Y. 2002).......................................................................42

*Official Comm. of Unsecured Creditors v. Travelers Indem. Co.
   (In re Maxwell Newspapers, Inc.)*,
   192 B.R. 633 (Bankr. S.D.N.Y. 1996).......................................................................82

*In re Ohio Corrugating Co.*,
   91 B.R. 430 (Bankr. N.D. Ohio 1988).......................................................................23

*In re Oneida Ltd.*,
   351 B.R. 79 (Bankr. S.D.N.Y. 2006).........................................................................18

*Orr v. Kinderhill Corp.*,
    991 F.2d 31 (2d Cir. 1993)...................................................................................42

*Page v. Rogers*,
    211 U.S. 575 (1909)...........................................................................................82

*Pan Am Corp. v. Delta Air Lines*
    175 B.R. 438 (S.D.N.Y. 1994).............................................................................95

*Pan Am. World Airways, Inc. v. Shulman Transp. Enters., Inc.*
    *(In re Shulman Transp. Enters. Inc.)*,
    744 F.2d 293 (2d Cir. 1984).................................................................................9

*Peltz v. Hatten*,
    279 B.R. 710 (Bankr. D. Del. 2002) ....................................13, 14, 16, 18, 22, 23, 26

*Pensco Trust Co. v. Tristar Esperanza Props., LLC*
    *(In re Tristar Esperanza Props., LLC)*,
    782 F.3d 492 (9th Cir. 2015) ...............................................................................35

*Pereira v. WWRD US, LLC (In re Waterford Wedgewood USA, Inc.)*,
    500 B.R. 371 (Bankr. S.D.N.Y. 2013) ................................................14, 15, 42, 43

*Pereira v. Wells Fargo Bank, N.A. (In re Gonzales)*,
    342 B.R. 165 (Bankr. S.D.N.Y. 2006) ...................................................................14

*Picard v. Ida Fishman Revocable Trust (In re Bernard L. Madoff Inv. Sec. LLC)*,
    773 F.3d 411 (2d Cir. 2014).........................................................................37, 39

*Pioneer Home Builders, Inc. v. Int'l Bank of Commerce*
    *(In re Pioneer Home Builders, Inc)*,
    147 B.R. 889 (Bankr. W.D. Tex. 1992)..................................................................24

*Powerex Corp. v. Reliant Energy Servs., Inc.*,
    551 U.S. 224 (2007)...........................................................................................72

*QSI Holdings Inc. v Alford (In re QSI Holdings, Inc.)*,
    571 F.3d 545 (6th Cir. 2009) ..............................................................................38

*Quebecor World (USA) Inc. v. Am. United Life Ins. Co.*
    *(In re Quebecor World (USA) Inc.)*,
    719 F.3d 94 (2d Cir. 2013)........................................................................33, 34, 37

*In re R.H.N. Realty Corp.*,
    84 B.R. 356 (Bankr. S.D.N.Y. 1988)....................................................................93

*RJR Nabisco, Inc. v. European Cmty.*,
    136 S. Ct. 2090 (2016).......................................................................................54

*In re Refco, Inc. Sec. Litig.*,
    No. 07 MDL 1902, 2009 WL 7242548, at *14 (S.D.N.Y. Nov. 13, 2009) .............................13

*Regency Holdings (Cayman), Inc. v. Microcap Fund Inc.*
  *(In re Regency Holdings (Cayman), Inc.)*,
  216 B.R. 371 (Bankr. S.D.N.Y. 1998) ................................................................8, 10

*Rhinebeck Assocs., L.P. v. Marine Midland Bank*,
  235 A.D.2d 308 (1st Dep't 1997) ............................................................................94

*Rubin v. Mfrs. Hanover Trust Co.*,
  661 F.2d 979 (2d Cir. 1981).............................................................................72, 73

*In re Rustia*,
  20 B.R. 131 (Bankr. S.D.N.Y. 1982) .......................................................................73

*SIPC v. Bernard L. Madoff Inv. Secs. LLC (In re Madoff Secs.)*,
  513 B.R. 222 (S.D.N.Y. 2014)...................................................................56, 59, 60

*In re Sabine Oil & Gas Corp.*,
  547 B.R. 503 (Bankr. S.D.N.Y. 2016) .....................................................................43

*Sale v. Haitian Ctrs. Council, Inc.*,
  509 U.S. 155 (1993).................................................................................................55

*Salomon v. A. Salomon & Co., Ltd.*,
  [1897] A.C. 22 (H.L.) ..............................................................................................45

*Schechter v. 5841 Building Corp. (In re Hansen)*,
  341 B.R. 638 (Bankr. N.D. Ill. 2006) ......................................................................48

*SeaQuest Diving, LP v. S&J Diving, Inc. (In re SeaQuest Diving, LP)*,
  579 F.3d 411 (5th Cir. 2009) ...................................................................................35

*Sec. Inv'r Prot. Corp. v. Stratton Oakmont, Inc.*,
  234 B.R. 293 (Bankr. S.D.N.Y. 1999)..............................................................10, 47

*Sec. Inv'r Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC (In re Madoff Sec.)*,
  501 B.R. 26 (S.D.N.Y. 2013).............................................................................52, 53

*In re SemCrude L.P.*,
  648 F. App'x 205 (3d Cir. 2016) .............................................................................23

*Senior Transeastern Lenders v. Official Comm. of Unsecured Creditors*
  *(In re TOUSA, Inc.)*,
  680 F.3d 1298 (11th Cir. 2012) ...............................................................................29

*In re Sherwood Square Assocs*,
  107 B.R. 872 (Bankr. D. Md. 1989) .........................................................................69

*Silverman v. Actrade Capital Inc. (In re Actrade Fin. Techs. Ltd.)*,
  337 B.R. 791 (Bankr. S.D.N.Y. 2005) .....................................................................67

*Singer v. Olympia Brewing Co.*,
  878 F.2d 596 (2d Cir. 1989).....................................................................................65

*Smith v. Am. Founders Fin., Corp.*,
 365 B.R. 647 (S.D. Tex. 2007) .......................................................................12

*Smith v. Miller (In re Dominguez)*,
 995 F.2d 883 (9th Cir. 1993) ...........................................................................30

*In re SubMicron Sys. Corp.*,
 291 B.R. 314 (D. Del. 2003)............................................................................96

*In re Telesphere Commc'ns Inc.*,
 179 B.R. 544 (Bankr. N.D. Ill. 1994) ............................................................65

*In re Tenn. Valley Steel Corp.*,
 203 B.R. 949 (Bankr. E.D. Tenn. 1996) ........................................................74

*TradeWind Distrib., LLC v. Unilux AG*,
 No. 10 Civ. 5716, 2011 WL 4382986 (E.D.N.Y. Sept. 19, 2011)..................28

*In re Tribune Co. Fraudulent Conveyance Litig.*,
 818 F.3d 98 (2d Cir. 2016) ..........................................................................6, 39

*Tronox Inc. v. Kerr McGee Corp. (In re Tronox Inc.)*,
 503 B.R. 239 (Bankr. S.D.N.Y. 2013)......................................................81, 82

*Turner v. Phoenix Fin., LLC (In re Imageset, Inc.)*,
 299 B.R. 709 (Bankr. D. Me. 2003)................................................................48

*In re Tyson*,
 433 B.R. 68 (S.D.N.Y. 2010)..........................................................................45

*U.S. Bank N.A. v. Verizon Comm. Inc.*,
 No. 3:10-CV-1842-G, 2013 WL 230329 (N.D. Tex. Jan. 22, 2013)..............19

*U.S. Bank, N.A. v. Verizon Commc'n, Inc.*,
 892 F. Supp. 2d 805 (N.D. Tex. 2012) ...........................................................36

*U.S. Bank Trust N.A. v. AMR Corp. (In re AMR Corp.)*,
 730 F.3d 88 (2d Cir. 2013)..............................................................................30

*United States v. Nordic Village Inc.*,
 503 U.S. 30 (1992)..........................................................................................52

*VFB LLC v. Campbell Soup Co.*,
 No. Civ.A.02-137, 2005 WL 2234606 (D. Del. Sept. 13, 2005)
 *aff'd*, 482 F.3d 624 (3d Cir. 2007) ............................................................15, 27

*VFB LLC v. Campbell Soup Co.*,
 482 F.3d 624, 633 (3d Cir. 2007 .................................................................... 19

*Verco Indus. v. Spartan Plastics (In re Verco Indus.)*,
 704 F.2d 1134 (9th Cir. 1983) ........................................................................81

*Wallace v. 600 Partners Co.*,
 86 N.Y.2d 543 (N.Y. 1995) ............................................................................28

*Weinman v. Simons (In re Slack-Horner Foundries Co.)*,
   971 F.2d 577 (10th Cir. 1992) ......................................................................52

*Weisfelner v. Hofmann (In re Lyondell Chem. Co.)*,
   No. 16-00518, 2016 WL 4030937 (S.D.N.Y. July 27, 2016)...........................2, 8, 9

*Weisfelner v. LR2 Mgmt., K/S (In re Lyondell Chem. Co.)*,
   No. 10-05358 (REG), 2015 WL 5560283 (Bankr. S.D.N.Y. Sept. 18, 2015) ................ 76, 77

*Whyte v. Barclays Bank PLC*,
   644 F. App'x. 60 (2d Cir. 2016) .......................................................................6

*Williams v. Mortillaro (In re Res., Recycling & Remediation, Inc.)*,
   314 B.R. 62 (Bankr. W.D. Pa. 2004) ..............................................................53

*Wong v. PartyGaming Ltd.*,
   589 F.3d 821 (6th Cir. 2009) ..........................................................................45

*Wood v. Richmond (In re Branding Iron Steak House)*,
   536 F.2d 299 (9th Cir. 1976) ..........................................................................96

*Wood v. Stratos Prod Dev. (In re Ahaza Sys., Inc.)*,
   482 F.3d 1118 (9th Cir. 2007) .............................................................74, 76, 80

*In re Xonics Photochemical, Inc.*,
   841 F.2d 198 (7th Cir. 1988) ..........................................................................28

*Youthland, Inc. v. Sunshine Girls of Fla. Inc. (In re Youthland, Inc.)*,
   160 B.R. 311 (Bankr. S.D. Ohio 1993).............................................................74

## Statutes

11 U.S.C. § 101(12) ...............................................................................................73

11 U.S.C. § 101(22) ...............................................................................................33

11 U.S.C. § 101(32)(A)......................................................................................16, 70

11 U.S.C. § 101(49)(A)(viii)..................................................................................35

11 U.S.C. § 101(49)(A)(xiii)..................................................................................35

11 U.S.C. § 101(49)(A)(xiv)..................................................................................35

11 U.S.C. § 502(b)(1) ...........................................................................................29

11 U.S.C. § 502(d) ................................................................................................53

11 U.S.C. § 502(h) ..........................................................................................81, 82

11 U.S.C. § 506(d) ................................................................................................29

11 U.S.C. § 510(c) ......................................................................................95, 96, 97

11 U.S.C. § 541 .................................................................................................57, 58, 59, 60

11 U.S.C. § 541(a) ........................................................................................................57

11 U.S.C. § 541(a)(1) ..............................................................................................57, 58

11 U.S.C. § 541(a)(3) ..........................................................................................30, 57, 58

11 U.S.C. § 541(c)(1)(B) ...............................................................................................29

11 U.S.C. § 544 ......................................................................................6, 11, 54, 58, 97

11 U.S.C. § 545 ......................................................................................................54, 97

11 U.S.C. § 546 ..............................................................................................................6

11 U.S.C. § 546(a) ........................................................................................................53

11 U.S.C. § 546(e) ................................................................................................. *passim*

11 U.S.C. § 546(g) ..........................................................................................................6

11 U.S.C. § 547 .......................................................................13, 56, 61, 72, 83, 100

11 U.S.C. § 547(b) ...................................................................................................69, 70

11 U.S.C. § 547(b)(4) ....................................................................................................78

11 U.S.C. § 547(c) ..................................................................................................71, 81

11 U.S.C. § 547(c)(2) .............................................................71, 72, 73, 75, 78, 79

11 U.S.C. § 547(c)(2)(A) .......................................................72, 74, 75, 77, 78

11 U.S.C. § 547(c)(2)(B) ..............................................................................................75

11 U.S.C. § 547(g) ...................................................................................................69, 70

11 U.S.C. § 548 ..................................................................................................... *passim*

11 U.S.C. § 548(a)(1) ..............................................................................................40, 57

11 U.S.C. § 548(a)(1)(A) .....................................................................................4, 6, 7, 8

11 U.S.C. § 548(a)(1)(B) ...............................................................................................12

11 U.S.C. § 548(a)(1)(B)(i) ...........................................................................................13

11 U.S.C. § 548(a)(1)(B)(ii)(I) ......................................................................................16

11 U.S.C. § 548(a)(1)(B)(ii)(III)....................................................................................24

11 U.S.C. § 548(a)(2)(B)(i)............................................................................................15

11 U.S.C. § 548(c) ...................................................................................................4, 67

11 U.S.C. § 548(d)(2)(A)........................................................................................14, 67

11 U.S.C. § 550.........................................................................51, 53, 57, 58, 60, 81, 97

11 U.S.C. § 550(a) ............................................................................................... *passim*

11 U.S.C. § 550(a)(1).........................................................................................46, 47, 48

11 U.S.C. § 550(d) ...........................................................................4, 41, 64, 65, 66, 67

11 U.S.C. § 550(f) ...................................................................................................53, 55

11 U.S.C. § 553(b) ...................................................................................................54, 97

11 U.S.C. § 724(a) ...................................................................................................54, 97

Luxembourg Civil Code Article 1382 ....................................................83, 84, 85, 86

Luxembourg Civil Code Article 1383 ....................................................83, 84, 85, 86

Luxembourg Company Law Article 59 ¶ 1 ...............................................83, 86, 87

Luxembourg Company Law Article 59 ¶ 2 ...............................................85, 86, 87

## **Miscellaneous**

H.R. Rep. No. 95-595, at 373 (1977)...........................................................................80

Jon Hilsenrath, Kelly Evans, *Fed Outlook Darkens on Economy*,
    The Wall Street Journal, Jan. 7, 2009, at A1, A5 ....................................................1

Michael Deal & Allison McCann, *2009 GDP's Negative Growth Rate*,
    Bloomberg (Sept. 12, 2013, 6:34 AM), http://www.bloomberg.com/news/articles/2013-09-
    12/2009-global-gdps-negative-growth-rate .................................................................1

Restatement (Second) of Torts § 8A.............................................................................8

Access Industries, Inc. ("Access Industries"), Access Industries Holdings LLC ("Access"), AI International, S.à.r.l. ("AI International"), Nell Limited ("Nell"), NAG Investments LLC ("NAG"), Len Blavatnik, Lincoln Benet, and Philip Kassin (the "Access Defendants"), and Perella Weinberg Partners LP ("Perella Weinberg" and with the Access Defendants, the "Defendants") respectfully submit this Pre-Trial Legal Brief addressing the main legal issues to be tried in the adversary proceedings commenced by Edward S. Weisfelner, as Litigation Trustee of the LB Litigation Trust (the "Trustee").

## PRELIMINARY STATEMENT[1]

We know now with the benefit of hindsight that 2008 and 2009 would see the United States and the entire global economy enter what is aptly known as "The Great Recession." *See*, *e.g.*, Jon Hilsenrath, Kelly Evans, *Fed Outlook Darkens on Economy*, The Wall Street Journal, Jan. 7, 2009, at A1, A5. Households and companies across the globe saw their wealth evaporate by trillions of dollars as markets became dislocated almost overnight in ways this generation has never seen. Global GDP actually went *negative* for the first time since global GDP growth has been measured, and governments and central banks all over the world engaged in unprecedented maneuvers to stave off economic collapse. *See* Michael Deal & Allison McCann, *2009 GDP's Negative Growth Rate*, Bloomberg (Sept. 12, 2013, 6:34 AM), http://www.bloomberg.com/news/articles/2013-09-12/2009-global-gdps-negative-growth-rate.

Of course no one knew it at the time, but it was literally on the eve of that unprecedented and unforeseeable global dislocation that Basell acquired Lyondell in a transaction valued by sophisticated investors and leading financial institutions at over $30 billion. To suggest LBI was foreseeably "doomed to fail" in 2007 is, simply put, to rewrite history.

---

[1]  Capitalized terms not otherwise defined herein are defined in the attached Glossary.

The Trustee spins a couple of different tales.  First, without a shred of proof, the Trustee brazenly alleges that Dan Smith, the CEO of the seller Lyondell, intentionally inflated management projections with the help of an "inner circle" of confidants.  Smith (whom the Trustee does not plan to call as a witness) supposedly did this to induce Blavatnik and Basell to over-pay for Lyondell.  Alternatively, the Trustee alleges that Blavatnik and Basell (and their advisors and financing banks) knew that the transaction was doomed to fail and would render LBI insolvent, but proceeded anyway in the pursuit of short-term financial objectives.  Focusing on Blavatnik, the Trustee claims he was not bothered by the foreseeably impending collapse of LBI because the Merger was being financed entirely with borrowed money and he had no capital at risk.  As for the banks that loaned billions to a supposedly insolvent company, they did so based on shoddy financial analysis because they wanted deal fees and planned to offload their enormous balance sheet risks to other market participants.  *So the stories go.*

Among the many problems with these tales is the Trustee's utter failure to address the impact of the Great Recession on LBI.  He just ignores it or calls it a foreseeable industry trough.  Then he dreams up motivations and hires "experts" to divine human intentions as "evidence."  But the Trustee cannot plausibly explain why a long-term equity investor like Blavatnik would put Basell at risk to benefit Lyondell shareholders, a fact recognized by the district court: "Blavatnik had committed over $6 billion of his own equity in Basell to the Merger" and "LBI entered into debt facilities with the Lending Banks, thereby placing Blavatnik's more than $6 billion in equity in Basell at risk were LBI to default."[2]  The Trustee will undoubtedly invoke the "100% debt financed" mantra throughout the trial, but it is patently false and ignores the reality that the banks financing the transaction did so only after concluding that their loans were

---

[2]    *Weisfelner v. Hofmann (In re Lyondell Chem. Co.)*, No. 16-00518, 2016 WL 4030937, at *3 n.5 (S.D.N.Y. July 27, 2016).

2

supported by Basell's substantial equity value.    In this important sense, the challenged transaction is not a garden-variety LBO, but a strategic merger, supported by the equity and assets of the acquirer as well as the assets of the acquired company.    Moreover, the Trustee (who intends to call no bank witnesses) has no plausible explanation for why five major banks—including one that joined the group of underwriters in late October 2007 (with full knowledge of Lyondell's third and anticipated fourth-quarter performance) would commit their balance sheets to a transaction that was doomed to fail in exchange for underwriting fees.    The math and logic of the Trustee's conspiracy theory just don't work.

No evidence will suggest that a single participant in the transaction expected LBI to fail. The shareholders of Basell invested *billions*.    Five of the world's leading financial institutions risked *billions*.    Based on publicly available market data, contemporaneous analysts and rating agencies projected a well-positioned, geographically diverse company with sufficient liquidity. The people involved in the due diligence and vetting of a combination of Basell and Lyondell believed that the Merger would succeed, and each and every stress test run by the equity sponsor and the five banks showed LBI's ability to service its debt in the event of even unexpectedly severe downside cases.    The Trustee's hyperbole aside, the soundness of the Merger cannot be questioned—the post-Great Recession performance of the combined company validates Blavatnik's belief that Basell and Lyondell would in fact create a global industrial leader.

The Trustee pursues a kitchen sink full of baseless claims (from intentional fraud to Luxembourgish torts) based on what in hindsight he says was known or knowable in 2007.    And then he tacks onto that false hindsight premise a story of alleged improper business activity (from revolving credit preferences to contractual breaches) between LBI and its equity sponsor in 2008.    The Trustee's remaining claims will fail at trial for the following reasons:

| Description | Key Legal Issues for Trial |
|---|---|
| **U.S. Bankruptcy Avoidance Actions** | |
| Count 2 | **Intentional fraudulent transfer claim seeking to avoid and recover Toehold Payments 1 and 2.**   The intent of Lyondell's pre-Merger CEO, even if imputable to Lyondell, cannot be imputed to Basell-side entities through any agency principle or an unprecedented use of the "collapsing" doctrine.  Even if Smith's intent could be so imputed across the deal table, the "actual intent" required under Section 548(a)(1)(A) is an extremely high bar (*i.e.*, "substantial certainty" that creditors would be hindered, delayed, or defrauded). |
| Count 1 | **Constructive fraudulent transfer claim seeking to avoid and recover Toehold Payment 1.**  Although summary judgment was denied pending a full factual record, this claim is barred by the safe harbor in Section 546(e).  And if the Court finds that Basell's payment of cash for approximately 10% of the common stock of Lyondell was not made to complete the Merger and was not made "in connection with" the Merger, and also that the equity interests in AI Chemical were not "securities," the Trustee will still have to prove each element of a constructive fraudulent transfer claim: interest of a *debtor* in property; requisite financial condition; and less than reasonably equivalent value.  Further, any recovery would be limited under Sections 548(c) and 550(d). |
| Count 11 | **Constructive fraudulent transfer claim seeking to avoid and recover fees paid to Nell and Perella Weinberg.**  The Trustee will have to prove, among other things, that the fees were not market rate.  Further, any recovery would be limited under Sections 548(c) and 550(d). |
| Count 17 | **Constructive fraudulent transfer claim seeking to avoid and recover the October Repayments under the Access Revolver.**  The Trustee continues pressing this head-scratcher of a claim, which requires the Court to recharacterize the Access Revolver as equity.  Judge Gerber already dismissed the separate count to recharacterize and held the Access Revolver was a true loan and his ruling is the law of the case precluding this claim. |
| NAG Complaint | **Constructive fraudulent transfer claims against NAG seeking to recover an extraterritorial dividend.**  The Trustee cannot recover from NAG because he cannot avoid the alleged initial transfer from Basell to BIS, and because Basell did not have a property interest in the dividend NAG allegedly received.  Nor can the Trustee satisfy the financial elements of this claim. |
| Count 9 | **Preference claim seeking to avoid and recover the October Repayments under the Access Revolver.**  Even if the Trustee could satisfy his burden of proof and show that LBI was insolvent in mid-October 2008, the October Draw and October Repayments were made in the ordinary course of business or financial affairs of LBI and Access. |
| **Luxembourgish Tort and De Facto Manager Actions** | |
| Counts 6 and 7 | **Claims by a Luxembourg company against its own board.**  The Trustee cannot point to any example of similar liability ever found under Luxembourg law but thinks this Court should be the first.  The Trustee also neglected to perform a damages analysis for this claim and instead incorrectly assumes that corporate harm from 2007 must be equal to the level of unpaid creditor claims in |

4

| Description | Key Legal Issues for Trial |
| --- | --- |
| | 2009. The Trustee also fails to account for the bankruptcy discharge and release of billions of dollars of claims. In all events, any claims against Blavatnik were waived and released under the Merger Agreement and the Termination Agreement. |
| **Texas Aiding and Abetting Claims** | |
| Count 18 | **Aiding and abetting breach of fiduciary duty claim against Access (and AI Chemical).**[3] This claim posits, rather bizarrely, that an underlying breach of duty by LBI's Supervisory Board and GP Managers (which is governed by Luxembourg law) could be aided and abetted and give rise to liability under Texas law. The Trustee will not be able to prove that Access, a holding company with no employees, knowingly participated in such breach. Moreover, defendant Kassin was both a member of the Supervisory Board and a GP Manager and cannot be an "aider and abettor" of his own actions. This count also suffers from the same missing damages element as the Luxembourgish claims. Finally, LBI waived and released any such claims under the Merger Agreement and the Termination Agreement. |
| **New York Breach of Contract Claim** | |
| Count 12 | **Breach of contract claim for AI International's refusal to lend under the Access Revolver in December 2008.** The Trustee cannot prevail on this claim because AI International had no contractual obligation to lend to Lyondell because an event or condition that had a "Material Adverse Effect" had occurred as of the date of the requested draw, releasing AI International from its obligation to lend. Even if the Trustee did prevail on this claim, the Court has held damages are limited to restitution (disgorgement of facility fees)—a claim on which the Trustee cannot prevail because he has no evidence concerning the value that LBI derived from the Access Revolver throughout 2008. |
| **U.S. Bankruptcy Code Equitable Subordination** | |
| Count 10 | **Equitable subordination claim seeking to subordinate AI International's unsecured claim under the Access Revolver.** The Trustee will not be able to establish the facts necessary for imposing this "drastic and usual remedy." |

Despite the piles of spaghetti he throws against the wall under laws of the United States, Luxembourg, Texas, and New York, the Trustee will be unable to meet his burden on any of these remaining claims.

---

[3]    The Trustee improperly names AI Chemical as a defendant not only with respect to this claim, but in the lawsuit in general. AI Chemical was dissolved nearly 9 years ago after assigning all of its assets and liabilities to LBIH, a Debtor, and the Trustee has abandoned his efforts to "resurrect" it.

## I.    INTENTIONAL FRAUDULENT TRANSFER CLAIM

### A.    Overview of Applicable Law

The Trustee's intentional fraudulent transfer claims under Section 544 and "applicable state law" are barred by Sections 546(e) and 546(g).[4]  Sections 546(e) and 546(g) provide that only federal-law intentional fraudulent transfer claims fall outside of their safe harbor.  *See* 11 U.S.C.§ 546(e) ("the trustee may not avoid a transfer . . . *except under section 548(a)(1)(A) of this title*") (emphasis added); § 546(g) (same).  The Second Circuit made clear in *Tribune* that it is following the line of cases holding that Section 546's safe harbors apply to state-law fraudulent transfer claims.  *See In re Tribune Co. Fraudulent Conveyance Litig.*, 818 F.3d 98, 112 (2d Cir. 2016) ("Section 546(e) creates an exception to that prohibition for claims brought by the trustee *et al. under Section 548(a)(1)(A)* that, as noted, establishes a *federal avoidance claim* to be brought *by a trustee et al.* based on an intentional fraud theory.") (emphasis added); *Whyte v. Barclays Bank PLC*, 644 F. App'x. 60, 60 (2d Cir. 2016) (affirming decision that Section 546(g) "impliedly preempts state-law fraudulent conveyance actions" seeking to avoid swap transactions for "substantially the same reasons" as in *Tribune*).

With respect to the remaining claim under Count 2—the intentional fraudulent transfer claim under Section 548(a)(1)(A) of the Bankruptcy Code—the Trustee will have to prove:

1.   there was a transfer of an interest of a debtor in property; and

2.   the debtor made such transfer with actual intent to hinder, delay, or defraud existing or future creditors.

---

[4]   Both Toehold Payments are protected by Section 546.  Toehold Payment 1 falls within the safe harbor for the reasons set forth in Section II.B.2, *infra*.  With respect to Toehold Payment 2, this Court has ruled that that payment was made in connection with a swap agreement, and that the Trustee's constructive fraudulent transfer claim is precluded by Section 546(g).  (*See* Order Granting In Part And Denying In Part Nell Limited And Len Blavatnik's Motion For Summary Judgment On Count 1 Of The Amended Complaint, Jul. 20, 2017 (Docket No. 772) (the "Toehold SJ Decision") at 12.)

*See* 11 U.S.C. § 548(a)(1)(A).

While courts are split regarding the level of proof needed to show actual fraud under Section 548(a)(1)(A), *see Gowan v. The Patriot Grp., LLC (In re Dreier LLP)*, 452 B.R. 391, 423 (Bankr. S.D.N.Y. 2011), courts in this district have required that intent be proven by "***clear and convincing evidence***." *Nisselson v. Empyrean Inv. Fund, L.P., et al. (In re MarketXT Holdings Corp.)*, 376 B.R. 390, 401-02 (Bankr. S.D.N.Y. 2002) (emphasis added).

## B.    Count 2:  Intentional Fraudulent Transfer Claim Against Nell, AI Chemical, And Blavatnik

### 1.    Overview Of Claim

Count 2 was dismissed and later reinstated after Judge Cote's July 27, 2016 decision in *Hofmann*.   The Trustee alleges that Toehold Payments 1 and 2 were intentional fraudulent transfers.  The Trustee has admitted that the Toehold Payments were made by ***non-debtor*** Basell Funding and Debtor LB Finance (together, the "Basell Borrowers/Transferors")—entities that were created by and existed on the Basell (or acquiring) side of the transaction.  The funds used to make Toehold Payment 1 came from Basell-side entities and were earmarked for that purpose. Toehold Payment 2 was also made by a Basell-side company.  The Trustee does not allege that the Basell Borrowers/Transferors had any intent to hinder, delay, or defraud creditors.  Rather, the Trustee alleges that Lyondell's pre-Merger CEO acted with such intent, and that his intent can be imputed to Lyondell and, upon collapsing, the intent of Lyondell somehow becomes operative to establish the actual intent of the Basell Borrowers/Transferors.

### 2.    Lyondell Had No Property Interest In The Toehold Payments

Count 2 fails because Lyondell had no property interest in the Toehold Payments.  *First*, the Trustee does not dispute that Lyondell was not the borrower or physical transferor of either Toehold Payment.  *Second*, as discussed in Section II.A.1, *infra*, the Trustee cannot prove that

Lyondell had control over the funds transferred. *Finally*, as discussed in Section II.B.3, *infra*, the fact that Lyondell was one of 51 guarantors of the credit facilities provides no basis for asserting that it had a property interest in all cash borrowed from the lenders, including the Toehold Payments, especially in light of the contractual limitations on liability (and corresponding liens) included in those credit facilities.

### 3.    The Trustee Will Not Be Able To Reach The High Bar Set By The District Court

Although she reinstated the claim in *Hofmann*, Judge Cote stated that proving "actual intent" to defraud creditors is a high bar: the relevant actor must "desire[] to cause consequences of his act, or . . . believe[] that the consequences are **substantially certain** to result from it." *Hofmann*, 2016 WL 4030937, at *12 (emphasis in original) (quoting Restatement (Second) of Torts § 8A). Inexplicably, the Trustee intends to try to prove facts that would meet this high bar without calling Smith to testify live at trial—a strategic decision that speaks volumes.

### 4.    Dan Smith's Intent Cannot Be Imputed To Basell-Side Entities

An intentional fraudulent transfer claim requires proof that the debtor whose interest in property was transferred made the transfer with the actual intent to hinder, delay, or defraud creditors. *See* 11 U.S.C. § 548(a)(1)(A); *Dreier*, 452 B.R. at 423 (The "plaintiff must establish the actual fraudulent intent of the transferor/debtor") (citation and quotation marks omitted). The required intent is thus of the specific transferor, not any affiliate at random. *See Regency Holdings (Cayman), Inc. v. Microcap Fund Inc. (In re Regency Holdings (Cayman), Inc.)*, 216 B.R. 371, 375-77 (Bankr. S.D.N.Y. 1998) (rejecting effort to avoid transfers made by subsidiary entity). Here, the transferors were non-debtor Basell Funding and Debtor LB Finance—two entities on the Basell, or "acquiring," side of the transaction.

Dan Smith—whose intent Judge Cote held could be imputed *to Lyondell*—was not an alleged agent of the Basell Borrowers/Transferors. Nor could he be. Establishment of an agency relationship requires a showing of (1) the principal's manifestation of intent to grant authority to the agent, (2) agreement by the agent, and (3) the principal's maintenance of control over key aspects of the undertaking. *See Commercial Union Ins. Co. v. Alitalia Airlines, S.p.A.*, 347 F.3d 448, 462 (2d Cir. 2003). As the Second Circuit has observed, "[a]n essential characteristic of an agency relationship is that the agent acts subject to the principal's direction and control." *Pan Am. World Airways, Inc. v. Shulman Transp. Enters., Inc. (In re Shulman Transp. Enters. Inc.)*, 744 F.2d 293, 295 (2d Cir. 1984) (citation omitted).

The Basell Borrowers/Transferors had no relationship with Lyondell pre-Merger, and never granted Smith any authority to act for them. And the Trustee's own allegation that Smith "fabricated" the projections "specifically to induce Blavatnik to pay a price for Lyondell beyond what a realistic valuation would support[,]" *Hofmann*, 2016 WL 4030937, at *3 (citing complaint in that action), precludes any argument that the Basell Borrowers/Transferors (whom the Trustee alleges were controlled by Nell and Blavatnik) maintained any kind of control over Smith. Thus, Judge Cote's reasoning that a corporation is "liable for the acts and knowledge of its agent," *id.* at *9, is simply inapplicable to the Basell Borrowers/Transferors.

The Trustee attempts to remedy this fatal flaw in his imputation theory by arguing for an improper and unprecedented application of the "collapsing" doctrine. Rather than seeking to collapse *transactions*, he argues that the Basell *corporate family* should be "collapsed" into Lyondell, with Lyondell treated as the transferor for all of Basell's payments for Lyondell shares. (*See* Memorandum In Opposition To Motion Of Nell Limited And Leonard Blavatnik To Dismiss Count II Of The Amended Complaint, Nov. 23. 2010 (Docket No. 454) at 18-24.) By

9

folding Basell-side entities into "Lyondell," and declaring "Lyondell" as the transferor, the Trustee hopes to impute Smith's intent to the Basell entities through sleight of hand.

"Collapsing," however, does not equate to substantive consolidation or veil-piercing. The Debtors were not substantively consolidated and must be treated as separate entities. *See EGP Fuels Co. v. Port of Houston Auth. (In re Enron Corp.)*, Adv. Pro. No. 03-92511, 2006 WL 2385194, at *2 n.1 (Bankr. S.D.N.Y. June 2, 2006) (joint administration does not affect substantive rights of claimants or respective debtor estates). Nor could it even be suggested that Lyondell and Basell were alter egos or subject to veil-piercing. *See Regency Holdings*, 216 B.R. at 375 (rejecting claim to avoid transfers made by separate affiliated entity since plaintiff could not prove veil-piercing); *Sec. Inv'r Prot. Corp. v. Stratton Oakmont, Inc.*, 234 B.R. 293, 319-20 (Bankr. S.D.N.Y. 1999) (equating collapsing parent and subsidiary with veil-piercing). As discussed in Section II.B.4, *infra*, the "collapsing" doctrine applies to multiple ***transfers***; it does ***not*** extend to treating distinct corporate entities as one. *See, e.g.*, *HBE Leasing Corp. v. Frank*, 48 F.3d 623, 635 (2d Cir. 1995). No court has ever "collapsed" counterparties to an acquisition to allow a plaintiff to attribute the fraudulent intent of the seller to the buyer.

The Trustee's disguised consolidation theory is also inconsistent with *Hofmann*. *Hofmann* contemplates imputing intent *vertically* in a principal-agent relationship; the Trustee's theory calls for collapsing and imputing intent *laterally* across arm's-length counterparties. This, of course, invites the question: Whose intent is being imputed to whom? The Trustee cannot explain why Lyondell's intent should be imputed to Basell, and not *vice versa*. If anything, upon collapsing, the relevant intent would be that of the acquirer, *Basell* (which was renamed LBI), and no Basell-side entity is alleged to have intended to hinder, delay, or defraud creditors.

10

### 5.  The Trustee Has Not Named Proper Defendants

For the same reasons discussed in Section II.B.6, *infra*, neither Blavatnik nor AI Chemical are proper defendants with respect to Count 2.

In addition, the Trustee cannot recover Toehold Payment 2 from Nell.  It is undisputed that the transfer was received by Merrill Lynch, in satisfaction of AI Chemical's Share Forward Contract at a time when Nell no longer owned the equity in AI Chemical.  Thereafter, AI Chemical assigned all of its assets and liabilities to LBIH, a Debtor, before its dissolution—a dissolution that the Trustee no longer challenges or seeks to "resurrect."  *See* Section II.B.6, *infra*.  Nell was not the initial transferee, the entity for whose benefit the initial transfer was made, or a subsequent transferee.  *See* 11 U.S.C. § 550(a).

## II.   CONSTRUCTIVE FRAUDULENT TRANSFER CLAIMS

### A.   <u>Overview Of Applicable Law</u>

The Trustee asserts constructive fraudulent transfer claims under Sections 544 and 548 and "applicable state law," including in Counts 1, 11, and 17 of the Second Amended Complaint (the "<u>SAC</u>") and in Counts 1 and 2 of the Amended NAG Complaint.  As the Trustee's predecessor, the Official Committee of Unsecured Creditors (the "<u>Committee</u>"), noted, "under the facts of this case, there are no material differences between the legal standards under Section 548 and state fraudulent transfer law."[5]  Therefore, to the extent the Trustee's claims under Section 548 are defective, his claims under Section 544 and applicable state law also fail.

---

[5]   *See* Pre-Trial Statement Of The Legal Contentions Of The Official Committee Of Unsecured Creditors With Respect To The Phase I Trial, Dec. 21, 2009 (Docket No. 277) ("<u>Committee's Phase I Brief</u>"), at 11 n.15  (citations omitted).  The Committee urged, "Texas law is likely the most appropriate law to apply on a consolidated basis, where Lyondell headquarters are located in Texas and where the transaction was ultimately approved by Lyondell's shareholders in Texas[,]" and noted that "[b]ankruptcy courts interpreting Texas fraudulent transfer law have interpreted it almost identically to Section 548." *Id.* (citing *Hinsley*

To avoid a transfer under Section 548(a)(1)(B), a trustee must show that, within two years before the date of the bankruptcy filing:

1. there was a transfer of an interest of the debtor in property;

2. the debtor received less than reasonably equivalent value in exchange for such transfer; and

3. the debtor—

   a. was insolvent on the date that such transfer was made, or became insolvent as a result of such transfer;

   b. was engaged in business or a transaction, or was about to engage in business or a transaction, for which any property remaining with the debtor was unreasonably small capital; or

   c. intended to incur, or believed that the debtor would incur, debts that would be beyond the debtor's ability to pay as such debts matured.

*See* 11 U.S.C. § 548(a)(1)(B).   The Trustee must prove each of these elements by a preponderance of the evidence.  *See Dreier*, 452 B.R. at 436.

### 1.      Interest Of The Debtor In Property

To state a claim for constructive fraudulent transfer, a plaintiff must show that "the **debtor** had an interest in the property."  *Andrew Velez Constr., Inc. v. Consol. Edison Co. of N.Y., Inc. (In re Andrew Velez)*, 373 B.R. 262, 271 (Bankr. S.D.N.Y. 2007) (emphasis added). "An interest in property, for the purposes of § 548, includes any interest of the debtor that would have been preserved for the benefit of the bankruptcy estate but for the alleged transfer."  *In re A.W. Lawrence & Co., Inc. v. Burstein (In re A.W. Lawrence)*, 346 B.R. 51, 56 (Bankr. N.D.N.Y. 2006) (citation and quotation marks omitted).   The debtor must have had control over the property in order to be deemed to have an interest in the property.  *See id*.  "Control" has two components:  (1) the power to designate which party will receive the funds; and (2) the power to

---

*v. Boudloche (In re Hinsley)*, 201 F.3d 638, 643 (5th Cir. 2000), and *Smith v. Am. Founders Fin., Corp.*, 365 B.R. 647, 666 (S.D. Tex. 2007)).

actually disburse the funds at issue to that party.  *See In re Refco, Inc. Sec. Litig.*, No. 07 MDL

1902, 2009 WL 7242548, at *14 (S.D.N.Y. Nov. 13, 2009), *report adopted in full*, No. 07 MDL

No. 1902, 2010 WL 5129072 (S.D.N.Y. Jan. 12, 2010).   "Some courts have applied the two-

component test of control by asking whether the transaction primarily serves the interests of the

debtor.  Where the debtor's interests do not animate the transaction, courts are more likely to find

that there was no transfer of property of the debtor."  *Id.* (internal citations omitted).  Moreover,

courts have drawn a distinction between the standards for establishing control by the debtor for

the purposes of considering whether the transfer was preferential under Section 547 or fraudulent

under Section 548.  *See Norberg v. Sanchez (In re Chase & Sanborn Corp.)*, 813 F.2d 1177,

1181 (11th Cir. 1987) (the standards to establish control are different for avoidable preferences

and fraudulent transfers, in part because "presuming control [for fraudulent transfers] poses the

distinct danger that creditors could receive a windfall in the form of funds that simply passed

through the debtor's possession but in fact were not the property of the debtor").

### 2.    Reasonably Equivalent Value

The Trustee also must prove that the relevant Debtor (if any) "received less than a

reasonably equivalent value in exchange for [the] transfer."  11 U.S.C. § 548(a)(1)(B)(i).  This is

a question of fact that must be evaluated as of the time of the transfer.  *See Liq'n. Trust v.

Daimler AG (In re Old CarCo LLC)*, 509 F. App'x. 77, 78 (2d Cir. 2013).  "Courts will not look

with hindsight at a transaction because such an approach could transform fraudulent conveyance

law into an insurance policy for creditors."  *In re Jumer's Castle Lodge, Inc.*, 329 B.R. 837, 845

(Bankr. C.D. Ill. 2005) (quotation marks omitted); *see also Peltz v. Hatten*, 279 B.R. 710, 738

(Bankr. D. Del. 2002) ("When sophisticated parties make reasoned judgments about the value of

assets that are supported by then prevailing marketplace values and by the reasonable

perceptions about growth, risks, and the market at the time, it is not the place of fraudulent

13

transfer law to reevaluate or question those transactions with the benefit of hindsight.") (citation omitted).

The term "reasonably equivalent value" is not defined in the Bankruptcy Code.  In fact, "[o]f the three terms . . . only 'value' has a definition, and is defined as 'property, or satisfaction of a . . . present or antecedent debt of the debtor.'"  *Id.* (quoting 11 U.S.C. § 548(d)(2)(A)).  In contrast, Congress left to courts the task of setting forth the scope and meaning of the term "reasonably equivalent," and in doing so, "courts have rejected the application of any fixed mathematical formula to determine reasonable equivalence."  *Peltz*, 279 B.R. at 736 (citation omitted); *see Pereira v. WWRD US, LLC (In re Waterford Wedgewood USA, Inc.)*, 500 B.R. 371, 381 (Bankr. S.D.N.Y. 2013).  Moreover, courts "seem to agree that there need not be a dollar-for-dollar exchange."  *ASARCO LLC v. Americas Mining Corp.*, 396 B.R. 278, 337 (S.D. Tex. 2008) (citation omitted); *see also MFS/Sun Life Trust-High Yield Series v. Van Dusen Airport Servs. Co.*, 910 F. Supp. 913, 937 (S.D.N.Y. 1995) (consideration need only "be reasonably equivalent rather than exactly equivalent in value to the property transferred or the obligation assumed.") (citation and quotation marks omitted).  Instead, the court should "examine the 'totality of circumstances'" in order to determine whether the transaction conferred reasonably equivalent value.  *Peltz*, 279 B.R. at 736 (citations omitted).

Under the "totality of the circumstances" approach, the factors most widely considered are: (1) the fair market value of the economic benefit received by the transferor-debtor; (2) the good faith of the parties; and (3) whether the transaction was an arm's length transaction.  *See Pereira v. Wells Fargo Bank, N.A. (In re Gonzales)*, 342 B.R. 165, 173 (Bankr. S.D.N.Y. 2006).  The goal of this approach is to determine "whether the transaction conferred realizable commercial value on the debtor reasonably equivalent to the realizable commercial value of the

assets transferred." *VFB LLC v. Campbell Soup Co.*, No. Civ.A.02-137, 2005 WL 2234606, at

*21 (D. Del. Sept. 13, 2005) (citation and quotation marks omitted), *aff'd*, 482 F.3d 624 (3d Cir.

2007).

With respect to the first factor, the value received by a debtor need not be exactly

equivalent, but may be "roughly the value of the transfer made."  *Waterford*, 500 B.R. at 381

(citation and internal quotation marks omitted); *see also ASARCO*, 396 B.R. at 364 (debtor

received reasonably equivalent value where it received 85% to 90% of value of stock, noting that

"the law does not demand that [the debtor] receive an amount equal to the fair market value of

the asset it transfers; the consideration must only be *reasonably* equivalent") (emphasis in

original).  In addition to more concrete value, such as cash or repayment or cancellation of debt,

*see*, *e.g.*, *Liq'n. Trust v. Daimler AG (In re Old CarCo LLC)*, 435 B.R. 169, 181 (Bankr.

S.D.N.Y. 2010), "[a]n LBO or other complex corporate transaction may give rise to indirect

benefits to the debtor that must be included in the calculation."  *MFS/Sun*, 910 F. Supp. at 937

(citations omitted).  Examples of indirect economic benefits that constitute valid consideration

for the purposes of a reasonably equivalent value analysis include:

- Synergistic effects of new corporate relationships, including operational synergies and benefits that may accrue from arrival of a new management team.  *See Mellon Bank, N.A. v. Metro Commc'ns*, 945 F.2d 635, 647 (3d Cir. 1991) ("The complementary nature of the two corporations' businesses would appear to create a stronger and more profitable combination."); *MFS/Sun*, 910 F. Supp. at 937.

- Tax benefits resulting from the transaction.  *See MFS/Sun*, 910 F. Supp. at 937.

- Availability of additional credit after the transaction, at least if it is demonstrated that it facilitates additional business opportunities for the company.  *See id.*

- Goodwill.  *See Mellon Bank*, 945 F.2d at 647 ("Here [in determining reasonably equivalent value], as well as in determining insolvency under section 548(a)(2)(B)(i), it is appropriate to take into account intangible assets not carried on the debtor's balance sheet including, *inter alia*, good will.").

- Reasonable prospects that an investment will yield positive returns, even if that investment is risky and ultimately a losing one. *See Butler Aviation Int'l, Inc. v Whyte (In re Fairchild Aircraft Corp.)*, 6 F.3d 1119, 1126-27, 1129 (5th Cir. 1993).

### 3. Requisite Financial Condition

### (a) Financial Condition Test #1: Insolvency

The first financial condition test provides that a transfer may be avoided where the debtor "was insolvent on the date that such transfer was made or such obligation was incurred, or became insolvent as a result of such transfer or obligation." 11 U.S.C. § 548(a)(1)(B)(ii)(I). A debtor is "insolvent" if "the sum of [its] debts is greater than all of [its] property, at fair valuation." 11 U.S.C. § 101(32)(A).

In the context of a going concern,[6] "fair value" "is determined by the fair market price of the debtor's assets that could be obtained if sold in a prudent manner within a reasonable period of time to pay the debtor's debts." *Comm. of Unsecured Creditors v. Motorola, Inc. (In re Iridium Operating LLC)*, 373 B.R. 283, 344 (Bankr. S.D.N.Y. 2007) (citation and quotation marks omitted). Fair value should be determined as of the date of the transfer. *See id.* at 346 (collecting cases demonstrating that relevant inquiry is insolvency as of the transfer date).

### (i) Actual Sale Price

Although not determinative, "purchase price may be highly probative of a company's value immediately after a leveraged buyout."[7] *MFS/Sun*, 910 F. Supp. at 939 (quoting *Moody v.*

---

[6] Unless at the time in question the business is so close to shutting its doors that a going concern standard is unrealistic, it is proper to value a business as a going concern. *See In re Coated Sales, Inc.*, 144 B.R. 663, 667 (Bankr. S.D.N.Y. 1992); *Peltz*, 279 B.R. at 743. Since bankruptcy was not clearly imminent on the relevant transfer dates in this case, the Debtors' businesses should be valued on a going concern basis.

[7] The Merger was a strategic acquisition by Europe's largest independent chemicals company and created a synergistic global giant with financing secured by the assets of both companies. Accordingly, presumptions that might apply in the context of an LBO transaction

16

*Sec. Pac. Bus. Credit, Inc.*, 971 F.2d 1056, 1067 (3d Cir. 1992)). "Where a transaction is consummated after arm's-length negotiations, . . . the sale price is a good indicator of the value of the target's assets." *MFS/Sun*, 910 F. Supp. at 939 (citation omitted).

### (ii)    Discounted Cash Flow

The discounted cash flow ("DCF") method is a "standard approach" for conducting a going concern valuation. *Iridium*, 373 B.R. at 351; *see also MFS/Sun*, 910 F. Supp. at 939 (DCF "is an appropriate method of determining the going concern value of a company that is not in imminent danger of collapse") (citation omitted). A DCF model estimates a company's value by projecting its future cash flows, discounting those cash flows back to present value, and adding that present value to the present value of the company's "terminal value" (*i.e.*, the remaining value of the firm at the end of the forecast period). *In re Exide Techs.*, 303 B.R. 48, 63 (Bankr. D. Del. 2003). For the reasons discussed in Section II.A.4, *infra*, DCF analyses that rely on management's contemporaneous projections are strongly preferred over DCFs that employ "made for litigation" projections tainted by litigation or cognitive hindsight biases.

Courts and other authorities prefer the DCF approach. *See, e.g., Chartwell Litig. Trust v. Addus Healthcare, Inc. (In re Med Diversified, Inc.)*, 334 B.R. 89, 98 (Bankr. E.D.N.Y. 2005) ("[T]he leading authorities on business valuation . . . 'recognize that the most reliable method for determining the value of a business is the [DCF] method.'") (quoting *Lippe v. Bairnco Corp.*, 288 B.R. 678, 689 (S.D.N.Y. 2003), *aff'd*, 99 F. App'x. 274 (2d Cir. 2004)). The DCF approach may be especially useful when the debtor was engaged in an expansion plan on the transfer date, as the value of the expansion may be reflected in the debtor's projections. *See, e.g., Del. Open*

---

are inapplicable. While the Trustee's expert simply assumes reasonably equivalent value was not given because the transaction was allegedly an LBO, the Trustee must actually prove that reasonably equivalent value was not provided in exchange for Toehold Payment 1.

*MRI Radiology Assocs., P.A. v. Kessler*, 898 A.2d 290, 314-15 (Del. Ch. 2006) (considering corporate opportunities as part of company's value where company's business plan as of the merger included specific expansion plans and changes in strategy).

### (iii)    Comparable Companies/Transactions Methods

Courts have also endorsed the so-called "comparable companies" and "comparable transactions" methodologies. *See Iridium*, 373 B.R. at 344. The comparable companies method "estimates the value of a firm by first examining the value of comparable peer firms, and then using their metrics to project the value of the subject company." *Adelphia Recovery Trust v. FPL Group, Inc. (In re Adelphia Commc'ns Corp.)*, 512 B.R. 337, 464 (Bankr. S.D.N.Y. 2014). "Values may be ascertained using one or more common metrics (such as revenue, earnings, or any other common metric that drives cash flow), with the expert then applying the multiple of the financial metric or metrics that yields the market's valuation of these comparable companies." *Id.* In light of the legitimate disagreement over how comparable one business is to another, this approach is often utilized to corroborate valuations obtained through other methods. *MFS/Sun*, 910 F. Supp. at 942.

The comparable transactions method attempts to ascertain value by examining prices paid in recent transactions for similar companies in similar industries. *See In re Oneida Ltd.*, 351 B.R. 79, 91 (Bankr. S.D.N.Y. 2006). This method "involves making subjective judgments as to which transactions are 'comparable' to the property being valued." *Peltz*, 279 B.R. at 738.

Since DCF valuations rely heavily on projections, courts often stress the value of basing comparable companies and comparable transactions analyses on historical analysis, so as to provide an independent check on the reliability of the DCF valuation. *See Iridium*, 373 B.R. at 351 (noting that "it is important to validate conclusions reached using the [DCF] methodology by comparing the results obtained when other accepted approaches to valuation are used").

18

### (iv)    Market Capitalization

Courts also look to the market capitalization of a company's public stock in valuing the company.  Market capitalization is the preferred standard of valuation (when available) of some courts, because "the public trading market constitutes an impartial gauge of investor confidence and remains the best and most unbiased measure of fair market value." *Iridium*, 373 B.R. at 293; *see also id.* at 303 (noting that the court would need a "substantial reason" to justify disregarding the market values of a company's publicly traded securities in an efficient market); *U.S. Bank N.A. v. Verizon Comm. Inc.*, No. 3:10-CV-1842-G, 2013 WL 230329, at *9 (N.D. Tex. Jan. 22, 2013) (considering the market's valuation of the debtor's securities in concluding that the debtor was solvent), *aff'd*, 761 F.3d 409 (5th Cir. 2014).  According to the Third Circuit, "[a]bsent some reason to distrust it, the market price is a more reliable measure of the stock's value than the subjective estimates of one or two expert witnesses." *VFB LLC v. Campbell Soup Co.*, 482 F.3d 624, 633 (3d Cir. 2007) (citations and internal quotation marks omitted) (upholding district court's use of market data for valuation purposes).

### (b)    Financial Condition Test #2:  Unreasonably Small Capital

The second test evaluates whether a transfer left a debtor with unreasonably small capital.  That is a fact question to be decided case-by-case.  *See Credit Managers Ass'n of S. California v. Federal Co.*, 629 F. Supp. 175, 183 (C.D. Cal. 1985).  "Unreasonably small capital" is not defined in the Bankruptcy Code, but is generally understood as "the inability to generate sufficient profits to sustain operations." *Moody*, 971 F.2d at 1070.  This definition "is aimed at transferees that leave the transferor technically solvent but ***doomed to fail***." *MFS/Sun*, 910 F. Supp. at 944 (emphasis added) (citing *Moody*, 971 F.2d at 1070 & n.22).

This test seeks to answer the question whether the transaction caused the company's downfall, or whether unforeseeable events intervened.  Therefore, the test that courts employ to

19

determine whether a company was left with unreasonably small capital is an objective one of "reasonable foreseeability" and is based on whether the company's cash flow projections regarding its ability to pay its creditors and service its debts after the transaction were "reasonable" when they were made.  In addition, courts consider (1) whether the deterioration of the enterprise was affected by any unforeseeable intervening events, (2) the length of time the company survived after the challenged transfer, and (3) the availability of additional credit.

### (i)      Reasonableness Of Projections

The "critical question" in the test for unreasonably small capital is "whether the parties' projections were reasonable." *Moody*, 971 F.2d at 1073.  "[T]he adequacy of capital need only be tested within a reasonable period of the transfer at issue." *MFS/Sun*, 910 F. Supp. at 944.

Courts have found that reasonable projections take into account both historical data and reasonably foreseeable events, circumstances, or downturns, "and otherwise incorporate some margin for error." *Moody*, 971 F.2d at 1073 (citation omitted).  Even so, optimistic projections are not necessarily unreasonable.  In *Moody*, for example, the plaintiff argued that the debtor's projections were unreasonable because they projected a more profitable year than the last, despite a downturn the year before and an ongoing recession.  971 F.2d at 1074.  The Third Circuit acknowledged that "[i]n hindsight, it is clear that the figures . . . were not entirely on the mark." *Id.*  But the projections were nevertheless reasonable because management based them on reasonable, albeit optimistic expectations of price increases and new product lines. *Id.*

Similarly, in *Credit Managers*, the court found that projections—which obviously turned out to be incorrect—were nonetheless reasonable when made and that the debtor was therefore not undercapitalized at the time of the buyout.  629 F. Supp. at 186-87.  "[T]he law does not require companies to be sufficiently well capitalized to withstand any and all setbacks to their business." *Id.* (projections were reasonable even though the debtor had insufficient capital to

20

withstand adverse events, including strike). Instead, "[t]he requirement is only that they not be left with 'unreasonably small capital' at the time of the conveyance alleged as fraudulent." *Id.*

### (ii) Subsequent Adverse Events Were Not Reasonably Foreseeable

Courts also assess whether the adverse events that caused the debtor to file for bankruptcy were reasonably foreseeable. Thus, the unreasonably small capital test contains a causation requirement. It must be the transaction itself that "put [the debtor] on the road to ruin" instead of intervening, adverse events. *Daley v. Chang (In re Joy Recovery Tech. Corp.)*, 286 B.R. 54, 76 (Bankr. N.D. Ill. 2002); *see also Moody*, 971 F.2d at 1074-75 (upholding district court's finding that debtor's "failure was caused by a dramatic drop in sales due to increased foreign and domestic competition, rather than a lack of capital"). For example, in *Credit Managers*, the court held that the debtor was not undercapitalized at the time of the transaction, and described a series of unforeseen events occurring together and at the worst possible time. 629 F. Supp. at 178, 186 (describing a worker strike that resulted in an interruption of business at the worst time of year, a loss of business due to the shutdown of some of the debtor's customers' stores, and a downturn in the economy).[8] Similarly, in *MFS/Sun*, the court rejected the plaintiffs' contention that the LBO left the debtor with unreasonably small capital:

> The more persuasive view is that VDAS failed because of a concurrence of factors not related to the financial structuring of the LBO. The rapid emergence of competition at Lexington, the insensitive manner in which a ramp fee was imposed, the loss of business because of the termination of a key maintenance supervisor, and the failure to implement planned growth and cost-saving strategies all contributed to VDAS' ultimate demise. No doubt, VDAS could have weathered even these setbacks if it had unlimited working capital, but that is not the proper legal standard.

---

[8] Notably, LBI's CEO, Volker Trautz, described the unforeseen and multiplying adverse factors that caused the Debtors to file for Chapter 11 as a "perfect storm squared."

*MFS/Sun*, 910 F. Supp. at 944.  Courts often emphasize the unforeseeable challenges that the debtor faced.  *See, e.g.*, *Fidelity Bond and Mortg. Co. v. Brand (In re Fidelity Bond and Mortg. Co.)*, 340 B.R. 266, 297-98 (Bankr. E.D. Pa. 2006) ("These economic events [*i.e.*, the Asian Crisis, Russian Bond Crisis, and LTCM failure], which had a considerable negative impact on the Debtor post-Merger, were not predictable.  As a result, I cannot conclude, in hindsight, that the Projections were unreasonable or that the Debtor was left with an inadequate amount of assets to withstand such unforeseeable economic circumstances.") (internal citation omitted); *Peltz*, 279 B.R. at 746 ("[T]he evidence shows that the capital markets unexpectedly dried up in the late summer of 1998" due to the Russian debt default).

Put simply, a claim for constructive fraudulent transfer requires ***a causal link*** between the transfer at issue and the bankruptcy.  *See, e.g.*, *Dev. Specialists, Inc. v. Kaplan (In re Irving Tanning Co.)*, No. 12-1024, -- B.R. --, 2016 WL 4427032, at *11 n.11 (Bankr. Me. Aug. 9, 2016) ("the Trustee was not able to convincingly link" the challenged payments to shareholders to the debtor's ultimate inability to pay its debts, because the "more likely culprit was the unforeseen, intervening, and devastating impact of the recession of late 2007 through 2009").

### (iii)    Length Of Time The Company Survives Post-Transaction

Support for the reasonableness of capitalization may be found by looking at how long a company survives after the challenged transfer.  "[C]ourts will not find that a company had unreasonably low capital if the company survives for an extended period after the subject transaction . . . ."  *Joy Recovery*, 286 B.R. at 76 (citations omitted); *see also Moody v. Sec. Pac. Bus. Credit, Inc.*, 127 B.R. 958, 986-87, 998 (W.D. Pa. 1991) (finding no unreasonably small capital where creditors were paid for twelve months after transaction), *aff'd*, 971 F.2d 1056 (3d Cir. 1992); *MFS/Sun*, 910 F. Supp. at 944 (finding no unreasonably small capital where company

was viable for eight months after LBO); *In re Ohio Corrugating Co.*, 91 B.R. 430, 440 (Bankr. N.D. Ohio 1988) (finding no unreasonably small capital where creditors were paid for ten months).  The longer a company survives after the transfer, the less likely it is that the transfer caused the bankruptcy.

### (iv)    Availability of Additional Credit

Courts examining the question of adequate capitalization place "great weight" on the ability of the debtor to obtain financing.  *Iridium*, 373 B.R. at 349 (citing *Moody*, 971 F.2d at 1071-73).  "The ability to borrow money has considerable value in the commercial world." *Mellon Bank*, 945 F.2d at 647 (discussing ability to obtain financing in the context of a reasonably equivalent value analysis).  Moreover, the reasonable belief that there would continue to be available financing is relevant, even if that belief turns out to be incorrect.  *See Peltz*, 279 B.R. at 746. ("The issue before the court is whether [the debtor's] expectations that it could again access the capital markets were unreasonable.").

The Third Circuit recently held that, in determining whether a debtor was left with unreasonably small capital after a series of equity distributions, it is "indisputable" that the bankruptcy court correctly considered the availability of credit under a credit agreement.  *In re SemCrude L.P.*, 648 F. App'x 205, 209-10 (3d Cir. 2016); *see also Moody*, 971 F.2d at 1073 (noting that, under the reasonable foreseeability test, it is proper for courts "to consider availability of credit in determining whether [the debtor] was left with an unreasonably small capital[,]" and that "[r]efusal to consider availability of credit in the adequacy of capital determination would result in a *per se* rule that failed leveraged buyouts are voidable").  The Trustee's own expert has considered continued access to capital markets to be indicative of adequate capitalization.  *See Adelphia*, 512 B.R. at 478 ("Tuliano, on behalf of FPL, opined that

23

Adelphia would have adequate capital to maintain operations, based primarily on its equity cushion and continued access to capital markets.").

> (c) **Financial Condition Test #3:  Intending To Be Unable To Pay Debts As They Come Due**

The third financial condition test examines whether the debtor "*intended to incur*, or *believed that the debtor would incur*, debts that would be beyond the debtor's ability to pay as such debts matured." 11 U.S.C. § 548(a)(1)(B)(ii)(III) (emphasis added). "This forward-looking standard is generally referred to as 'equitable insolvency.'"  *MFS/Sun*, 910 F. Supp. at 943 (citation omitted).

In addition to showing that, at the time of the challenged transfer, the debtor had the *subjective intent or belief* that it would be unable to pay its debts as they came due, a plaintiff must establish a financial condition more severe than "unreasonably small capital" to establish equitable insolvency.  *See*, *e.g.*, *Moody*, 971 F.2d at 1070 (noting that "unreasonably small capital encompasses financial difficulties short of equitable insolvency"), *MFS/Sun*, 910 F. Supp. at 944 (same); *Pioneer Home Builders, Inc. v. Int'l Bank of Commerce (In re Pioneer Home Builders, Inc)*, 147 B.R. 889, 894 (Bankr. W.D. Tex. 1992) (unreasonably small capital tests under Bankruptcy Code and Texas Uniform Transfer Act "indicate[] a financial condition short of [equitable] insolvency").  Therefore, failure to meet the unreasonably small capital test means a plaintiff cannot prove inability to pay debts as they come due.

> 4. **The Role Of Contemporaneous Management Projections**

Courts place significant weight on a company's own projections when assessing solvency and/or reasonable capitalization.  *See Iridium*, 373 B.R. at 347 ("[T]he starting point for a solvency analysis should be management's projections.") (citation and quotation marks omitted); *Kipperman v. Onex Corp.*, 411 B.R. 805, 836 (N.D. Ga. 2009) (same).  The relevant question is

whether projections were reasonable at the time that they were made rather than in hindsight. *See*, *e.g.*, *Credit Managers*, 629 F. Supp. at 184 ("The question the court must decide is *not* whether GECC's projection was correct, for it clearly was not, but whether it was reasonable and prudent at the time it was made.") (emphasis in original).

(a)    **Courts Defer to Contemporaneous Management Projections**

Courts defer to management's projections where those projections originated from a reasonable process.  For example, in *Iridium*, the court relied heavily upon management's projections because they were "reasonable and prudent when made," despite the fact that they turned out to be wrong.  373 B.R. at 345 (citations and quotation marks omitted).  Many other courts have applied the same logic and have treated management projections as presumptively valid and preferable to after-the-fact analysis.  *See*, *e.g.*, *Del. Open MRI*, 898 A.2d at 332-33.

(b)    **Projections That Are Subject to Contemporaneous Review By Third Parties Are More Likely To Be Reasonable**

Courts are likely to hold that management projections were reasonable when outside analysts and consultants contemporaneously vet them and calculate similar projections. According to the *Iridium* court, "[e]xpert analysis by investment bankers that confirms the validity of management's projections is an indicator of reasonableness."  373 B.R. at 348 (citing *In re Duplan Corp.*, 9 B.R. 921, 926 n.9 (S.D.N.Y. 1980) (rejecting attempts to discard management's projections in litigation, when contemporaneous expert analysis by Bear Stearns confirmed them)).  "Similarly, a thorough analysis by an independent accounting firm of the projections that affirms their validity is an indicator of reasonableness."  *Iridium*, 373 B.R. at 348 (citation omitted); *see also MFS/Sun*, 910 F. Supp. at 924-25 (management's projections were reasonable where independent accountants and financiers contemporaneously analyzed them, using sensitivity analyses and account auditing).

25

Furthermore, courts recognize "that a powerful indication of contemporary, informed opinion as to value comes from private investors who with their finances and time at stake, and with access to substantial professional expertise, concluded at the time that the business was indeed one that could be profitably pursued." *Iridium*, 373 B.R. at 348 (internal alterations and quotation marks omitted) (citing *Brandt v. Samuel, Son & Co. (In Longview Aluminum, L.L.C.)*, No. 03 B 12184, 2005 WL 3021173, at *7 (Bankr. N.D. Ill. July 14, 2005); *Davidoff v. Farina*, No. 04 Civ. 2617, 2005 WL 2030501, at *11, n.19 (S.D.N.Y. Aug. 22, 2005) (finding it important that "sophisticated investors with the most intimate knowledge of [the debtor's] business plan and capitalization had confidence in the company's future and certainly did not think that the company was undercapitalized" since it makes "no economic sense for defendants to invest literally billions of dollars in a venture that they knew would fail"); *Metlyn Realty Corp. v. Esmark, Inc.*, 763 F.2d 826, 835 (7th Cir. 1985) ("***The price at which people actually buy and sell, putting their money where their mouths are, is apt to be more accurate than the conclusions of any one analyst.***")) (emphasis added).

### (c)    Management Investment Indicates Reasonableness

That members of management invest money in the transaction is a factor courts may consider in determining reasonableness of projections. *See*, *e.g.*, *Peltz*, 279 B.R. at 746 (noting that members of senior management, including the CFO, purchased shares in the debtor's IPO); *Longview Aluminum*, 2005 WL 3021173, at *7 (finding that a "powerful indication of contemporary, informed opinion as to value" came from the principals who, with their finances and time at stake, determined at the time of the acquisition that the business would be profitable).

26

> **(d)     Projections Prepared With Hindsight For Purposes of Litigation Are Disfavored**

Courts view projections developed for litigation skeptically, and often reject projections created by litigation experts that "fly in the face of what everyone involved in the [transaction] believed at that time." *VFB*, 2005 WL 2234606, at *29 n.71; *see also Burtch v. Opus, LLC (In re Opus East, LLC)*, 528 B.R. 30, 55 (Bankr. D. Del. 2015) (litigation experts' projections are "inherently suspect"); *In re Emerging Commc'ns Inc. S'holders Litig.*, No. Civ. A 16415, 2004 WL 1305745, at *15 (Del. Ch. June 4, 2004) ("*post hoc* litigation-driven forecasts have an untenably high probability of containing hindsight bias and other cognitive distortions") (citation and quotation marks omitted).

> **(e)     Reasonable Projections Need Not Be "Worst Case" Projections**

Management projections need not be the "worst case" or most conservative projections to be reasonable. In *MFS/Sun*, the court considered multiple sets of projections, all prepared before the merger, and determined that management's final projections were reasonable even though they were based on a "most likely" and not the ultimately more accurate "conservative" case projections produced at the same time. 910 F. Supp. at 923-24. In *Iridium*, the court found management projections to be reasonable despite the fact that banks and outside consultants produced lower "downside" cases as part of their due diligence. 373 B.R. at 294 n.2. That the lenders approved the financing despite reviewing these more conservative projections *actually supported a conclusion* that the company was solvent at the time. *Id.* at 294 n.2, 325.

> **(f)     Management Projections May Be Reasonable Even When Past Projections Fell Short**

Management's projections may be reasonable, even though management maintained or revised its projections upward after the company failed to meet previous projections. In *MFS/Sun*, the court rejected the plaintiff's suggestion that management deliberately inflated

projections to "shop" the company, finding instead that management's upward adjustments appropriately accounted for, among other things, an expansion of business.  910 F. Supp. at 940. Important to the court's decision was (1) management's explanation that the shortfall was not attributable to a "chronic problem such as insufficient revenue but rather to one time costs associated with the LBO" and (2) diligence performed on the projections.  *Id.*

### 5.    Valuing Contingent Liabilities

Contingent liabilities, such as guarantees, are valued based upon "their probabilities of being called."  *In re Capmark Fin. Grp. Inc.*, 438 B.R. 471, 517-18 (Bankr. D. Del. 2010) (citations omitted).  "By definition, a contingent liability is not certain—and often is highly unlikely—ever to become an actual liability.  To value the contingent liability it is necessary to discount it by the probability that the contingency will occur and the liability become real."  *In re Xonics Photochemical, Inc.*, 841 F.2d 198, 200 (7th Cir. 1988).  Moreover, if "liabilities might not be enforceable in the event of bankruptcy (depending of course on what a trustee in bankruptcy or debtor in possession might choose to do)," this uncertainty is another reason to further discount these contingent liabilities for the purposes of calculating solvency.  *Id.* at 203.

### 6.    Contractual Limitations On Liability

When liabilities are limited by contract, such limitations must be enforced.  *See TradeWind Distrib., LLC v. Unilux AG*, No. 10 Civ. 5716, 2011 WL 4382986, at *3-4 (E.D.N.Y. Sept. 19, 2011) ("New York law seeks to give effect to all of a contract's provisions to the greatest extent possible," including across and among multiple agreements); *Beal Sav. Bank v. Sommer*, 8 N.Y.3d 318, 324-25 (N.Y. 2007) (a court's "reading of the contract should not render any portion meaningless") (citation omitted); *see also Wallace v. 600 Partners Co.*, 86 N.Y.2d 543, 548 (N.Y. 1995); *Mastr Adjustable Rate Mortgs. Trust 2006-OA2 v. UBS Real Estate Secs., Inc.*, No. 12-cv-7322, 2015 WL 797972, at *1 (S.D.N.Y. Feb. 25, 2015).

These limitations are enforceable in bankruptcy. *See Capmark*, 438 B.R. at 517-18 (discussing liability limitation clauses in guarantees). When an obligation that is limited is supported by a security interest, the contractual limit caps the value of any liens transferred to secure the associated liability. *See*, *e.g.*, 11 U.S.C. §§ 502(b)(1), 506(d) (disallowing claims that are not enforceable against the debtor under applicable law and voiding any associated liens to the extent of the claim disallowance); *In re Kaplan Breslaw Ash, LLC*, 264 B.R. 309, 328-30 (Bankr. S.D.N.Y. 2001) (extent of a lien on a debtor's property is limited by the amount of the underlying indebtedness that is secured by the lien).

The only contrary case is *Official Committee of Unsecured Creditors v. Citicorp N. Am., Inc. (In re TOUSA, Inc.)*, 422 B.R. 783 (Bankr. S.D. Fla. 2009). The *TOUSA* decision is unpersuasive and should not be followed for several reasons.

*First*, the discussion of "savings" clauses in *TOUSA* was pure *dictum*, which no other court has endorsed. More specifically, the *TOUSA* court found that the debtors were insolvent even before the applicable transactions, which meant, "[i]n [that] circumstance, the savings clauses have no effect at all." *TOUSA*, 422 B.R. at 863. This should have ended the analysis. The court's continued musings on the savings clauses were ignored on appeal and have never been followed. *See 3V Capital Master Fund. Ltd. v. Official Comm. of Unsecured Creditors (In re TOUSA, Inc.)*, 444 B.R. 613 (S.D. Fla. 2011); *Senior Transeastern Lenders v. Official Comm. of Unsecured Creditors (In re TOUSA, Inc.)*, 680 F.3d 1298 (11th Cir. 2012).

*Second*, the *TOUSA* court's suggestion that Section 541(c)(1)(B) invalidates liability limitation clauses, 422 B.R. at 863, flies in the face of Second Circuit law. That section bars *ipso facto* clauses that would cause "a forfeiture, modification, or termination of ***the debtor's interest*** in property." 11 U.S.C. § 541(c)(1)(B) (emphasis added). Its purpose is to negate contractual

29

provisions that would remove *the debtor's prepetition property* from the post-petition bankruptcy estate, and its reach is limited in that respect. *See, e.g.*, *U.S. Bank Trust N.A. v. AMR Corp. (In re AMR Corp.)*, 730 F.3d 88, 106-07 (2d Cir. 2013). Yet a fraudulent transfer action is never prepetition property *of the debtor*; only property that is recovered through the postpetition action belongs to the estate. *See* 11 U.S.C. § 541(a)(3); *Fed. Deposit Ins. Corp. v. Hirsch (In re Colonial Realty Co.)*, 980 F.2d 125, 130-31 (2d Cir. 1992); *Official Comm. of Unsecured Creditors v. Chinery (In re Cybergenics Corp.)*, 226 F.3d 237, 243-44 (3d Cir. 2000). A limiting clause in a contract operates entirely on the liability side of the balance sheet and thus has no impact on a "debtor's interest in property."

*Third*, the *TOUSA* court erred by concluding that a liability limitation clause is an invalid effort to "contract around" the Bankruptcy Code. 422 B.R. at 863-64. To the contrary, such clauses adjust a debtor's liabilities *to avoid running afoul of those laws to begin with*. A contractual cap on liability represents "a bona fide effort to comply with the law," *Smith v. Miller (In re Dominguez)*, 995 F.2d 883, 887 n.3 (9th Cir. 1993), not an effort to negate it. That such a clause may come up in bankruptcy gives no license to disregard it as written.

*Fourth*, the *TOUSA* court wrongly suggested that multiple limiting clauses across affiliated entities are rendered "inherently indefinite" and hence unenforceable. 422 B.R. at 864-65. The court noted that this was not true in all cases. *See id.* at 864 n.52. Further, in the context of multiple entities, the intent is obvious: to avoid imposing contingent liabilities on the entities, whether individually or collectively, that exceed what applicable law permits. As between the different creditors, courts could easily apply principles of suretyship under longstanding New York law and determine each entity's proportionate share of guarantee liability as compared with their financial condition and benefits obtained and cap liability

accordingly.  *See*, *e.g.*, *First Am. Bank of N.Y. v. Fallova Shredder Co.*, 587 N.Y.S.2d 119, 120-21 (1st Dep't 1992); *Falb v. Frankel*, 423 N.Y.S.2d 683, 685 (2d Dep't 1980).

*Fifth*, despite the *TOUSA* court's suggestion, 422 B.R. at 865, there is no need to amend an agreement to give effect to a limitation on liability that is already part of that same agreement *ab initio*.  This is particularly true when clauses by their terms are self-executing.

### B.   Count 1: Constructive Fraudulent Transfer Claim Against Nell And Len Blavatnik

#### 1.   Overview Of Claim

In Count 1, the Trustee seeks to avoid and recover two payments (*i.e.*, Toehold Payment 1 and Toehold Payment 2) totaling "approximately $1.2 billion of Merger Consideration" (SAC ¶ 265) from defendants Nell, AI Chemical, and Blavatnik.  This Court granted summary judgment on Count 1 with respect to Toehold Payment 2.  (*See* Toehold SJ Decision.)  Thus, the only transfer at issue under Count 1 is Toehold Payment 1.

Toehold Payment 1 was a $523.8 million payment made by Basell Funding, a non-debtor, to Nell under a Stock Purchase Agreement, whereby Nell sold 100% of its equity interests in AI Chemical to Basell Funding.[9]  AI Chemical's only assets were 24,961,970 shares of Lyondell stock, and its sole liability was $674.3 million owed to Merrill Lynch under a postpaid share forward contract to settle its swap for 20,990,070 of those shares.  (*See* JX0036, Stock Purchase Agreement; JX0017, AI Chemical 13-D filed August 20, 2007.)  At the closing, each third-party holder of Lyondell stock, including Merrill Lynch and AI Chemical, obtained the right to receive $48 in cash per share.  (*See* JX0079, Lyondell Form 14-A, filed October 12, 2007 ("The merger

---

[9]  After AI Chemical became a subsidiary of Basell Funding, Basell Funding contributed AI Chemical to its subsidiary LB Finance, which then contributed AI Chemical to its subsidiary, LBIH, a Debtor.  AI Chemical assigned all if its assets and liabilities to LBIH pursuant to an Assignment and Assumption Agreement, and was dissolved.  (*See* JX0044, Assignment and Assumption Agreement between AI Chemical and LBIH.)

agreement provides that, at the effective time of the merger . . . each Lyondell share issued and outstanding immediately prior to the effective time of the merger (including the shares owned by AI Chemical Investments LLC, which is an affiliate of Basell . . .) will be converted into the right to receive $48.00 in cash, without interest and less any applicable withholding tax (resulting in a total expected payments of approximately $12.2 billion)."); JX0008, Merger Agreement § 2.1(b)(i) ("[E]ach share of common stock of the Company . . . shall be converted into the right to receive $48.00 in cash, without interest (the 'Merger Consideration').").)  Toehold Payment 1 was part and parcel of the Merger Consideration paid out to Lyondell shareholders to facilitate Basell's acquisition.  (SAC ¶¶ 265, 267.)

The sources and transferors of the funds for Toehold Payment 1 are as follows:[10]

- Nell received $523.8 million from Basell Funding, a non-debtor.  Citibank transferred the $523.8 million from Basell Funding's escrow account at Citibank to Nell's account at Chase Manhattan Bank "to purchase the toehold position."

- Basell Funding received those funds from Basell Holdings, a non-debtor ($500 million), and Basell Finance ($23.8 million).

- The source of the funds for the transfer from Basell Holdings to Basell Funding was a $492.5 million draw on the Dutch Tranche A Term Loan (part of the Senior Credit Facility) and a $7.5 million transfer from Basell Finance.

- The source of the funds for the transfer from Basell Finance to Basell Funding was a €1,267.5 million transfer from Basell Germany, which came from a draw on the German Tranche B Term Loan (part of the Senior Credit Facility) in the same amount (net of underwriting fees).

- Therefore, the original sources of cash for the $523.8 million Toehold Payment 1 were the Dutch Tranche A Term Loan to Basell Holdings and the German Tranche B Term Loan to Basell Germany.

---

[10]  *See* JX0074, Closing Funds Memorandum.

###    2.    The Trustee Cannot Prove All Of The Elements Necessary To Prevail On Count 1, Which Is Barred By The Safe Harbor In Any Event

####    (a)    Toehold Payment 1 Is Protected By The Safe Harbor

The Trustee cannot avoid Toehold Payment 1 because it is protected under Section 546(e) of the Bankruptcy Code.  This safe harbor requires the following elements:

1.  payment must be made "by or to (or for the benefit of)" a financial institution or financial participant; and

2.  payment was—

   a.  a settlement payment; or

   b.  made in connection with a securities contract.

*See* 11 U.S.C. § 546(e) (emphasis added).

####    (i)    Toehold Payment 1 Was Made By Or To (Or For The Benefit Of) A Financial Institution Or Financial Participant

The Trustee does not deny that Toehold Payment 1 was made by or to a financial institution and/or a financial participant.  (*See* Response To Nell Limited And Len Blavatnik's Notice Of Supplemental Authorities In Support Of Their Motion For Summary Judgment On Count 1 Of The Amended Complaint, Jun. 15, 2016 (Docket No. 736) at 7 n.7 (Trustee abandons his "conduit" argument in light of *Quebecor World (USA) Inc. v. Am. United Life Ins. Co. (In re Quebecor World (USA) Inc.)*, 719 F.3d 94 (2d Cir. 2013)).)  Indeed, Citibank—the bank from which Toehold Payment 1 was made—and Chase Manhattan Bank—the bank to which the payment was made—are both qualifying entities because they are "financial institutions."  *See* 11 U.S.C. § 101(22) (defining the term "financial institution" to mean, in relevant part, "an entity that is a commercial or savings bank").  As the Trustee has acknowledged, the Second Circuit has held that a financial institution need not acquire control or dominion over the transferred

funds. *See Quebecor*, 719 F.3d at 99. Instead, a transfer may qualify for the Section 546(e) safe

harbor even if the financial institution is a merely a conduit. *Id.*

        **(ii)**     **Toehold Payment 1 Was Made In Connection With A Securities Contract**

              **A)**     <u>Toehold Payment 1 was made in connection with the Stock Purchase Agreement, which is a securities contract</u>

What constitutes a "security" under Section 546(e) must be determined by the text of the

Bankruptcy Code. Where a court is called upon to interpret the Bankruptcy Code, "[i]t makes

little sense to look to a definition from a different statutory scheme." *Enron Creditors Recovery*

*Corp. v. Alfa, S.A.B. de C.V.*, 651 F.3d 329, 339 n.4 (2d Cir. 2011) (rejecting attempts to

"supplant the Bankruptcy Code's definition of 'security' with the definition in the Securities

Exchange Act of 1934"). Courts in this district have declined to look to federal securities law

when interpreting Section 546(e). *See Alfa S.A.B. de C.V. v. Enron Creditors Recovery Corp. (In*

*re Enron Creditors Recovery Corp.)*, 422 B.R. 423, 437 (S.D.N.Y. 2009) (it is improper to rely

on interpretations of the Investment Company Act of 1940 in analyzing similar terms in Section

546(e)). "The overlapping subject matter between the various laws designed to regulate

securities does not confer judicial license to treat requirements under different statutory schemes

employing alternate sets of statutory language as interchangeable." *Id.*[11]

Indeed, courts that have discussed whether a membership interest in a limited liability

company constitutes a "security" under the Bankruptcy Code have applied the Bankruptcy

Code's definition of "security." The Fifth and Ninth Circuits have held that a membership

---

[11]    Similarly, Article 8 of the Delaware Uniform Commercial Code also includes a definition of what constitutes a "security" for purposes of the Delaware UCC (which deals with investment securities). *See* 6 Del. C. § 8-103(c). That definition varies significantly from the definition of "security" in Section 101(49) of the Bankruptcy Code. Courts have not applied the Delaware UCC's definition in interpreting a Bankruptcy Code's safe harbor provision.

interest in a limited liability company is a "security" under Section 101(49). *See Pensco Trust Co. v. Tristar Esperanza Props., LLC (In re Tristar Esperanza Props., LLC)*, 782 F.3d 492, 495 (9th Cir. 2015); *SeaQuest Diving, LP v. S&J Diving, Inc. (In re SeaQuest Diving, LP)*, 579 F.3d 411, 418 (5th Cir. 2009). According to those courts, "[a]mong the non-exclusive list of items defined as securities under the Bankruptcy Code, '[an] LLC interest either qualifies as a 'transferable share' or falls within the broad residual category.'" *Pensco*, 782 F.3d at 495 (quoting *SeaQuest*, 579 F.3d at 418; 11 U.S.C. §§ 101(49)(A)(viii), (xiv)).

The Bankruptcy Appellate Panel of the Ninth Circuit, which also held that a membership interest in a limited liability company is a "security" under Section 101(49), discussed its reasoning in detail. *See O'Donnell v. Tristar Esperanza Props., LLC (In re Tristar Esperanza Props., LLC)*, 488 B.R. 394, 399 (B.A.P. 9th Cir. 2013). The court noted that the Bankruptcy Code's definition of "security" lists fifteen examples of what constitutes a security, and seven examples of what is not a security. *Id.* Neither list mentions an LLC membership interest. *Id.* The omission of mention of an LLC membership interest from the examples of a "security" was not fatal to the status of such interest as a "security," ***because the operative word at the beginning of the list is "includes."*** *Id.* (citing 11 U.S.C. § 101(49)(A)) (emphasis added). Since is non-exclusive, the court looked to an analogous item on the list. The court noted that the statute includes "interest of a limited partner in a limited partnership" as an example of a "security." *Id.* (citing 11 U.S.C. § 101(49)(A)(xiii)). The court also noted that the "similarities between the interest of a limited partner in a limited partnership and a membership in an LLC are substantial." *Id.* For example, "each owns an interest in the enterprise and shares in net revenues and increases in value, and those who extend credit to the enterprise do so in the expectation that their claims will be paid before any distribution to limited partners or LLC

members." *Id.* "It follows that, if the interest of a limited partner in a limited partnership is a 'security' under the Bankruptcy Code, then ***the interest of a member in an LLC is also a 'security' for the purposes of the Bankruptcy Code.***" *Id.* (emphasis added); *see also Crescent Res. Litig. Trust v. Duke Energy Corp.*, 500 B.R. 464, 475 (W.D. Tex. 2013) (LLC membership interests are "securities" under Section 546(e)); *U.S. Bank, N.A. v. Verizon Commc'n, Inc.*, 892 F. Supp. 2d 805, 815-16 (N.D. Tex. 2012) (shares of limited liability company and stock and debt of corporation "are all securities" and Section 546(e) applied).

Notably, none of the cases determining whether an LLC membership unit is a "security" under the Bankruptcy Code engaged in an analysis of the characteristics of the particular LLC or membership interests at issue. However, even if the Court were to engage in such an analysis here, the following factors support a finding that membership interests in AI Chemical were securities: (1) it was contemplated that membership interests could be transferred;[12] (2) managers—not members—exercised control over the LLC;[13] and (3) parties to the Stock Purchase Agreement clearly considered the interests to be securities.[14]

A payment is covered by Section 546(e) if it is "made in connection with a securities contract." 11 U.S.C. § 546(e). The Bankruptcy Code defines a "securities contract" as a "contract for the purchase, sale, or loan of a security . . . [or] any other agreement or transaction

---

[12]   *See* DX0617, Limited Liability Company Agreement for AI Chemical Investments LLC, dated April 25, 2007, § 9.

[13]   *Id.* § 4.1 ("The Managers shall direct, manage and control the business of the Company to the best of their abilities. The Manager is authorized and empowered on behalf of and in the name of the Company to carry out any and all objectives and purposes of the Company . . . .").

[14]   *See* JX0036, Stock Purchase Agreement § 3.8 ("Buyer understands and agrees further that the Units must be held indefinitely unless they are subsequently registered under the Securities Act and these laws or an exemption from registration under the Securities Act and these laws covering the sale of Units is available.").

36

that is similar." *Id.* § 741(7).    Under the authorities discussed above, an LLC membership interest is a "security" for purposes of this definition.   The Stock Purchase Agreement, pursuant to which Basell Funding made Toehold Payment 1 in exchange for 100% of the membership interests in AI Chemical (a limited liability company), is therefore a "securities contract."

> B)    <u>Toehold Payment 1 was made in connection with the Merger Agreement, which is a securities contract</u>

Although the Court properly drew all inferences in favor of the Trustee on this issue at summary judgment, the evidence will show Toehold Payment 1 was made *in connection with* the Merger Agreement.   The Court relied on a Utah case holding that the phrase "in connection with" in Section 546(e) "requires that the transfer to be [*sic*] ***causally connected*** to the securities contract." *In re D.E.I. Sys., Inc.*, 2011 Bankr. LEXIS 1143, at *20-21 (Bankr. D. Utah Apr. 5, 2011) (emphasis added).   This holding conflicts with the Second Circuit's articulation of what is required for a transfer to have been made "in connection with" a securities contract:   "[i]n the context of § 546(e), a transfer is 'in connection with' a securities contract if it is '***related to***' or '***associated with***' the securities contract." *Picard v. Ida Fishman Revocable Trust (In re Bernard L. Madoff Inv. Sec. LLC)*, 773 F.3d 411, 421 (2d Cir. 2014) ("*Madoff III*") (emphasis added) (citation omitted).   Thus, "Section 546(e) ***sets a low bar for the required relationship between the securities contract and the transfer sought to be avoided.***" *Id.* at 422 (emphasis added).

> (iii)    **Toehold Payment 1 Was Also A "Settlement Payment" That Separately Falls Within The Safe Harbor Protection Of Section 546(e)**

Section 546(e) also covers "settlement payments."   11 U.S.C. § 546(e).   A settlement payment is a "transfer of cash made to ***complete*** a securities transaction." *Quebecor*, 719 F.3d at 98 (emphasis added) (citation omitted); *see also Madoff III*, 773 F.3d at 422 ("[T]he statutory definition [of settlement payment] should be broadly construed to apply to the transfer of cash or

securities made to complete [a] securities transaction.") (citation and internal quotation marks omitted).

In *Enron*, the Second Circuit reaffirmed a broad definition, holding that "settlement payment" includes transactions that are not traditional stock purchases. 651 F.3d at 338 (Enron's payments made to repurchase its own commercial paper were "settlement payments," despite the lack of purchase or sale); *see also QSI Holdings Inc. v Alford (In re QSI Holdings, Inc.)*, 571 F.3d 545, 550 (6th Cir. 2009) (Congress used the phrase "commonly used in the securities trade" as a "catchall phrase intended to underscore the *breadth* of the § 546(e) exemption") (emphasis in original) (citation omitted). Any transaction consisting of "the delivery and receipt of funds and securities" includes a settlement payment. *Kaiser Steel Corp. v. Charles Schwab & Co.*, 913 F.2d 846, 850 (10th Cir. 1990). "Settlement payment" covers any exchange of consideration for shares, regardless of the public or private nature of the transaction. *See, e.g., Contemporary Indus. Corp. v. Frost*, 564 F.3d 981, 985-86 (8th Cir. 2009) (payments for privately held shares were settlement payments); *Kaiser Steel*, 913 F.2d at 849-50 (same). *Cf. AP Servs. LLP v. Silva*, 483 B.R. 63, 67-69 (S.D.N.Y. 2012) (payments made to shareholders' bank accounts in an LBO were "settlement payments" and agreeing with cases holding that "a payment made for shares during an LBO is obviously a commonly used securities transaction and therefore fits within the statute's definition of settlement payment") (internal citations and quotation marks omitted).

> **(iv)   The Second Circuit Has Consistently Interpreted Section 546(e) Broadly Based On Congress's Expressed Intent To Enhance Efficiency In The Securities Markets And Reduce Cost of Capital**

In the Toehold SJ Decision, the Court stated that it "must determine whether the rationale behind Section 546(e) is served in protecting the transaction at issue" based on a more developed factual record. (Toehold SJ Decision at 10.)

"Congress intended § 546(e) to sweep broadly." *Madoff III*, 773 F.3d at 419.  Congress's purpose was "to promote finality and certainty for investors by limiting the circumstances . . . under which securities transactions could be unwound." *Tribune*, 818 F.3d at 121 (citations and internal quotation marks omitted).  The *Tribune* court cited Congress's "purpose of enhancing the efficiency of securities markets in order to reduce the cost of capital to the American economy." *Id.*  But Section 546(e) "was not intended as protection of politically favored special interests.  Rather, it was sought by the SEC . . . in order to protect investors from the disruptive effect of after-the-fact unwinding of securities transactions." *Id.* at 122.  Therefore, a transaction may be protected by the safe harbor even if unwinding it would not disrupt financial markets. *See AP Servs.*, 483 B.R. at 70.

Notably, Section 546(e) includes no language indicating that the safe harbor should apply only where doing so would further Congress's goals or rationale for enacting the safe harbor. *See Grede v. FCStone, LLC*, 746 F.3d 244, 253 (7th Cir. 2014) ("The district court . . . conclud[ed] that Congress could not have intended the safe harbor provisions to apply to the circumstances of this case . . . .  We understand the district court's powerful and equitable purpose, but its reasoning runs directly contrary to the broad language of § 546(e) . . . .  We also do not see any persuasive reason to depart from the deliberately broad text of § 546(e)."); *Buchwald Capital Advisors, LLC v. Papas (In re Greektown Holdings, LLC)*, Adv. Pro. No. 10-05712, 2015 WL 8229658, at *5 (Bankr. E.D. Mich. Nov. 24, 2015) (declining to assess whether privately and/or closely-held securities present the same systematic risk to the securities market such that, for legislative intent or policy reasons, they should not be granted safe harbor under Section 546(e), because doing so would require going "beyond the plain and unambiguous language of the statute").

### 3.    Toehold Payment 1 Was Not A Transfer Of Interest Of A Debtor

The Trustee must prove that Toehold Payment 1 was a transfer of an interest of *a Debtor* in property.  *See* 11 U.S.C. § 548(a)(1); Section II.A.1, *supra*.  He does not contest that Toehold Payment 1 was a transfer by Basell Funding to Nell.  (*See* SAC ¶ 270.)  Basell Funding (**a non-debtor**) received $500 million of this amount through an intercompany loan from Basell Holdings (**a non-debtor**), which had obtained this money primarily through a $492.5 million draw on Dutch Tranche A Term Loan that was provided to Basell Holdings as "Dutch Borrower," and the remaining $7.5 million came through a transfer from Basell Finance.[15]

If the Court concludes after seeing the full factual record that "Toe-Hold Payment I was not made in connection with the Merger Agreement because Toe-Hold Payment I was for the purchase of the membership interest in AI Chemical—a transaction that was not contemplated by the Merger Agreement" and that "[t]he Merger Agreement and Toe-Hold Payment I were independent and could have occurred in isolation from one another[,]" (Toehold SJ Decision at 8), then Toehold Payment 1 and the transfers made pursuant to the Merger Agreement cannot be collapsed under prevailing case law, *see* Section II.B.4, *supra*, and the Trustee will not be able to show that Toehold Payment 1 was made by a Debtor under the "integrated transaction," or "collapsing," doctrine.  The Trustee also will not be able to prove by a preponderance of the evidence that Lyondell, or any other Debtor, exercised the requisite control over the funds giving it a property interest in those funds.  *See* Section II.A.1, *supra*.

The Trustee also cannot establish that Lyondell or any other Debtor had an interest in Toehold Payment 1 by virtue of any guaranty they may have provided, because, as permitted by New York law, the guarantees themselves limit the guarantors' liability pursuant to so-called

---

[15]    *See* JX0074, Closing Funds Memorandum.

"savings clauses."  Those "savings clauses" prevent each guarantor from being liable (and from transferring an interest in property if the obligation was secured by a pledge) if the liability would render it insolvent, unreasonably capitalized, or unable to pay its debts as such mature.

Among the entities that were borrowers, Basell Holdings and Basell Finance were the "Dutch Borrowers" and Basell Germany was the "German Borrower."  In total, 51 entities (including Lyondell and Basell and their respective subsidiaries) were guarantors of various facilities under the Senior Credit Facility.  These guarantors' liabilities were contractually limited at inception:

> Section 11.08.  <u>General Limitation on Guarantee Obligations.</u>  In any action or proceeding involving…any applicable state, federal or foreign bankruptcy, insolvency, reorganization or other Law affecting the rights of creditors generally, if the obligations of any Guarantor under Section 11.01 [Section 9.01 for Bridge Loan] would otherwise … be held or determined to be void, voidable, invalid or unenforceable, or subordinated to the claims of any other creditors, on account of the amount of its liability under Section 11.01, then . . . *the amount of such liability shall, without any further action* by such Guarantor, any Loan Party or any other Person, *be automatically limited and reduced to the highest amount* (after giving effect to the right of contribution established in Section 11.10 [Section 9.10 for Bridge Loan]) *that is valid and enforceable and not subordinated to the claims of other creditors as determined in such action or proceeding*.

(JX0054, Senior Credit Facility § 11.08 (emphasis added); JX0046, Bridge Loan § 9.08.)

Applying the savings clauses as written comports with the record of these Chapter 11 cases.  The Trustee sought (through his predecessor) to avoid the obligations incurred to the lenders and to subordinate those claims.  (*See* Original Complaint, Counts 1, 2, 18-21.)  Those claims were settled, and Senior Credit Facility claims and Bridge Loan claims were paid only a fraction of the amount incurred to finance the Merger.  *See*  Section III.A, *infra* (discussing Section 550(d)).  In other words, when the time came for the lenders to collect on the allegedly unfair loans, the liabilities were capped as written by the Debtors at what the Trustee's

41

predecessor agreed was a fair amount.  The remainder of the secured debt was discharged and

released (or capped) for $10 billion, which is consistent with how the savings clauses work.

### 4.    Proper Application Of Collapsing

A series of transactions may, under some circumstances, be "collapsed" and treated as

phases of a single transaction.  *See HBE Leasing Corp.*, 48 F.3d at 635. Where a transfer is "only

a step in a general plan," a court may invoke this "collapsing" doctrine and evaluate "the entire

plan and its overall implications."  *Official Comm. of Unsecured Creditors v. Morgan Stanley &*

*Co. (In re Sunbeam Corp.)*, 284 B.R. 355, 370 (Bankr. S.D.N.Y. 2002) (citing *Orr v. Kinderhill*

*Corp.*, 991 F.2d 31, 35 (2d Cir. 1993)).   Under this doctrine, "interrelated yet formally distinct

steps in an integrated transaction may not be considered independently of the overall

transaction."  *Waterford*, 500 B.R. at 379 (quoting *Comm'r of Internal Revenue v. Clark*, 489

U.S. 726, 738 (1989)).[16]

The "collapsing" doctrine is most familiar in the LBO context, where the "paradigmatic

scheme" involves a transaction in which "one transferee gives fair value to the debtor in

exchange for the debtor's property, and the debtor then gratuitously transfers the proceeds of the

first exchange to a second transferee."  *HBE Leasing Corp.*, 48 F.3d at 635.  Thus, "[t]he first

transferee . . . receives the debtor's property, and the second transferee receives the

consideration, while the debtor retains nothing."  *Id.*  The doctrine, however, is not confined to

LBOs. *See, e.g., Orr*, 991 F.2d at 35-36; *Waterford*, 500 B.R. at 379-81.

---

[16]   The "collapsing" doctrine collapses multiple **transfers**; "collapsing" does **not** extend
to treating multiple distinct corporate entities as one (substantive consolidation is the name for
that doctrine).   The Trustee misconstrues the Defendants' argument on this point.   The
Defendants are not arguing that "collapsing" cannot apply to multi-step transactions involving
multiple entities.  The Defendants are well aware that multiple transfers involving multiple
entities may be collapsed.  It is the Trustee's attempt to "collapse" multiple **entities** to shoehorn
his intentional fraudulent transfer theory that is improper.

In determining whether to treat a transfer as part of a general plan, courts focus on the knowledge and intent of the parties. *See In re Sabine Oil & Gas Corp.*, 547 B.R. 503, 541 (Bankr. S.D.N.Y. 2016). Courts consider the following factors: (1) whether all of the parties involved had knowledge of the multiple transactions; (2) whether each transaction would have occurred on its own; and (3) whether each transaction was dependent or conditioned on the other transactions. *Id.* (citing *Adelphia*, 512 B.R. at 491).

Assessment of reasonably equivalent value is impacted when an integrated transaction is collapsed. Upon collapsing transactions involving members of the same corporate family, courts will assess *whether reasonably equivalent value was given to the enterprise as a whole*, rather than to a particular debtor entity. *See, e.g.*, *Waterford*, 500 B.R. at 381-83 (assessing the value received by both parent holding company and its subsidiaries in connection with the single integrated transaction, which was comprised of two separate sale agreements).

In this respect, collapsing is fatal to the Trustee's claim because it is apparent that the purchaser Basell received fair value when it purchased the shares of the former Lyondell shareholders in order to accomplish its strategic objective of combining the two companies. If Toehold Payment 1 is collapsed with transfers relating to the overall Merger, the reasonably equivalent value analysis would require consideration of, among other things, the value of the Lyondell shares (which conveyed control over Lyondell's assets) to Basell, the $6 billion in Basell equity value that was contributed to the LBI enterprise to facilitate Basell's acquisition of Lyondell, the retirement of $7.5 billion in debt, and all of the intangible value received by the LBI enterprise as of the Merger closing, particularly the reasonably expected synergies. *See* Section II.A.2, *supra*; *Old CarCo*, 435 B.R. at 187 (plaintiff is required to "account for all of the elements of value that were received"). The Trustee instead seeks to myopically present only a

43

part of the transaction—the role of Lyondell—and ignore the totality of the transaction to obfuscate that Basell (LBI) acquired Lyondell for fair value.

### 5. Toehold Payment 1 Was Made In Exchange For Reasonably Equivalent Value

Assuming that the Trustee is able to prove that this was a transfer of an interest of a Debtor in property without it being part and parcel of the Merger to evade the safe harbor, Count 1 still fails because $48 was the reasonably equivalent value of a share of Lyondell stock. Lyondell shares traded in an efficient, public market, which market indicated a premium-free share price of approximately $37. Even the Trustee's own expert has recognized elsewhere that it is appropriate to add a premium to the public trading price when acquiring control, "because the stock prices of publicly traded securities reflect minority interests." *Adelphia*, 512 B.R. at 465-66 (citing Tuliano's declaration submitted in connection with that case, in which he added a 25% control premium); *see also ASARCO*, 396 B.R. at 349 (finding that "in an arm's-length transaction, a willing buyer would have paid a willing seller a premium on top of the stock price to acquire a controlling interest in" the subsidiary). With an appropriate control premium considered as part of the calculation, paying $48 per share was reasonably equivalent value.

### 6. Neither Len Blavatnik Nor AI Chemical Are Proper Defendants With Respect To This Claim

The Trustee cannot recover Toehold Payment 1 from Blavatnik or AI Chemical. *First*, AI Chemical, which was dissolved on December 26, 2007, should not be a defendant. In a prior iteration of the complaint, the Trustee named AI Chemical in Counts 1 and 2, and sought a declaration that AI Chemical's Certificate of Cancellation was null and void. Nell moved to dismiss the Trustee's request for such a declaration (Docket Nos. 407, 408), arguing, among other things, that before its dissolution, AI Chemical entered into an Assignment and Assumption Agreement, assigning all of its assets and liabilities to Debtor LBIH. Counsel to the

Trustee advised Judge Gerber that "the Trustee . . . has elected not to pursue the relief requested as part of Counts I and II that AI Chemical's Certificate of Cancellation be declared null and void." (Letter from Sigmund Wissner-Gross to Judge Gerber, dated Mar. 8, 2011.)  It is unclear why the Trustee continues to name AI Chemical (which he is not seeking to "resurrect") as a defendant, particularly where AI Chemical assigned all of its liabilities to a Debtor.

*Second*, while the Trustee blithely contends that Blavatnik operated Nell, a Gibraltar entity, and AI Chemical, a Delaware entity when it existed, as alter egos (SAC ¶ 34), he cannot come close to meeting the extremely high standards for establishing alter ego liability.

A court determining whether to pierce the corporate veil of a Gibraltar entity should apply English law.  *See Wong v. PartyGaming Ltd.*, 589 F.3d 821, 829 (6th Cir. 2009); *In re Tyson*, 433 B.R. 68, 79 (S.D.N.Y. 2010) (applying English law to determine whether to pierce the corporate veil of a Gibraltar corporation).  Under English law, a corporation is a separate legal entity from its directors, officers, members, shareholders, or other controlling parties.  *Tyson*, 433 B.R. at 79 (citing *Salomon v. A. Salomon & Co., Ltd.,* [1897] A.C. 22 (H.L.)).  English courts recognize that the veil of incorporation may be pierced, but "only in extremely limited circumstances."  *Tyson*, 433 B.R. at 79 (citation and quotation marks omitted).  "[U]nlike American law, English case law does not provide an enumerated set of factors that a court can evaluate in deciding whether to lift the corporate veil."  *Id.* (quoting *Gabriel Capital, L.P. v. NatWest Fin., Inc.*, 122 F. Supp. 2d 407, 433 n.13 (S.D.N.Y. 2000)).

After extensively surveying English veil piercing law, the *Tyson* court set forth the following principles:  (1) "[l]egal formalisms must be respected even at the risk of abiding a seeming injustice"; (2) courts may pierce the corporate veil "only where special circumstances exist indicating that it is a mere façade concealing the true facts," which generally requires a

45

showing of impropriety of some sort (although evidence of impropriety is itself insufficient to justify veil-piercing); (3) where a corporate structure is interposed for the purpose of shielding a defendant from liability to the plaintiff or other third parties, the plaintiff's ability to recover from the defendant on a veil-piercing theory turns on whether the defendant had already incurred some liability to the plaintiff at the time he interposed the corporate structure; and (4) "where the plaintiff may recover in fraud . . . against a defendant directly, that path is preferable to indirect liability via veil-piercing." *Id.* at 86-90 (citations and quotation marks omitted).

To pierce the corporate veil of AI Chemical, the Trustee would have to show "a mingling of the operations of [AI Chemical] and [Blavatnik] plus an overall element of injustice or unfairness." *NetJets Aviation, Inc. v. LHC Commc'ns, LLC*, 537 F.3d 168, 176 (2d Cir. 2008) (citation and quotation marks omitted). An alter ego analysis must start with an examination of how the corporation operates and its relationship with its alleged alter ego, including (1) whether the corporation was adequately capitalized, (2) whether the corporation was solvent, (3) whether dividends were paid, (4) whether corporate records were kept, officers and directors functioned properly, and other corporate formalities were observed, (5) whether the dominant shareholder siphoned corporate funds, and (6) whether, in general, the corporation simply functioned as a façade for the dominant shareholder. *Id.* at 176-77 (citation and quotation marks omitted). No single factor can justify the decision to disregard the corporate entity, but some combination of them is required and *an overall element of injustice or unfairness must always be present, as well.*") *Id.* at 177 (emphasis in original) (citation and quotation marks omitted).

*Third,* the Trustee seeks to recover Toehold Payment 1 from Blavatnik under Section 550(a), arguing that it was made to Nell "for the benefit of Blavatnik." (SAC ¶ 332.) This theory does not work. Section 550(a)(1) permits a trustee to recover property from: "(1) the

46

initial transferee of such transfer or the entity for whose benefit such transfer was made; or (2) any immediate or mediate transferee of such initial transferee." 11 U.S.C. § 550(a). Per the statute's plain language, the Trustee may recover from an entity only if it was the beneficiary of the *initial* transfer, and may not recover from the beneficiaries of *immediate or mediate* transfers. *See id.*; *Danning v. Miller (In re Bullion Reserve of N. Am.)*, 922 F.2d 544, 547 (9th Cir. 1991) (holding that the transfer must have been for the entity's benefit and that such benefit must be as a result of the initial transfer from the debtor and not some later transfer); *Bonded Fin. Servs., Inc. v. European Am. Bank*, 838 F.2d 890, 896 (7th Cir. 1988) ("Someone who receives the money later on is not an 'entity for whose benefit such transfer was made'; only a person who receives a benefit *from the initial transfer* is within this language.") (emphasis added).

Moreover, "to benefit from the initial transfer cannot mean to exercise dominion and control over the money or property, or else the Bankruptcy Code would not have made a distinction between a transferee and the beneficiary of the initial transfer." *Stratton Oakmont, Inc.*, 234 B.R. at 313. "Benefit occurs without the beneficiary ever holding money or property, precisely because someone else received it." *Id.* at 313-14. Such benefit "must be direct, ascertainable and quantifiable and must correspond to, or be commensurate with, the value of the property that was transferred." *Dreier*, 452 B.R. at 478 (citation and quotation marks omitted). The paradigm example of an entity who benefits from an initial transfer is "a guarantor of the debtor" who is "relieved of the obligation to pay the lender—which is the benefit—while the lender receives the money." *Stratton Oakmont*, 234 B.R. at 314 (citations omitted).

The Trustee cannot show that a transfer to a corporate entity provides a "direct" benefit to its shareholders, either generally or here. "There is nothing in section 550(a)(1) which indicates that the corporate form can be thrust aside and that members of an LLC or shareholders in a

corporation are liable on the mere assumption that shareholders somehow automatically 'benefit' from such transfers." *Brown Publ'g Co. Liq'g Trust v. Brown (In re Brown Publ'g Co.)*, No. 12-08193, 2015 WL 1009177, at *8 (Bankr. E.D.N.Y. Mar. 4, 2015) (citation and quotation marks omitted).  A shareholder who "receives the benefit of a fraudulent transfer is *not* personally liable under section 550(a)(1)."  *Id.* (emphasis added); *see also Turner v. Phoenix Fin., LLC (In re Imageset, Inc.)*, 299 B.R. 709, 718 (Bankr. D. Me. 2003) ("The benefit must derive directly from the transfer, not from the use to which it is put by the transferee . . . .  For that reason, the individuals' rights as interest holders in the LLC is not alone sufficient to qualify them as persons for whose benefit the transfers were made within § 550(a)(1)'s meaning.") (quotation marks omitted).  The argument that a transfer to a corporation automatically benefits its equity holders "ignores the fundamental concept that a corporation exists as a separate legal entity, and its owners are not liable for the debts of the corporation."  *Brown*, 2015 WL 1009177, at *7 (citations omitted).  Therefore, Section 550(a)(1) does not relieve the Trustee of his affirmative burden in piercing the corporate veil or showing Nell and/or AI Chemical to be Blavatnik's alter egos.  *See Schechter v. 5841 Building Corp. (In re Hansen)*, 341 B.R. 638, 646 (Bankr. N.D. Ill. 2006) ("Without a showing sufficient to pierce the corporate veil, the separate corporate existence of [the corporation] must be respected.  It cannot simply be assumed that [the equity holder] benefited from [the debtor's] payments to [the corporation].") (citations omitted).  Without piercing the corporate veil or proving an alter ego theory, the Trustee cannot recover Toehold Payment 1 from Blavatnik since the transfers did not convey a "direct" benefit to him.

### C.    Count 11: Constructive Fraudulent Transfer Against Nell And Perella Weinberg

#### 1.    Overview Of Claim

In Count 11, the Trustee seeks to avoid a $127.6 million payment made by Basell to Nell (a $100 million transaction advisory fee, a $25 million annual management fee, and $2.6 million for expense reimbursement) and a $500,000 payment to Perella Weinberg for its advisory fee in connection with the Merger (the Trustee does not allege which Debtor made that payment).

#### 2.    The Trustee Must Prove That The Fees Were Not Market Rate

The Trustee must prove by a preponderance of the evidence each of the elements of a constructive fraudulent transfer discussed in Section II.A, *supra*.  These elements include: (1) the transferor Debtor (if any) fails one of the three financial condition tests discussed in Section II.A.3, *supra*; and (2) Nell and/or Perella Weinberg did not provide services that are of reasonably equivalent value to their respective fees.

Courts have held that a debtor received reasonably equivalent value in exchange for acquisition fees, management fees, and investment advisory fees paid by a debtor in connection with an LBO to a private equity firm and an investment banking firm.  *See*, *e.g.*, *Brandt v. Trivest II, Inc. (In re Plassein Int'l Corp.)*, 405 B.R. 402 (Bankr. D. Del. 2009).  In *Plassein*, the court considered whether the fees were "in the range of usual and customary fees payable in a purchase/recapitalization transaction."  *Id.* at 410-11.

Nell and Perella Weinberg provided reasonably equivalent value even if the transactions undertaken in connection with the Merger are avoided.  *See Balaber-Strauss v. Sixty-Five Brokers (In re Churchill Mortg. Inv. Corp.)*, 256 B.R. 664, 680-81 (Bankr. S.D.N.Y. 2000) (dismissing constructive fraudulent transfer claims relating to mortgage brokers' fees that were paid by a debtor involved in a Ponzi scheme), *aff'd sub nom. Balaber-Strauss v. Lawrence*, 264

B.R. 303 (S.D.N.Y. 2001).  "[A] determination of whether value was given under section 548 should focus on the value of the goods and services provided rather than on the impact that the goods and services had on the bankrupt enterprise."  *Id.* at 680.

> **D.      Count 17:  Constructive Fraudulent Transfer Against Access**

> **1.      Overview Of Claim**

In Count 17, the Trustee asserts a constructive fraudulent transfer claim against Access seeking to avoid and recover the October Repayments on the basis that the "purported[] . . . loans under the Access Revolver are properly characterized as, and should be adjudged to be, capital contributions."  (SAC ¶ 492.)

> **2.      The Claim Cannot Be Sustained Where The Law Of The Case Rejects Its Underlying Premise**

In Count 15 of his Amended Complaint, the Trustee sought a declaratory judgment for recharacterization of the "purported loan advances" under the Access Revolver as capital contributions.  (Am. Compl. ¶¶ 429-432.)  Judge Gerber dismissed that claim, finding that the Trustee failed to state a claim for recharacterization.  (*See* Decision And Order On Defendants' Motions To Dismiss Counts 12, 15, And 16, Jan. 4, 2016 (Docket No. 697) ("Recharacterization MTD Decision"), at 40.)  The Court concluded that the Access Revolver "is exactly what the parties said it was—a debt facility under which funds could be (and were) borrowed, and could be (and were) repaid."  *Id.* at 38.

Because the law of the case is that that the funds advanced under the Access Revolver were not capital contributions—the allegation upon which the Trustee bases Count 17—it is unclear how or why the Trustee continues to prosecute this claim.  Count 17 is baseless.

### E.   Counts 1 And 2 Of Amended NAG Complaint: Constructive Fraudulent Transfer And/Or Recovery Against NAG

#### 1.   Overview Of Claims

The Amended NAG Complaint asserts two counts, both of which seek to avoid and/or recover the same transfer.  The transfer in question was previously the subject of Count 19 of the Amended Complaint—*i.e.*, the €100 million dividend made by Basell to BIS—which was dismissed for lack of personal jurisdiction over BIS.  Count 1 of the Amended NAG Complaint seeks to recover from NAG, as subsequent transferee, an alleged initial transfer of funds from Basell (a Luxembourg entity) to its majority shareholder, BIS (a Luxembourg entity) (the "<u>BIS Initial Transfer</u>"), pursuant to Section 550.  (Am. NAG Compl. ¶¶ 21-25.)  Count 2, pled in the alternative, seeks to avoid and recover under Sections 548 and 550 the same purported transfer, which it characterizes as one made by Basell to NAG.

#### 2.   The Trustee Must Avoid The Initial Transfer Made To BIS In Order To Recover From NAG Under Section 550

To recover from NAG as a subsequent transferee under Section 550, the Trustee would have had to have named BIS as a defendant.  He could not because, as Judge Gerber ruled, the Court lacks personal jurisdiction over BIS.  *See* Decision And Order On Defendant BI S.à.r.l.'s Motion To Dismiss Counts 14 And 19 Of The Complaint, Adv. Pro. No. 09-01375, Jan. 4, 2016 (Docket No. 696) (the "<u>BIS MTD Decision</u>").  This should end the inquiry.

In recent years, courts have split on whether a trustee must sue the initial transferee to avoid a fraudulent transfer.  "A significant number of cases have read § 550 to require that the plaintiff must first (or simultaneously) bring a successful suit against the initial transferee before he can recover the transfer or its value from the subsequent transferee. . . .  An equally significant number of cases have reached the opposite result . . . ."  *Official Comm. of Unsecured Creditors v. JP Morgan Chase Bank, N.A. (In re M. Fabrikant & Sons, Inc.)*, 394 B.R. 721, 741-42 (Bankr.

S.D.N.Y. 2008) (citations omitted).  Notably, the two court of appeals decisions are split.
*Compare IBT Int'l, Inc. v. Northern (In re Int'l Admin. Servs., Inc.)*, 408 F.3d 689, 706 (11th Cir. 2005) *with Weinman v. Simons (In re Slack-Horner Foundries Co.)*, 971 F.2d 577, 580 (10th Cir. 1992).  Similarly, the two district court opinions in this district are likewise split.  *See Sec. Investor Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC (In re Madoff Sec.)*, 501 B.R. 26, 31, 31 n.2 (S.D.N.Y. 2013) ("*Madoff I*") (holding that joinder of initial transferee is not necessary, but acknowledging that *Enron Creditors Recovery Corp. v. Int'l Fin. Corp. (In re Enron Creditors Recovery Corp.)*, 388 B.R. 489, 490 (S.D.N.Y. 2008), took a contrary view subject to an "exception where for legal or practical reasons it is impossible or impractical to satisfy the precondition of an avoidance").[17]

Given that "courts have recognized [that] the avoidance provisions of the Bankruptcy Code do not address against whom an avoidance action should be brought," *Madoff I* 501 B.R. at 321, coupled with the muddiness of the case law, this Court should resolve the issue based on well-recognized principles of statutory construction.  Of particular utility here is the axiom that "a statute must, if possible, be construed in such fashion that every word has some operative effect."  *United States v. Nordic Village Inc.*, 503 U.S. 30, 36 (1992).

---

[17] It is unlikely this equitable exception survives the Supreme Court's later opinion in *Law v. Siegel*, 134 S. Ct. 1188, 1197 (2014) ("equitable considerations [do not] permit a bankruptcy court to contravene express provisions of the Code").  *Law v. Siegel* also undermines that part of the rationale for Judge Rakoff's 2013 *Madoff I* decision premised upon "concern that a strict construction would preclude a trustee from pursuing subsequent transferees after settling with an initial transferee who does not admit liability [and] could cause bankruptcy proceedings to drag on unnecessarily for years," 501 B.R. at 33, as well as the Eleventh Circuit's choice in *International Administrative Services* not to "embrace a strict construction" and instead endorse "a more pragmatic and flexible approach to avoiding transfers," 408 F.3d at 707.  *See also, e.g.*, *Baker Botts L.L.P. v. ASARCO LLC*, 135 S. Ct. 2158, 2169 (2015) (rejecting effort to interpret the Bankruptcy Code based on policy considerations).

This principle applies with particular force to two subsections of Section 550. Subsection (a) enables a trustee to recover from various parties "to the extent that a transfer is avoided." Subsection (f)(1) provides that an action under Section 550 may be commenced "one year after the avoidance of the transfer on account of which recovery under this section is sought." These provisions make clear that, whatever actual practice has been, Congress envisioned a two-step process: (1) avoidance of the transfer and (2) recovery.[18] The first step must be initiated within two years following the petition date per Section 546(a), but the second step can await one year following the conclusion of the first step per Section 550(f). The first step must transform a transfer from one that is *avoidable* (*see, e.g.*, 11 U.S.C. § 502(d)) to one that is *avoided*. The second only then permits the avoided transfer to be recovered.

This structure makes sense only if Congress envisioned a process whereby avoidance and recovery are sought against different parties, with avoidance occurring first and recovery second.[19] *Williams v. Mortillaro (In re Res., Recycling & Remediation, Inc.)*, 314 B.R. 62, 69 (Bankr. W.D. Pa. 2004) ("Section 550(a) is a recovery provision and gives rise to a secondary cause of action which applies after the trustee has prevailed under one (or more) of the avoidance provisions found in the Bankruptcy Code.") (citation omitted); *see also Slack-Horner*, 971 F.2d at 580; *Greenwald v. Latham & Watkins (In re Trans-End Tech., Inc.)*, 230 B.R. 101, 104 (Bankr. N.D. Ohio 1998) ("A complete reading of § 550 supports the conclusion that actual avoidance of an initial transfer is required before recovery is sought from subsequent transferees.").

---

[18] Avoidance "may be all that the trustee wants; for example, if the State has a claim against the bankrupt estate, the avoidance determination operates to bar that claim until the preference is turned over." *Cent. Va. Cmty. College v. Katz*, 546 U.S. 356, 371-72 (2006).

[19] In practice, of course, sequential actions are the exception, not the rule, but they do occur, as described in the above-cited *Madoff I* decision. 501 B.R. at 36-37. Ordinarily, as the Court is well aware, trustees do not split claims and sue to both avoid and recover.

Against this statutory backdrop, NAG submits that when Congress spoke, in Section 550(a), of a "transfer [being] avoided under section 544, 545, 547, 548, 549, 553(b), or 724(a)," Congress had to be thinking of avoidance vis-à-vis an initial transferee, and that when it spoke of an outside limit on recovery, in Section 550(f), of "one year after the avoidance of the transfer," Congress had in mind a follow-on action against a subsequent transferee. To permit a trustee to skip the initial transferee and sue only the subsequent transferee is a statutory non-sequitur.

### 3. Even If The Trustee Could Establish Each Of The Requisite Elements Of A Constructive Fraudulent Transfer, The Bankruptcy Code's Avoidance Powers Do Not Apply To These Claims

### (a) The Trustee Cannot Avoid The Initial Transfer From Basell To BIS Because The Bankruptcy Code's Avoidance Powers Do Not Apply To Extraterritorial Transactions

Even if the Court determined that the Trustee need only show that the BIS Initial Transfer (assuming it actually happened) was avoidable generally, the Trustee would not be able to do so, because the BIS Initial Transfer is a wholly extraterritorial prepetition transfer made by Basell, a Luxembourg entity (Am. NAG Comp. ¶ 7) to BIS, another Luxembourg entity (*id.* ¶ 12), and extraterritorial transfers are beyond the reach of the Bankruptcy Code's avoidance provisions.

Federal statutes are presumed *not* to apply extraterritorially. It is a "longstanding principle of American law that legislation of Congress, unless a contrary intent appears, is meant to apply only within the territorial jurisdiction of the United States." *Morrison v. Nat'l Australia Bank, Ltd.*, 561 U.S. 247, 255 (2010) (citation and quotation marks omitted); *see also RJR Nabisco, Inc. v. European Cmty.*, 136 S. Ct. 2090, 2101 (2016) (reaffirming "guiding principles" set forth in *Morrison*). Therefore, "unless there is the affirmative intention of the Congress clearly expressed" to give a statute extraterritorial effect, "we must presume it is primarily concerned with domestic conditions." *Morrison*, 561 U.S. at 254 (quoting *Equal Employment Opportunity Comm. v. Arabian Am. Oil Co.*, 499 U.S. 244, 248 (1991) ("*Aramco*")). This

presumption applies regardless of whether there is a risk of conflict between the United States statute and foreign law. *See Sale v. Haitian Ctrs. Council, Inc.*, 509 U.S. 155, 173-74 (1993).

In deciding whether a statute applies extraterritorially, courts conduct a two-part inquiry. *See Maxwell Comm'n Corp. plc v. Societe General plc (In re Maxwell Commc'n Corp. plc)*, 186 B.R. 807, 815-16 (S.D.N.Y. 1995) ("*Maxwell II*"), *aff'd on other grounds*, 93 F.3d 1036 (2d Cir. 1996) ("*Maxwell III*"). First, the court must ask whether the conduct "occurred outside the borders of the U.S." *Maxwell II*, 186 B.R. at 815-16. If the conduct was extraterritorial, the court must consider whether Congress intended the federal statute to apply extraterritorially. *Id.* Under *Morrison*, and in keeping with the presumption *against* extraterritoriality, "[w]here a statute gives no clear indication of an extraterritorial application, it has none." *Morrison*, 561 U.S. at 255; *see also Aramco*, 499 U.S. at 248 (unless "the affirmative intention of the Congress" to apply the law extraterritorially is "clearly expressed," a federal law will only apply domestically) (quoting *Benz v. Compania Naviera Hidalgo, S.A.*, 353 U.S. 138, 147 (1957)).

Courts have applied a "center of gravity" test, under which they "look to the facts of a case to determine whether they have a center of gravity outside the United States." *Florsheim Grp. Inc. v. USAsia Int'l Corp. (In re Florsheim Grp. Inc.)*, 336 B.R. 126, 130 (Bankr. N.D. Ill. 2005) (quoting *Maxwell Commc'n Corp. plc v. Barclays Bank (In re Maxwell Commc'n Corp. plc)*, 170 B.R. 800, 809 (Bankr. S.D.N.Y. 1994) ("*Maxwell I*")). Although "all component[s]" of a transfer will be considered, the fact that the transferor and transferee are non-U.S. entities is important. *See Maxwell II*, 186 B.R. at 816-18 (center of gravity was outside of U.S. when parties to transfers were non-U.S. entities, notwithstanding that transfers were initiated in U.S. after sale of U.S. assets). The "center of gravity" of an extraterritorial transfer between two foreign corporate entities is not affected by whether certain signatories of the foreign

55

corporation's manager or shareholder resolutions reside in the U.S.  Corporate citizenship is not

based on the residency of individual shareholders or officers.  *See*, *e.g.*, *E.R. Squibb & Sons, Inc.*

*v. Accident & Cas. Ins. Co.*, 160 F.3d 925, 931 (2d Cir. 1998); *Airlines Reporting Corp. v. S & N*

*Travel, Inc.*, 58 F.3d 857, 861-62 (2d Cir. 1995).

If a transfer is extraterritorial, it is necessary to consider whether Congress intended the

statute to apply extraterritorially.  The Trustee does not specify the statutory basis for avoidance

of the BIS Initial Transfer, but in Count 19 of the (prior) Amended Complaint, he sought to

avoid the transfer under Section 548.  This Court therefore must determine whether Congress

"clearly expressed" its intent for Section 548 to apply extraterritorially.  *See SIPC v. Bernard L.*

*Madoff Inv. Secs. LLC (In re Madoff Secs.)*, 513 B.R. 222, 228 (S.D.N.Y. 2014) ("*Madoff II*")

(looking first to the text of the statute—Section 550(a)—and determining that nothing in the

statutory language suggests that Congress intended the section to apply to foreign transfers).

Judge Gerber previously considered the extraterritorial reach of Section 548 in the

context of the BIS Initial Transfer.  Although he dismissed the claims against BIS for lack of

personal jurisdiction, he stated in *dicta* his views that (i) the BIS Initial Transfer was in fact

extraterritorial,[20] but (ii) Section 548 applies to extraterritorial transfers.  (BIS MTD Decision at

23.)  This Court is not bound to Judge Gerber's decision.  (*See* Order Denying NAG's Motion To

Dismiss, Adv. Pro. No. 11-01844, July 20, 2016 (Docket No. 39) at 7 n.3.)

Judge Gerber acknowledged that "the text of Section 548 does not contain any express

language or indication that Congress intended the statute to apply extraterritorially," and instead

---

[20]  Judge Gerber determined that the BIS Initial Transfer was "substantially foreign" and that "the connection to the United States is not sufficiently strong for the transfer to be considered anything but extraterritorial."  (BIS MTD Decision at 26-27.)

concluded that Section 541 demonstrates such intent.  (BIS MTD Decision at 27-29.)  Section

541, which defines "property of the estate," provides, in relevant part:

> (a) . . . Such estate is comprised of all the following property, wherever located
> and by whomever held:
>
>> (1) . . . [A]ll legal or equitable interests of the debtor in property as
>> of the commencement of the case. . . .
>
>> (3)  Any interest in property that the trustee recovers under section
>> 329(b), 363(n), 543, 550, 553, or 723 of this title.

11 U.S.C. § 541(a).  In evaluating the effect of Section 541 on Section 548, Judge Gerber agreed

with the Fourth Circuit's decision in *French v. Liebmann (In re French)*, 440 F.3d 145 (4th Cir.

2006), which held that Section 548 applies extraterritorially because it provides for the avoidance

of transfers of property that *would have been* property of the estate.  (BIS MTD Decision at 29

(citing *French*, 440 F.3d at 151-52).)  However, *French* is premised on an interpretation of

Section 541 that *the Second Circuit has rejected*.  Section 541 defines property, generally, as all

"interests of the debtor in property as of the commencement of the case . . . wherever located."

11 U.S.C. § 541(a).  The Fourth Circuit, homing in on the phrase "interests of the debtor in

property," noted that Section 548 allows the avoidance of certain transfers of "interest[s] of the

debtor in property."  *French*, 440 F.3d at 151 (quoting 11 U.S.C. § 548(a)(1)).  The court

extrapolated that through the use of the language of Section 541 to define what property a trustee

may recover pursuant to his avoidance powers, "Congress made manifest its intent that Section

548 apply to all property that, absent a prepetition transfer, would have been property of the

estate, wherever that property is located."  *Id.* at 152.

The Fourth Circuit's reasoning conflicts with clear, binding Second Circuit precedent:

> If property that has been fraudulently transferred is included in the § 541(a)(1)
> definition of property of the estate, then § 541(a)(3) is rendered meaningless with
> respect to property recovered pursuant to fraudulent transfer actions.  Further, the
> inclusion of property recovered by the trustee pursuant to his avoidance powers in

> a separate definitional subparagraph clearly reflects the congressional intent that
> such property is not to be considered property of the estate until it is recovered.

*Colonial Realty Co.*, 980 F.2d at 131 (citation and quotation marks omitted).  Because the Fourth

Circuit relied on Section 541's reach to property "wherever located" as evidence of Congress'

intent for Section 548 to apply extraterritorially, absent the incorporation of Section 541 into

Section 548, no such intent can be found.

Judge Gerber attempted to reconcile his decision and *French* with *Colonial Realty* by

positing that "Section 541(a)(1) speaks of property of the estate as of the commencement of the

case; whereas section 541(a)(3) speaks of property that enters the estate at a later time, when it is

recovered under section 550."  (BIS MTD Decision at 31.)  According to Judge Gerber:

> Section 550 authorizes a trustee to recover transferred property to the extent that
> such transfer is avoided under either section 544 or 548.  It would be inconsistent
> (such that Congress could not have intended) that property located anywhere in
> the world could be property of the estate once recovered under section 550, but
> that a trustee could not avoid the fraudulent transfer and recover that property if
> the center of gravity of the fraudulent transfer were outside of the United States.

(*Id.* at 32.)  But this is circular, and ignores the text, which states that property of the estate

includes "any interest in property that the trustee *recovers* under section . . . 550 . . . of this title."

11 U.S.C. § 541(a)(3) (emphasis added).  Thus, the section only addresses the recovered interests

in property, not the avoidance powers that are needed to potentially allow recovery of such

interests.  Judge Gerber's logic is also at odds with other courts in this district and elsewhere.

Courts in this district have held that Congress did not intend for the Bankruptcy Code's

avoidance powers to apply extraterritorially.  Although no court in this district, or circuit, for that

matter, has ruled on whether Congress intended Section 548 to apply extraterritorially, the

district court held that Section 547—the Code's preference provision—could not be applied

extraterritorially.  *See Maxwell II*, 186 B.R. at 816.  Relying on *Colonial Realty*, the court held

that "[b]ecause preferential transfers do not become property of the estate until recovered, § 541

does not indicate the Congress intended § 547 to govern extraterritorial transfers." *Id.* at 820. That the Trustee is challenging the BIS Initial Transfer as a fraudulent transfer under Section 548 rather than as a preferential transfer under Section 547 does not warrant a different outcome. *See Barclay v. Swiss Fin. Corp. Ltd. (In re Midland Euro Exch. Inc.)*, 347 B.R. 708, 717-18 (Bankr. C.D. Cal. 2006) (citing *Maxwell I* and holding that Section 548 does not apply extraterritorially).

A recent decision by the district court likewise held that Section 550(a) does not apply extraterritorially. In *Madoff II*, the trustee argued that Section 541 is incorporated into the Code's avoidance and recovery provisions, which use the phrase "an interest of the debtor in property" to define the transfers that may be avoided—a phrase that is repeated in Section 541 in defining "property of the estate." 513 B.R. at 228-29. According to the *Madoff II* trustee's theory, Section 541's reference to property "wherever located and by whomever held" is thereby indirectly incorporated into the Bankruptcy Code's avoidance and recovery provisions, indicating that Congress intended that those provisions apply extraterritorially as well. *Id.* The court rejected this theory as "neither logical or persuasive." *Id.* at 229. "That section 541's definition of 'property of the estate' may be relevant to interpreting 'property of the debtor' does not necessarily imply that transferred property is to be treated as 'property of the estate' under section 541 prior to recovery by the Trustee." *Id.* "Under the logic of *Colonial Realty*, whether 'property of the estate' includes property 'wherever located' is irrelevant to the instant inquiry: fraudulently transferred property becomes property of the estate only after it has been recovered by the Trustee, so section 541 cannot supply any extraterritorial authority that the avoidance and recovery provisions lack on their own." *Id.* (citations omitted). The court declined the trustee's invitation to adopt the Fourth Circuit's ruling, noting that "the logic of *French* is inconsistent with the Second Circuit's decision in *Colonial Realty*, as *French* relies on a notion that the

foreign property would have been property of the debtor's estate absent a fraudulent transfer, whereas *Colonial Realty* implies that section 541 would not apply until after property has been recovered." *Id.* at 30 n.2 (citations and quotation marks omitted).

In light of the clear weight of the case law, the Court should preclude the Trustee from applying Section 548 to avoid extraterritorial transactions. Because the BIS Initial Transfer is not avoidable, it provides no basis for any recovery from NAG under Section 550(a).

### (b) International Comity Prevents Application Of Sections 548 And 550 To The BIS Initial Transfers

Even if the presumption against extraterritoriality were rebutted and Section 548 could be read to apply extraterritorially to the BIS Initial Transfer, concerns of international comity should nevertheless prevent that reading. Comity "is the recognition which one nation allows within its territory to the legislative, executive or judicial acts of another nation, having due regard both to international duty and convenience, and to the rights of its own citizens or of other persons who are under the protection of its laws." *Madoff II*, 513 B.R. at 231. "International comity is a separate notion from the 'presumption against extraterritoriality'" and may even preclude the application of federal law "where the conduct at issue was otherwise clearly subject to [a federal] statute." *Maxwell III*, 93 F.3d at 1047 (citations omitted). And according to the Second Circuit, "[c]omity is especially important in the context of the Bankruptcy Code." *Id.* 93 F.3d at 1048.

"Courts conducting a comity analysis must engage in a choice-of-law analysis to determine whether the application of U.S. law would be reasonable under the circumstances, comparing the interests of the United States and the relevant foreign state." *Madoff II*, 513 B.R. at 231 (citation omitted). Generally, "[t]he federal common law choice-of-law rule is to apply the law of the jurisdiction having the greatest interest in the litigation." *Koreag, Controle et Revision S.A. v. Refco F/X Assocs., Inc. (In re Koreag, Controle et Revision S.A.)*, 961 F.2d 341,

60

350 (2d Cir. 1992), *cert. denied*, 506 U.S. 865 (1992) (citations omitted).   There is "no significant difference between the applicable federal and New York choice-of-law rules," which both require "an interest analysis consistent with the law of either jurisdiction."   *Id.* at 350-51; *see also Kraken Inv. Ltd. v. Jacobs (In re Salander-O'Reilly Galleries, LLC)*, 475 B.R. 9, 31 (S.D.N.Y. 2012).

This Court's ruling in *Hoskin v. TPG Capital Mgmt., LP (In re Hellas Telecomm. (Luxembourg) II SCA)*, 524 B.R. 488, 516 (Bankr. S.D.N.Y. 2015), which addressed a similar situation, details how the choice-of-law and interest analysis should be undertaken.   There, a debtor's liquidators brought a claim under New York's constructive fraudulent conveyance statute—which, like Section 548, does not require intent—with respect to transfers originating in Luxembourg, between Luxembourg-based entities, and pursuant to Luxembourg corporate resolutions.   *Id.* at 517, 519-20.   The defendants countered that Luxembourg law—which requires intent—should apply.   *Id.* at 517.   The Court recognized an "actual conflict" of law.   *Id.* at 518.   The Court then performed an "interest analysis" in which it noted that because "fraudulent conveyance laws are 'conduct regulating,' the law of the jurisdiction where the tort occurred will generally apply because that jurisdiction has the greatest interest in regulating behavior within its borders," *id.* at 519 (citations omitted), and moreover, if the injury occurred elsewhere, "it is the place of the allegedly wrongful conduct that generally has superior interests in protecting the reasonable expectation of the parties who relied on the laws of that place to govern their primary conduct and in the admonitory effect that applying its law will have on similar conduct in the future." *Id.* (citations, quotation marks, and alterations omitted).   The Court held that Luxembourg law applied, and dismissed the claim.   *Id.* at 521.   The same analysis applies here in deciding whether to apply Section 548 extraterritorially.

4.    **Count 2 Of The Amended NAG Complaint Seeks To Avoid And Recover A Transfer Of Property In Which No Debtor Had An Interest**

In the Original NAG Complaint, the Trustee alleged that Basell Holdings, a non-debtor, instructed Basell Funding, a non-debtor, to wire €100 million to NAG.  (*See* Orig. NAG Compl. ¶ 15.)  Exhibit C to the Original NAG Complaint was a letter from Basell Funding to Basell Holdings instructing Basell Holdings to make that transfer to NAG.  (*See id.*, Ex. C.)  Thus, the Trustee has already provided evidence that there was a transfer, made by a non-debtor (Basell Holdings), of property of another non-debtor (Basell Funding).

In recognition of this obvious, fatal flaw in the claim, the Trustee altered his allegations in the Amended NAG Complaint.  Now, he alleges that Basell instructed Basell Funding, a non-debtor, to wire that same €100 million to NAG (and includes a different instruction letter to that effect as Exhibit C to the Amended NAG Complaint).  (*See* Am. NAG Compl. ¶ 17, Ex. C.)

Even if the Trustee could prove that a transfer was in fact made in accordance with this second instruction letter, the Trustee's revised theory does not save this claim.  The Trustee argues that Blavatnik caused Basell to be stripped of cash in the form of shareholder distributions and that, to "extract cash, Blavatnik caused shareholder distributions to be 'upstreamed' from the Basell operating companies by each entity in the chain of ownership declaring a distribution to its respective shareholder."  (*See* Am. NAG Compl. ¶ 8.)  If this is true, then Basell—which was an entity in the middle of this "chain of ownership"—never had the requisite property interest in the €100 million.  *See Norberg*, 813 F.2d at 1181 ("In determining whether the debtor had control of funds transferred to a noncreditor, the court must look beyond the particular transfers in question to the entire circumstance of the transactions.").

In a seminal case regarding whether a debtor controlled property for the purposes of determining whether it had an interest in such property that was allegedly fraudulently

transferred, the Eleventh Circuit held that the debtor did not control funds that were deposited in its account, without any restrictions, and ultimately transferred to the defendant, since the transfer was part of a larger scheme involving numerous transactions among several corporate entities. *Id.* at 1182. Notably, the fact that the debtor directed the transfer to the defendant was insufficient to establish that the debtor had the requisite control over the funds. Since the debtor did not "control" the transfer, the court held that the funds were not property of the debtor, and thus the transfer was not avoidable as a constructive fraudulent transfer. *Id.*

Here, Basell Holdings, a non-debtor, was the first entity in a chain to declare the €100 million dividend (to non-debtor Basell Funding), and after a series of dividends, one of which was made by Basell, NAG received the €100 million. Under *Norberg* and the cases cited in Section II.A.1, *supra*, Basell did not ever have the requisite control over the pass-along dividend. Moreover, the fact that the funds were never deposited into, let alone transferred out of, a Basell account further undercuts the Trustee's argument that Basell had the requisite property interest. *See A.W. Lawrence*, 346 B.R. at 58 (holding that the debtor did not have an interest in the property transferred where "neither the check for $50,000, nor cash in that amount, passed through [the debtor's] bank account" and instead was "endorsed directly over to [the defendants]"). Finally, the evidence will show that Basell Holdings (a non-debtor) was the nerve center for the Basell enterprise as the Dutch holding company where decisions were made, not Basell, during the pre-Merger period.

The result would be no different even if the Court accepted the Trustee's invitation to stop and take a freeze frame at the step in the "chain" at which Basell allegedly acquired a property interest in the funds—when Basell Funding declared the dividend to Basell. If that is proper, then so too is considering the next logical freeze frame—when Basell declared a

dividend to BIS, at which point, BIS became the initial transferee of the allegedly fraudulent transfer. However, for the reasons discussed in Section II.E.3, *supra*, this extraterritorial transfer cannot be avoided, and therefore cannot be recovered from NAG as a subsequent transferee.

The Trustee cannot prove that Basell had the requisite property interest in the €100 million originally transferred from Basell Holdings and allegedly ultimately received by NAG.[21]

## III.    STATUTORY OFFSETS TO FRAUDULENT TRANSFER LIABILITY

### A.    The Import of Section 550(d)

In the Original Complaint, the Committee sought to avoid the obligations incurred to the lenders and to subordinate their claims. (*See* Orig. Compl., Counts 1, 2, 18-21.) In 2010, the Debtors and the Committee settled those claims (the "Lender Settlement"). As a result, Senior Credit Facility claims received only 61.1% in recoveries (approximately $6.25 billion), Bridge Loan claims received a mere 6.3% (approximately $523 million), and the lenders subordinated their deficiency claims to general unsecured creditors with respect to any litigation proceeds. (*See* Third Amended Disclosure Statement, Mar. 12, 2010 (Docket No. 3988) at 6-8.) Per the settlement, $450 million was also made available to general unsecured creditors (or 16.8% in recoveries), and that distribution, too, excluded the lenders' deficiency claims. (*See id.* at 9.) Thus, the allegedly harmful "transfer" made by the Debtors and non-debtors (the obligations incurred and security interests pledged) of more than $20 billion was satisfied and discharged for

---

[21]    Moreover, regardless whether Basell Holdings or Basell Funding was the transferor, both instruction letters directed those Luxembourg entities to make a wire transfer to NAG's account at J.P. Morgan AG, Frankfurt. Therefore, under either of the Trustee's alleged scenarios, the transfer would be extraterritorial, and could not (or should not) be avoided for the same reasons discussed in Section II.E.3, *supra* (*i.e.*, the Bankruptcy Code's avoidance provisions cannot be applied to extraterritorial transfers, and even if they could, they should not be for reasons of international comity).

approximately $10 billion in return.[22]  The lenders also released all non-debtor affiliates from any liability associated with the acquisition debt.

The order approving the Lender Settlement stated that "nothing herein shall prejudice or operate to preclude the rights of any Non-Settling Defendant to . . . obtain judgment credit or reduction to the fullest extent available under applicable law on any applicable grounds whatsoever; provided that the Plaintiff reserves the right to dispute any such claimed right to judgment credit or reduction[.]"  (Order Approving Revised Settlement With Financing Party Defendants In Committee Litigation Pursuant To Bankruptcy Rule 9019, No. 09-10023, Mar. 11, 2010 (Docket No. 371) at 11.)

Section 550(d) provides that "[t]he trustee is entitled to only a single satisfaction under subsection (a) of this section." 11 U.S.C. § 550(d).  Section 550(d) may be applied in the context of multiple transfers that are part of a "collapsed" transaction.  *See In re Telesphere Commc'ns Inc.*, 179 B.R. 544, 563 n.32 (Bankr. N.D. Ill. 1994) (noting that to the extent the debtor recovered from the lenders, it could not recover from the party from whom it purchased the stock).  Moreover, settlement credit is appropriate under Section 550(d).  *See, e.g.*, *Dzikowski v. N. Trust Bank of Fla., N.A. (In re Prudential of Fla. Leasing Inc.)*, 478 F.3d 1291, 1300 (11th Cir. 2007) (noting that settlement credit is appropriate when applying Section 550(d)'s single satisfaction rule as a matter of federal law).

Although the Second Circuit has not considered whether Section 550(d) requires a judgment reduction or credit to reflect the value already received by the estate in a settlement, it has held that "a uniform national rule of settlement credit is appropriate." *Singer v. Olympia Brewing Co.*, 878 F.2d 596, 599 (2d Cir. 1989).  Under such a rule of federal law, "when a

---

[22] The $10 billion amount includes $3.25 billion of Senior Secured Claims that were rolled up into the debtor-in-possession financing facility and repaid in full under the Plan.

plaintiff receives a settlement from one defendant, a nonsettling defendant is entitled to a credit of the settlement amount against any judgment obtained by the plaintiff against the nonsettling defendant as long as both the settlement and judgment represent common damages." *Id.* at 600.

The alleged harm here was not a payment to shareholders with cash on-hand while creditors were left behind awaiting repayment; it was borrowing more than $20 billion of secured debt and immediately using those loan proceeds in a way alleged to be unfair ***while remaining liable to the acquisition lenders for repayment in full***. However, $7.5 billion of that $20 billion was used to repay Lyondell's existing debt, with $12.5 billion in shareholder payments potentially subject to challenge. Meanwhile, all of the approximately $20 billion of secured debt (including the liens transferred) was discharged and released (or capped) for $10 billion, leaving only $2.5 billion (*i.e.*, $10 billion of ultimate liability to the lenders minus $7.5 billion used to repay existing debt) subject to even theoretical recovery.

In fashioning a settlement credit under Section 550(d), the Court should reduce the notional liability of any transferee of the proceeds of the lenders' cash by the amount of the debt that was forgiven. Thus, each transferee would have—at most—20% liability for the amount received since 80% of the allegedly injurious loans used to fund shareholder payouts has already been discharged and subordinated to and for the benefit of all unsecured creditors ($10 billion divided by $12.5 billion equals 80%). The math is the same and would limit transferee liability to 20% of any amount received if the Court considers $2.5 billion of the $10 billion ultimately repaid as having been incurred for less than reasonably equivalent value (giving credit for the $7.5 billion of debt that was merely refinanced in the Merger), and dividing that payment by the total payouts to shareholders ($2.5 billion divided by $12.5 billion equals 20%). Either way, in the event that any transactions are actually avoided by the Court (which they should not be),

Section 550(d) mandates that the recovery available to the Trustee under Section 550(a) be reduced to avoid a double recovery in light of previous settlements.

### B.   The Import Of Section 548(c)

Under Section 548(c), a transferee may assert an affirmative defense to the avoidance of a transfer to the extent the transferee took the transfer (1) for value and (2) in good faith. *See* 11 U.S.C. § 548(c); *Christian Bros. High Sch. Endowment v. Bayou No Leverage Fund, LLC (In re Bayou Grp.)*, 439 B.R. 284, 344 (S.D.N.Y. 2010).  This is an affirmative defense that defendants have the burden of establishing.  *Silverman v. Actrade Capital Inc. (In re Actrade Fin. Techs. Ltd.)*, 337 B.R. 791, 805 (Bankr. S.D.N.Y. 2005).

The Section 548(c) defense permits a transferee that did not provide reasonably equivalent value to nevertheless reduce its liability by the amount of the value in fact provided. "Value" is defined in Section 548(d)(2)(A) to include "property, or satisfaction or securing of a present or antecedent debt of the debtor[.]"  11 U.S.C. § 548(d)(2)(A).  The relevant inquiry is the determination of the value given by the transferee, not the value received by the debtor.  *See Dobin v. Hill (In re Hill)*, 342 B.R. 183, 204 (Bankr. D.N.J. 2006) ("The provision looks at the value from the perspective of the transferee.").

The second element of a Section 548(c) defense is that the transferee took in "good faith."  11 U.S.C. § 548(c).  "Good faith is . . . determined on a case-by-case basis."  *In re Armstrong*, 259 B.R. 338, 343 (E.D. Ark. 2001) (internal citations omitted), *aff'd*, 285 F.3d 1092 (8th Cir. 2002).  Courts will look to "what the transferee actually knew or should have known when it accepted the transfers."  *Gold v. First Tenn. Bank N.A. (In re Taneja)*, 743 F.3d 423, 430 (4th Cir. 2014) (citation and quotation marks omitted).  "Good faith" has both subjective ("honesty in fact") and objective ("observance of reasonable commercial standards") components.  *Id.* at 430 (noting that subjective prong implicates "honesty" and "state of mind" of

67

the transferee while the objective prong requires the transferee to "abide by routine business practice"). The party asserting a good faith defense need not present evidence that every action concerning the relevant transfers was objectively reasonable in light of industry standards. *Id.* Instead, "[the court's] inquiry regarding industry standards serves to establish the correct context in which to consider what the transferee knew or should have known." *Id.* at 431. Moreover, the party asserting the defense need not present third-party expert testimony in order to establish prevailing industry standards, but "the objective component of the good-faith defense may be established by lay or expert testimony, or both, depending on the nature of the evidence at issue." *Id.*

In determining what a transferee knew or should have known, courts consider whether the transferee was on "inquiry notice" (*i.e.*, an awareness of suspicious facts that would have led a reasonable person, acting diligently, to investigate further and by doing so discovering wrongdoing (or insolvency)). *See Grede v. Bank of New York Mellon Corp. (In re Sentinel Mgmt. Grp., Inc)*, 809 F.3d 958, 961 (7th Cir. 2016). Some courts have formulated a two-part test that looks at (1) whether the transferee was on inquiry notice of fraud or insolvency, and, if so, (2) whether the transferee reasonably followed up with due diligence as to the facts giving rise to that inquiry notice. *See*, *e.g.*, *Christian Bros.*, 439 B.R. at 308-09.

Regardless whether the Court collapses Toehold Payment 1 with the other Merger transactions, value was certainly given by Nell and/or the Access entities. Viewing the Toehold transfer in isolation, Nell gave value in the form of its equity interests in AI Chemical, the assets of which were the Toehold shares (which had value to Nell and LBI). Viewing the Merger as a whole, Nell caused its indirect subsidiary, Basell, to pledge and cause its subsidiaries to pledge Basell's assets, including $6 billion of equity value, to secure the credit facilities for the benefit

of the new combined enterprise. And the very fact that Nell placed its more than $6 billion in equity in Basell at risk by consummating these transactions is indicative of good faith. The fact that the acquisition of Lyondell was structured in a tax-efficient way is not a basis to suggest bad faith. *See In re Coburn*, 175 B.R. 400, 403-04 (Bankr. D. Or. 1994) (noting that it is not bad faith for a taxpayer to structure his finances to minimize his tax obligations); *In re Sherwood Square Assocs*, 107 B.R. 872, 876 (Bankr. D. Md. 1989) (reorganization plan structured to create tax savings is not evidence of bad faith). In any event, contrary to the Trustee's false accusations, Nell was not created or used to minimize U.S. tax obligations. The evidence will establish the reasons for Nell's creation and its utter irrelevance to U.S. tax laws.

Nell and Perella Weinberg similarly provided value to the Debtors in good faith in exchange for the fees they were paid and, therefore, their respective liability—if any—would be reduced by the amount of such value.

## IV. PREFERENCE CLAIM

### A. <u>Overview Of Applicable Law</u>

Section 547(b) permits the Trustee to avoid any transfer of an interest of the debtor in property: (1) made to or for the benefit of a creditor; (2) for or on account of an antecedent debt owed by the debtor before such transfer was made; (3) made while the debtor was insolvent; (4) made on or within 90 days before the date of the filing of the petition (with respect to creditors who are not "insiders" of the debtor); and (5) that enables such creditor to receive more than it would receive in a Chapter 7 distribution had the transfer not been made. *See* 11 U.S.C. § 547(b). The Trustee bears the burden of proving each of these elements. *See* 11 U.S.C.

§ 547(g);[23] *Lawson v. Ford Motor Co. (In re Roblin Indus., Inc.)*, 78 F.3d 30, 34 (2d Cir. 1996);

*Goldberg v. Such (In re Keplinger)*, 284 B.R. 344, 346 (N.D.N.Y. 2002).

While Section 548 allows clawback of constructive fraudulent transfers if any one of

three financial condition tests is satisfied, the ***only relevant measure of insolvency for purposes***

***of a Section 547 preference claim is balance sheet insolvency*** (*i.e.,* where the debtor's liabilities

are greater than the fair valuation of its assets).  *See* 11 U.S.C. § 101(32)(A); *Roblin Indus.*, 78

F.3d at 35; *In re McLean Industries, Inc.*, 132 B.R. 247, 257 (Bankr. S.D.N.Y. 1991), *aff'd*, 162

B.R. 410 (S.D.N.Y. 1993), *rev'd on other grounds*, 30 F.3d 385 (2d Cir. 1994).

### B.    Overview Of Count 9 Against Access

In Count 9, the Trustee asserts a preference claim with respect to $300 million that LBI

drew under the Access Revolver on October 15, 2008 (the "October Draw"), and repaid, in three

separate payments, on October 16, 17, and 20, 2008 (the "October Repayments").  The Trustee

seeks to avoid and recover the October Repayments from Access under Section 547(b).

### 1.    Access Rebutted The Presumption Of Insolvency, And The Trustee Will Not Be Able To Prove This Element At Trial

While the Trustee is entitled to a presumption of insolvency when the allegedly

preferential transfer is made within 90 days of the bankruptcy filing, s*ee*, *e.g.*, *Roblin Indus.*, 78

F.3d at 34, the Access Defendants rebutted this presumption.  (*See* Order Denying Cross Motions

For Summary Judgment On Count 9 Of The Amended Complaint, July 20, 2016 (Docket No.

771) (the "Preference SJ Decision") at 5 ("Access offers evidence that Lyondell was solvent at

the time of the transfers, including, among other things, the Debtors' bankruptcy schedules,

---

[23]  Section 547(g) provides that "the trustee has the burden of proving the avoidability of
a transfer under subsection (b) of this section, and the creditor or party in interest against whom
recovery or avoidance is sought has the burden of proving the nonavoidability of a transfer under
subsection (c) of this section."  11 U.S.C. § 547(g).

valuation, and business records, ***rebutting the presumption that a debtor is insolvent in the 90 days preceding the petition and shifting the burden of proof on insolvency to the Trustee***.") (emphasis added) (internal citations omitted).)  Thus, the Trustee must prove insolvency.

### 2.    The Ordinary Course Of Business Defense Prohibits Avoidance Of The October Repayments

Even if the Trustee can prove all of the elements of a preference claim, including insolvency, this claim still fails because the October Repayments are protected from avoidance by Section 547(c)'s ordinary course of business defense.   Section 547(c)(2) precludes the avoidance of an otherwise preferential payment (a) made on account of a debt that was incurred in the ordinary course of business of the debtor and the transferee and (b) made either in the parties' ordinary course of business ***or*** according to ordinary business terms.   The defense thus has two prongs: "incurrence" and "payment."

### (a)    Compliance With Contractual Terms Is Relevant To Both Prongs Of The Ordinary Course Of Business Defense

Courts have widely held that compliance with contractual terms is indicative of the ordinary nature of a transfer.   *See, e.g.*, *Jubber v. SMC Elec. Prods., Inc. (In re C.W. Mining Co.)*, 798 F.3d 983, 991 (10th Cir. 2015) ("[T]he court may refer solely to the written terms of the transaction to define the ordinary course of business between the parties."); *Kleven v. Household Bank F.S.B.*, 334 F.3d 638, 643 (7th Cir. 2003) ("In the absence of modifying behavior, we see no reason why we should not look to the terms of the parties' agreement in order to determine their ordinary course of business."); *KH Funding Co. v. Escobar (In re KH Funding Co.)*, 541 B.R. 308, 315 (Bankr. D. Md. 2015) ("[I]n the absence of any prior transactions, courts typically look to see if the debtor complied with the payment terms of its contract.").   While the Trustee seems to have conceded that acting in compliance with a contractual obligation is dispositive in finding that the "payment" prong of the defense is

satisfied, he claims that the same is not true for the "incurrence" prong.  But his distinction makes no sense and violates the principle that similar language used by Congress in the same statute carries the same meaning.

The "incurrence" prong requires that a debt be "incurred by the debtor in the ordinary course of business or financial affairs of the debtor and the transferee."  11 U.S.C. § 547(c)(2).  And the "payment" prong can be satisfied if the transfer is "made in the ordinary course of business or financial affairs of the debtor and the transferee." 11 U.S.C. § 547(c)(2)(A).  The language is identical and must be interpreted as such; if the written terms of an agreement may define whether payment was made in the ordinary course, the same is inescapably true for incurrence.  *See*, *e.g.*, *Powerex Corp. v. Reliant Energy Servs.*, *Inc.*, 551 U.S. 224, 232 (2007) ("A standard principle of statutory construction provides that identical words and phrases within the same statute should normally be given the same meaning.").

Here, Lyondell, LBI, and Access entered into the Access Revolver in March 2008, established a regular course of dealing with regard to compliance with the terms of the contract, fully performed the terms of the contract, and ultimately used the Access Revolver exactly as contemplated by contractual terms and established conduct.

### (b)     The Debt Was Incurred In The Ordinary Course Of Business

### (i)     The Debt Was Incurred At The Time Of The Draw

A debt is "incurred" under a revolving credit facility when a debtor draws on a facility, not when it executes the loan agreement.[24]  *See Rubin v. Mfrs. Hanover Trust Co.*, 661 F.2d 979, 989-91 (2d Cir. 1981) (finding obligations were incurred under guarantees when credit lines on

---

[24]  The Trustee seems to agree.  (*See* Memorandum Of Law In Opposition To The Motion Of Access Industries Holdings LLC For Summary Judgment On Count 9 Of The Amended Complaint, October 17, 2011 (Docket No. 669) at 28 n.85 (citing *Rubin*, 661 F.2d at 990).)

underlying guaranteed loans were drawn, not when guarantees were executed: "[w]hile these obligations existed only because of the system of guarantees, it does not follow that the execution of the guarantees, rather than the creation of contingent liabilities under them, constituted the incurring of the obligations for purposes of [Section] 67(d)(2)"); *In re Nirvana Rest., Inc.*, 337 B.R. 495, 502 n.3 (Bankr. S.D.N.Y. 2006) (discussing *Rubin* and noting that "the guarantor of a line of credit incurred an 'obligation' for fraudulent conveyance purposes when the principal debtor subsequently borrowed money (*i.e.*, used the line of credit) rather than when the guaranty was executed"); *In re Rustia*, 20 B.R. 131, 134 (Bankr. S.D.N.Y. 1982) (holding that "the availability of a line of credit to the debtors is not the correlative of an indebtedness owed by them to the extent of that credit line," but rather that credit is extended only when the debtor avails itself of that credit line by receiving cash advances or making purchases); *Cambridge Meridian Grp., Inc. v. Connecticut Nat'l Bank (In re Erin Food Servs., Inc.)*, 117 B.R. 21, 30 (Bankr. D. Mass. 1990) (reviewing debt incurred under revolving credit agreement with reference to draw dates; finding revolving credit agreement draws that were used to pay interest on term loan were entitled to contemporaneous exchange defense); 11 U.S.C. § 101(12) (defining "debt" to mean "liability on a claim").

       **(ii)**      **The Debt Was Incurred In The Ordinary Course Of Business Under Either The "Objective" or "Subjective" Test**

Courts generally apply one of two tests when determining whether a debt was "incurred by the debtor in the ordinary course of business or financial affairs of the debtor and creditor," 11 U.S.C. § 547(c)(2): (1) whether the debt was incurred in the ordinary course of business or financial affairs between the parties (the "between" test), *see, e.g., In re NewPage Corp.*, No. 13-52520-KG (Docket No. 52) at 9 (Bankr. D. Del. Sept. 30, 2016); *Jacobs v. Matrix Cap. Bank (In re AppOnline.com, Inc.)*, 315 B.R. 259, 283 (Bankr. E.D.N.Y. 2004); or (2) whether the debt was

incurred in the ordinary course of business or financial affairs of the debtor and of the transferee

(the "of … of" test), *see, e.g., Wood v. Stratos Prod Dev. (In re Ahaza Sys., Inc.)*, 482 F.3d 1118,

1125-26 (9th Cir. 2007).[25]

The Second Circuit and courts in this district have not definitively chosen one test over

the other.  Under the first approach—the "between" test—courts look to the dealings between the

parties, *i.e.*, whether the debt was incurred in the ordinary course of business between a

particular debtor and creditor.  Under the second approach—the "of … of" test—courts also will

consider the debtor's and creditor's business dealings generally, and do not limit themselves to

dealings they had with each other.  In *Roblin Industries*, a case that did not require a choice

between the two approaches, the Second Circuit cited with approval cases applying both

approaches.  78 F.3d at 391-41.  And in *Official Comm. of Unsecured Creditors v. Martin (In re*

*Enron Creditors Recovery Corp.)*, the district court reviewed arguments supporting both tests

and, although it seemed to favor the first test, applied both and concluded that the challenged

---

[25]   *Compare, e.g.*, *In re Tenn. Valley Steel Corp.*, 203 B.R. 949, 954 (Bankr. E.D. Tenn. 1996) (discussing courts' differing approaches and adopting "majority view" that it should examine "whether the debt was incurred in the ordinary course of business between the parties, as opposed to a determination of whether the debt was incurred in the ordinary course of each party's business, as viewed separate from their dealings with one another") *and In re Liberty Livestock Co.*, 198 B.R. 365, 373 (Bankr. D. Kan. 1996) ("§ 547(c)(2)(A) requires that the Court determine whether the debt was incurred in the ordinary course of business between this particular debtor and creditor."), *with Meeks v. Harrah's Tunica Corp. (In re Armstrong)*, 231 B.R. 723, 730 (Bankr. E.D. Ark. 1999) ("[T]he transfer must be in payment of a debt incurred in the ordinary course of financial affairs of the debtor *and* the transferee"; although the debt was incurred in the ordinary course of business of the transferee, ordinary course defense failed where the debt was not also incurred in the ordinary course of the debtor's financial affairs) (emphasis in original), *aff'd*, 260 B.R. 454 (E.D. Ark. 2001), *aff'd*, 291 F. 3d 517, 527 (8th Cir. 2002) *and Youthland, Inc. v. Sunshine Girls of Fla. Inc. (In re Youthland, Inc.)*, 160 B.R. 311, 314 (Bankr. S.D. Ohio 1993) (noting that incurrence test "requires an examination of the debts incurred for which the transfers were payment for the normality of such incurrences in each party's business operations generally" and applying the "of . . . of" test).

severance payment could not pass muster under either one. 376 B.R. 442, 459-64 (Bankr.

S.D.N.Y. 2007).

Indeed, each of the tests may be appropriate, depending on the facts of the case.

Embracing this flexible approach, the court in *Brooke Inv., Inc. v. CJD & Assocs., LLC (In re*

*Brooke Corp)* stated:

> There is no apparent reason why courts should adopt either the subjective or
> objective alternatives as controlling for all circumstances. The Bankruptcy Code
> requirement that the transfer be "in payment of a debt incurred by the debtor in
> the ordinary course of business or financial affairs of the debtor and the
> transferee" does not specify that the test must be either subjective or objective.
> This is in contrast to the requirement of § 547(c)(2) that the transfer satisfy one of
> two tests, the subjective test stated in § 547(c)(2)(A) or the objective test stated in
> § 547(c)(2)(B). The Tenth Circuit's directive that the incurrence of the debt
> requirement be read in light of the general policy of the preference section to
> discourage unusual action by either the debtor or [its] creditors during the debtor's
> slide into bankruptcy does not require a choice between the two alternatives.

536 B.R. 896, 916 (Bankr. D. Kan. 2015) (internal quotation marks omitted).

Regardless of whether the Court determines that one of the two tests is controlling, or if it

applies the more flexible approach applied in *Enron* and *Brooke*, the evidence will show that the

October Draw was made both in the ordinary course of the parties' mutual dealings, and also in

the ordinary course of Lyondell's and Access's individual businesses.

### (c)        The Debt Was Repaid In The Ordinary Course Of Business

A payment must satisfy one of two tests: (1) the "ordinary course of business" test (the

subjective test); or (2) the "ordinary business terms" test (the objective test). Before the 2005

BAPCPA amendments, a payment had to satisfy *both* tests. "Today, however, the test is a

disjunctive one. Thus, a defendant can prevail by demonstrating either the 'subjective' test of

Section 547(c)(2)(A) or the 'objective' test of Section 547(c)(2)(B)." *Davis v. Clarklift-West,*

*Inc. (In re Quebecor World (USA), Inc.)*, 518 B.R. 757, 762 (Bankr. S.D.N.Y. 2014).

The ordinary course of business defense is available to first-time transactions.  *See*, *e.g.*, *C.W. Mining*, 798 F.3d at 992 ("The gist of the [plaintiff's] argument was simply that this was a first time transaction.  As we have already said, that is not enough."); *Ahaza Sys.*, 482 F.3d at 1125 ("Obviously every borrower who does something in the ordinary course of her affairs must, at some point, have done it for the first time."); *Gosch v. Burns (In re Finn)*, 909 F.2d 903, 908 (6th Cir. 1990) ("We hold that, as a general rule, . . . a transaction can be in the ordinary course of financial affairs even if it is the first such transaction . . . ."); *Weisfelner v. LR2 Mgmt., K/S (In re Lyondell Chem. Co.)*, No. 10–05358, 2015 WL 5560283, at *7-9 (Bankr. S.D.N.Y. Sept. 18, 2015) (holding that first-time transfer between debtor and defendant was protected by the objective test of ordinary business terms).

Under the subjective test, the defendant generally must show that the disputed payments were ordinary in relation to the prior course of dealings between the debtor and the defendant.  *KH Funding*, 541 B.R. 308 at 314-15.  However, if there is no prior course of dealings between the parties, the court may look to other factors in assessing whether the payment nevertheless satisfies the subjective test.

*First*, the payment prong may be satisfied by showing the parties' compliance with contractual terms.  *See* Section IV.B.2.a, *supra*.

*Second*, when assessing whether a first-time transaction satisfies the subjective test, courts have held that a debtor's dealings with other "similarly situated parties" that are consistent with the conduct in relation to the transferee may signal ordinariness.  *Kelley v. McCormack (In re Mitchell)*, 548 B.R. 862, 892 (Bankr. M.D. Ga. 2016) ("[T]he growing trend in the case law is clear as to the first element—a transfer made pursuant to a first-time transaction debt can fall within the ordinary course exception if the transferee can show that the debt would be considered

as occurring ordinarily between similarly situated parties."); *KH Funding*, 541 B.R. at 315-16

(assuming that "a showing [that other contractors were treated in a similar manner] would

establish a defense under section 547(c)(2)(A)," but ultimately finding that the defendant failed

to make such a showing because she "was routinely treated differently and more beneficially

than other contractors, both in terms of the manner and timing of payments").

Under the alternative test—the "objective" test—courts focus on general industry

practice, rather than the subjective characteristics of the relationship between the transferor and

transferee. *See*, *e.g.*, *McCord v. Venus Foods, Inc. (In re Lan Yik Foods Corp.)*, 185 B.R. 103,

114 (Bankr. E.D.N.Y. 1995). As one court described, "ordinary business terms" means "the

range of terms that encompasses the practices in which firms similar in some general way to the

creditor in question engage, and . . . only dealings so idiosyncratic as to fall outside that broad

range should be deemed extraordinary and therefore outside the scope of subsection C." *Id*. at

115 (internal quotation marks omitted).

The standard is easy to meet. *See Lyondell Chem. Co.*, 2015 WL 5560283, at *8 ("only

dealings so idiosyncratic as to fall outside that broad range [of the general practices of similar

industry members] should be deemed extraordinary"). Thus, Access need not "establish the

existence of a uniform set of business terms in a particular industry but rather . . . 'evidence of a

prevailing practice among similarly situated members of the industry facing the same or

similar problems.'" *Lan Yik Foods Corp.*, 185 B.R. at 115 (quoting *Jones v. United States Sav.*

*& Loan Ass'n (In re U.S.A. Inns of Eureka Springs Ark., Inc.)*, 9 F.3d 680, 685 (8th Cir. 1993)

(examining practice in savings and loan industry of dealing with delinquent customers on special

terms)); *see also Abovenet, Inc. v. Lucent Techs., Inc. (In re Metromedia Fiber Network, Inc.)*,

No. 04-08564A, 2005 WL 3789133, at *13 (Bankr. S.D.N.Y. Dec. 20, 2005) ("[T]hose aspects

of the transactions between [debtor and transferee] . . . which the Debtors assert are 'unique' or 'different' from other restructurings in the telecommunications business and are not material in the context of preference analysis or not so extraordinary or idiosyncratic as to fall outside the broad range of business terms which the case law has defined for subparts (B) and (C) of section 547(c)(2).").

> **(d)     The Ordinary Course Of Business Defense Is Available To Insiders**

Any claim by the Trustee that the ordinary course of business defense is inapplicable because Access was an insider of Lyondell or because the transaction was not done at arm's length, would have no basis in fact, the statute, or the case law.

Nothing in Section 547(c)(2) forecloses an insider or affiliate from the ordinary course defense. It would have been simple enough for Congress to exclude insiders or affiliates, but Congress did not do so—even though it recognized the distinction between insiders and non-insiders elsewhere in the statute. *See*, *e.g.*, 11 U.S.C. § 547(b)(4) (providing one-year preference period for insider creditors and 90-day preference period for non-insiders).

We are unaware of any case holding that transactions involving insiders or affiliates are not subject to the ordinary course of business defense. But courts have widely held that the ordinary course defense *does* apply to such transfers, and have not made exceptions based on the relationship between the transferor and transferee. *See*, *e.g.*, *KH Funding*, 541 B.R. at 315 ("The absence of any pre-preference period transactions should not foreclose a creditor, even an insider, from attempting to establish a § 547(c)(2)(A) defense through some other evidence."); *Bierbach v. Wagner*, No. 07-CV-0072, 2007 WL 1074473, at *3 (M.D. Pa. Apr. 4, 2007) ("[T]here is no statutory basis to deny the defenses of Section 547(c) to any defendant in a preference litigation.") (emphasis in original) (citation omitted); *Harman v. First Am. Bank of*

*Md.* (*In re Jeffrey Bigelow Design Grp., Inc.*), 956 F.2d 479, 487-88 (4th Cir. 1992) ("insider" loans extended and repaid in ordinary course fall within Section 547(c)(2)). This is true even for first-time transactions. *See Mitchell*, 548 B.R. at 895 (holding that transfer to insider in first-time transaction could not be clawed back under the ordinary course of business defense).

Finally, even non-arm's length, affiliate transactions have been protected from avoidance by the ordinary course of business defense. *See Brooke Corp.*, 536 B.R. at 917 ("Although it was not an arm's length transaction, there [was] nothing in the record indicating this Cash Management Transfer was unusual. Creditors of [debtor parent] were not harmed—by definition each Cash Management Transfer repaid the exact amount [defendant subsidiary] had very recently transferred to [the debtor]. The debt was sufficiently ordinary to satisfy § 547(c)(2).").

### 3. Other Liquidity Sources (Which Also Did Not Require Solvency Representations) Were Unavailable At The Time Of The Draw

On summary judgment, the Court held that "the applicability of the ordinary course exception requires factual findings not appropriate for summary judgment." (Preference SJ Decision at 8-9.) "Pertinent to the Court's evaluation of the ordinary course defense is a determination of whether (i) Lyondell had access to other liquidity sources (*i.e.*, availability under the 2007 credit agreement) when the transfers occurred and (ii) borrowing under any of those sources of liquidity was subject to solvency conditions." (*Id.* at 9.)

With respect to the first question, LBI drew on the Access Revolver when only $11 million remained available under its primary day-to-day liquidity facility—the 2007 Revolver. The Access Revolver was the Debtors' most expensive source of liquidity. It therefore made eminent sense to draw on it only when cheaper sources of liquidity were exhausted and to pay back the amounts drawn as soon as cash became available (which the Debtors did with the 2007 Revolver, too). With respect to the second question, none of the Debtors' revolving credit

facilities required a solvency representation as a condition to each draw.  In a July 12, 2016 letter

to the Court, the Trustee's counsel confirmed that "[s]olvency was not a condition precedent to

the October Draw" and that "Lyondell did not represent (nor was it required to represent) that it

was Solvent as of the October Draw . . . ."  (*See* Letter from Steven D. Pohl to Judge Glenn,

dated July 12, 2016 at 2.)   Together with other indicators of ordinariness that the Access

Defendants will present at trial, these uncontroverted facts plainly show that the Access Revolver

was an ordinary facility used in conjunction with other sources of credit in a manner consistent

with the expectations and established course of dealing of LBI and Access.

### C.     The Policy Behind Section 547 Does Not Support A Determination That The October Repayments Were Preferences

"[T]he general policy" of the preference section of the Bankruptcy Code is "to discourage

unusual action by either the debtor or his creditors during the debtor's slide into bankruptcy."

H.R. Rep. No. 95-595, at 373 (1977), *as reprinted in* 1978 U.S.C.C.A.N. 5963, 6329.  Congress

decided to leave "normal financial relations" undisturbed because doing so does not detract from

that general policy, and therefore included a defense for transactions in the ordinary course of

business.  *Id.*; *see also Ahaza Sys.*, 482 F.3d at 1125.  Thus, the focus of the inquiry is whether

there was "unusual action" in the incurrence or repayment of the debt.  *Finn*, 909 F.2d at 907.

The ordinary course defense is designed to "encourage creditors to continue to deal with

troubled debtors on normal business terms by obviating any worry that a subsequent bankruptcy

filing might require the creditor to disgorge as a preference an earlier received payment."

*Barnhill v. Johnson*, 503 U.S. 393, 402 (1992).  Allowing the Trustee to avoid transfers under the

Access Revolver would undermine these established policies.  It would deter creditors from

complying with the terms of pre-existing agreements and from doing business with debtors who

are in danger of filing for bankruptcy.  It would allow payments that did not harm any creditors

and had no effect on the estate to be unnecessarily clawed-back. It would disrupt exactly the kinds of "normal relations" the preference statute is designed to protect.

## V.     STATUTORY  RIGHTS UNDER SECTION 502(h)

The Defendants reserve their right to assert claims under Section 502(h) in the event that they are required to satisfy any avoidance judgment.[26]

Section 502(h) provides that a claim arising from the recovery of property under Section 550 shall be determined and allowed (or disallowed) the same as if such claim had arisen before the petition date. *See* 11 U.S.C. § 502(h). "Section 502(h) is based on the principle of fraudulent transfer law that the return of a fraudulent transfer restores the parties to the *status quo*." *Gowan v. HSBC Morgt. Corp. (In re Dreier, LLP)*, No. 10-5456, 2012 WL 4867376, at *3 (Bankr. S.D.N.Y. Oct. 12, 2012). Based on this "restorative" principle, "cases have construed § 502(h) more broadly . . . and have recognized that a claim thereunder can include more than the consideration paid by the defendant for the transferred assets." *Tronox Inc. v. Kerr McGee Corp. (In re Tronox Inc.)*, 503 B.R. 239, 331 (Bankr. S.D.N.Y. 2013) (citing *Verco Indus. v. Spartan Plastics (In re Verco Indus.)*, 704 F.2d 1134, 1138 (9th Cir. 1983); *Misty Mgmt. Corp. v. Lockwood*, 539 F.2d 1205, 1215 (9th Cir. 1976)). In *Tronox*, the plaintiffs asked the court to use its equitable powers to collapse multiple transactions. 503 B.R. at 332. The defendants argued that, if the court did collapse the transactions, the parties should be placed in their positions had the initial transfers—which occurred 3 years before to the subsequent transfers—been avoided at the time, with the residual value available to the defendants, which the court believed was a reasonable position. *Id.* (the court ultimately did not decide the issue).

---

[26]     Nell also reserves the right to amend the proof of claim it filed against LBI for indemnification under the Management Agreement.

If the Trustee is able to avoid and recover any of the alleged fraudulent transfers, the relevant Access Defendants will, at a minimum, have general unsecured claims for the value of the consideration they paid for the property recovered, *see Tronox*, 503 B.R. at 331, but will also seek to be restored to their pre-transfer *status quo*. For example, if Toehold Payment 1 is avoided, Nell would have a claim for the value of the Toehold shares it transferred, or, in the event the Court collapses Toehold Payment 1 with the other steps of the Merger transaction, the value of the equity in Basell. If the Trustee avoids and recovers the $300 million repayments under the Access Revolver as preferences, Access and/or AI International will have a general unsecured claim in that amount. *See Official Comm. of Unsecured Creditors v. Travelers Indem. Co. (In re Maxwell Newspapers, Inc.)*, 192 B.R. 633, 640 (Bankr. S.D.N.Y. 1996) ("Pursuant to section 502(h) of the Code, once [the transferee] disgorges the preference, it will have an unsecured claim . . . for which it may recover in accordance with the terms laid out in the Debtors' confirmed plan of reorganization.").

As for the fees paid to Nell and Perella on account of contractual obligations (the avoidance of which was never sought), such agreements would form the basis for the reinstated claims under Section 502(h).

Finally, in addition to reserving their right to assert Section 502(h) claims, the Defendants reserve the right to apply those claims to directly net against and reduce any liability to the Trustee by the amount of the projected distribution. *See*, *e.g.*, *Page v. Rogers*, 211 U.S. 575, 581 (1909).

## VI.    LUXEMBOURG LAW CLAIMS

### A.    Count 6: Mismanagement And Breach Of Duty Claim Under Luxembourg Law Against Len Blavatnik

In Count 6, the Trustee asserts that Len Blavatnik is liable for mismanagement while acting as the *de facto* manager of Basell (before the Merger) and LBI (following the Merger) under Article 59 ¶ 1 ("Article 59 ¶ 1") of the Luxembourg Company Law of August 10, 1915, as amended (the "Company Law").  Count 6 fails because the parties agree both that Article 59 ¶ 1 provides exclusively for contractual liability and that Blavatnik had no contractual relationship with Basell or LBI.  (*See* Expert Declaration of Alex Schmitt, dated August 22, 2016 ("Schmitt Decl."), ¶¶ 32-34.)[27]  Since *de facto* directors by definition lack a contractual relationship with the companies they manage, they cannot be held liable under Article 59 ¶ 1.  (*See id.* ¶¶ 35-38.)

### B.    Count 7: Tort Claim Under Luxembourg Law Against Access, Len Blavatnik, Lincoln Benet, And Philip Kassin

#### 1.    The Trustee Cannot Meet The Legal Requirements To Prove A Tort Claim Against Access And Blavatnik

In Count 7, the Trustee asserts a claim against Access and Blavatnik for breach of Articles 1382 and 1383 ("Articles 1382 and 1383") of the Luxembourg Civil Code (the "Civil Code"), alleging that these defendants acted recklessly and negligently by causing Basell/LBI to enter into the Merger, structure and implement the Toehold Payments, upsize the ABL Facility, and approve the Access Revolver.  (*See* SAC ¶¶ 413-26.)[28]  The Trustee bears the burden of proof on each element of his claim.  (*See* Schmitt Decl. ¶ 44.)

---

[27]    The other provisions of the Company Law identified by the Trustee do not give rise to a basis for liability independent of Article 59 ¶ 1.  (*See* Schmitt Decl. ¶¶ 41-42, 134 (regarding Articles 1991 through 1997 of the Company Law), ¶ 30 n.14 (regarding Articles 51bis, 60bis-16, 62, 74 ¶ 2, 102, 103, 107, 109, and 192 of the Company Law).)

[28]    Despite Access's and Blavatnik's inclusion in a list of defendants subject to additional claims under Articles 192 and 59 ¶ 2 of the Company Law, two footnotes clarify that the claim

### (a)    The Trustee Cannot Establish De Facto Director Status

Because Access and Blavatnik were not *de jure* managers, the Trustee has a high burden of first establishing that these defendants were *de facto* managers.  (*See* Schmitt Decl. ¶ 44.)  To do so, the Trustee must show that the defendants:  (i) acted affirmatively, beyond the provision of advice or influence, concerning the company's fate; and (ii) substituted themselves for the *de jure* directors by actually implementing the company's operations in lieu of *de jure* management, not just controlling or instructing those managers.  (*See id.* ¶¶ 47, 49, 55.)  Neither a parent or subsidiary nor a director of a parent or subsidiary is a *de facto* manager merely by virtue of exercising control over operations of its affiliates.  (*See id.* ¶¶ 63-64, 66.)

### (b)    The Trustee Cannot Establish Tort Liability

Even if the Trustee can show that Access and Blavatnik were *de facto* managers of Basell/LBI, he still must show that they committed a tort under Articles 1382 and 1383.  (*See* Schmitt Decl. ¶¶ 72-73 (a *de facto* manager is not liable merely by virtue of that status).)  Liability under Articles 1382 and 1383 generally requires a showing that a defendant committed (i) a "fault" (ii) that proximately caused (iii) non-speculative and (iv) wholly compensatory damages.  (*Id.* ¶¶ 73-74, 89.)  When a claim concerns managerial conduct, however, a "fault" demands more than mere negligence, and instead must be (i) an intentional action, (ii) of a serious nature, (iii) that is completely inconsistent with the manager's ordinary functions.  (*See id.* ¶¶ 77, 82.)  Moreover, managerial decision-making is granted substantial deference under Luxembourg's business judgment rule.  (*See id.* ¶ 82.)

---

against Access and Blavatnik is lodged under Articles 1382 and 1383 only.  (*See* SAC at 133 nn.25, 26.)

### 2. The Trustee Cannot Meet The Legal Requirements To Prove A Tort Claim Against The GP Managers

In Count 7, the Trustee also asserts tort claims on behalf of LBI against Philip Kassin and others[29] (the "GP Managers") for breach of Articles 1382 and 1383, as well as for breach of Article 59 ¶ 2 ("Article 59 ¶ 2") of the Company Law, alleging that the GP Managers committed mismanagement by deferring to Blavatnik in approving the Merger and thus failing "to actually manage LBI through the GP." (SAC ¶ 409.) The Trustee bears the burden of proof. (*See* Schmitt Decl. ¶ 44.)

LBI is a third party with respect to the GP Managers. (*See* SAC at p. 133 n.26 (the Trustee claims in tort because "there is no contractual relationship between LBI and the GP Managers").) Third parties to companies generally may not bring direct claims against a company's directors except with respect to: (i) claims under Article 59 ¶ 2, which must consist of committing a breach of the Company Law or the articles of association that is so severe as to usurp the general principle of non-liability to third parties; and (ii) claims under Articles 1382 and 1383, under the circumstances and with the restrictions described in Section VI.B.1.b, *supra*. (*See* Schmitt Decl. ¶¶ 93-94.) These exceptions are interpreted narrowly. (*Id.* ¶ 95.)

### (a) The Trustee Cannot Establish Tort Liability Under Article 59 ¶ 2

A third party may assert a claim against a company's directors under Article 59 ¶ 2 only with respect to damages resulting from a violation of the articles of association of the company or a provision of the Company Law. (*See* Schmitt Decl. ¶ 100.) A claim under Article 59 ¶ 2 must concern extremely severe faults constituting a violation of a mandatory duty imposed by either the Company Law or the company's governing articles in a manner that violates the social

---

[29] The Trustee has dismissed Alan Bigman and the estate of Dick Floor.

pact or endangers the public.  (*See id.* ¶¶ 102, 111.)  Third parties may not lodge a claim for mere mismanagement, as this claim belongs to the company alone (here, the GP) through a claim under Article 59 ¶ 1.  (*See id.* ¶¶ 99, 101.)  Nor may a third party attempt to transform a breach of contract claim for mismanagement under Article 59 ¶ 1 into a tort claim under Article 59 ¶ 2 by citing provisions of the Company Law or the articles of association which describe the structure of a company or managerial roles, rather than imposing specific and mandatory duties on managers.  (*See id.* ¶¶ 105-07, 104 (quoting Article 191, violation of which is purportedly a predicate for the Trustee's third-party claim: "S.à r.l.s are managed by one or more agents, who may but are not required to be members of the S.à r.l., and who may be paid or unpaid.").)

**(b)     The Trustee Cannot Establish Tort Liability Under Articles 1382 And 1383**

The high standard for liability of a company's directors under Articles 1382 and 1383 is detailed in Section VI.B.1.b.  (*See* Schmitt Decl. ¶¶ 112, 114, 116.)  The Trustee's claim of "failure to manage" facially lacks both the required intentionality to prove this claim and action incompatible with normal corporate functions.  (*See id.* ¶¶ 114-15).

**3.     The Trustee Cannot Meet The Legal Requirements To Prove Claims Against The Supervisory Board Under Articles 59 ¶¶ 1 Or 2**

In Count 7, the Trustee also asserts claims on behalf of LBI against Messrs. Blavatnik, Kassin, Floor, and Benet, as members of the post-merger LBI Supervisory Board (the "Supervisory Board Members") for breach of Article 59 ¶ 1 and/or Article 59 ¶ 2, alleging that the Supervisory Board Members failed to veto the decisions to upsize the ABL Facility and approve the Access Revolver.  The Trustee bears the burden of proof.  (*See* Schmitt Decl. ¶ 44.)

Under Luxembourg law, a supervisory board's responsibility is to "supervise" a company.  (*See id.* ¶ 122.)  It has no "veto right" over management acts.  (*Id.*)  This is true even where management refers matters to the supervisory board; while the supervisory board may

respond to that referral, the company's management retains the ability to disregard the advice provided without consequence. (*Id.* ¶¶ 126, 128 (LBI's articles of incorporation do not authorize its Supervisory Board "to interfere with . . . management").) The Trustee's claim that the Supervisory Board Members failed to exercise a right they did not possess must fail.

> **(a)**     **The Trustee Cannot Show Contractual Liability Under Article 59 ¶ 1**

To establish liability under Article 59 ¶ 1, the Trustee must show that (i) Supervisory Board Members' failure to act as would reasonably diligent statutory auditors in like circumstances (ii) proximately caused (iii) non-speculative harm to LBI. (*See* Schmitt Decl. ¶ 123.) Yet Luxembourg law limits the duties of statutory auditors (like a Supervisory Board) of an S.C.A. to giving non-binding "advice" both on matters traditionally assigned to it (*e.g.*, the company's financial statements) and on matters referred to it by management. (*See id.* ¶ 126.) Even if that advice were faulty, errors committed by the Supervisory Board Members are protected by Luxembourg's business judgment rule. (*See id.* ¶ 130.) And even if the Supervisory Board's "veto" were binding, any purported failure to veto did not proximately cause the asserted effects, as management, not the Supervisory Board, was responsible for managing LBI's liquidity, and thus constituted an intervening cause. (*See id.* ¶ 133.)

> **(b)**     **The Trustee Cannot Show Liability Under Article 59 ¶ 2**

As detailed above in Section VI.B.2.a, a claim under Article 59 ¶ 2 can be based only on the violation of a mandatory duty imposed by the Company Law or the company's articles of incorporation. (*See* Schmitt Decl. ¶ 132.) Provisions that merely guide management action and do not impose positive or negative duties are insufficient for liability. (*See id.* ¶¶ 111, 132.) Accordingly, to establish liability under Article 59 ¶ 2, the Trustee must show that (i) a Supervisory Board Member's violation of a *mandatory* prescription of the Company Law or of

LBI's articles of association (ii) proximately caused (iii) non-speculative harm.  (*See id.* ¶¶ 123-24.)  Again, the Supervisory Board Members' decisions are protected by Luxembourg's business judgment rule.  (*See id.* ¶ 132.)  And again, even if the Supervisory Board's "veto" violated a mandatory prescription, any purported failure to veto did not proximately cause the complained-of effects, as management, not the Supervisory Board, was responsible for executing or refraining from executing the Merger, and thus constituted an intervening cause.  (*See id.* ¶ 133.)

### C.   The Trustee's Claimed Damages Are Not Cognizable Under Luxembourg Law; Alternately, If They Are, They Must Incorporate Any Offsetting Benefits Conferred By The Bankruptcy Case

The Trustee's claims under Count 7 require a showing not just of a tortious or breaching act, but also that that act proximately caused non-speculative harm.  (*See* Sections VI.B.1.b, 3.a) *supra*; Schmitt Decl. ¶¶ 88-91, 116-117, 133.)  The Trustee cannot satisfy this requirement.

With respect to the first requirement—"proximate causation"—the Trustee must establish a direct link of cause and effect between the predicate action and the damage suffered.  (*See* Schmitt Decl. ¶¶ 88-91, 116-117, 133.)  For example, the Trustee alleges that Access's and Blavatnik's pre-Merger conduct caused "harm" consisting of, among other things, the bankruptcy filings, and the "related costs, expenses, loss of goodwill and diminished value associated with or caused by bankruptcy proceedings."  (Expert Report Of Philippe Thiebaud, July 15, 2016 (the "Thiebaud Decl.", at 31-32 (citing SAC ¶ 421); *see also* SAC ¶ 411 (same harm alleged with respect to GP Managers).)  To establish the required proximate causation between Blavatnik's pre-Merger conduct and this harm, the Trustee must show "that the insolvency proceedings initiated in respect of LBI are the *direct* and *certain* consequence of the fault," (Schmitt Decl. ¶ 91 (emphasis added)), and that no intervening cause has cut off that "certainty."  (*See* Supplemental Expert Report Of Philippe Thiebaud, Sept. 19, 2016, at 24 (the "causal nexus could be 'broken' if a new event has interfered with the causal chain").)  This is a

difficult showing indeed, especially since the eighteen-month-long period between the decision to consummate the Merger (July 2007) and the bankruptcies (January 2009 and later) saw a worldwide financial crisis with an unprecedented contraction of liquidity.   The difficulty of establishing a direct harm applies to other claims too, and demands a close examination of the harms alleged.  (*See* Schmitt Decl. ¶¶ 91, 116-117, 133; Section VI.B.3.b, *supra* (Supervisory Board Members' purported failure to veto Merger could not have proximately caused the purported harm springing from the Merger without subsequent, intervening action of management to effect that Merger).)[30]

The Trustee must also establish the second requirement—that the harm be "non-speculative" or "certain."   Arriving at a "certain" harm requires the provision of a detailed calculation of the actual costs and losses suffered, which includes and offsets any profits or gains directly caused by the complained-of conduct.  (*See* Schmitt Decl. ¶ 117.)  Thus, to return to the example above, any calculation of damages alleged to flow from bankruptcy must include not only "costs, expenses, loss of goodwill and diminished value associated with or caused by bankruptcy proceedings" (*see* SAC ¶¶ 411, 421), but any resultant benefits.  (*See* Schmitt Decl. at ¶ 91.)[31]  This is not a rule of law, but simply an element inherent in the concept of "harm;" absent the requirement to account for benefit, the Trustee could recoup the "costs as a result of the Merger itself" (Thiebaud Decl. at 32), without first showing that the Merger left Basell/LBI worse off.  Any harm the Trustee alleges, including with respect to both the Merger and the

---

[30] The same intervening causation which cuts off claims against Blavatnik for purportedly executing the Merger also cut off claims against the members of the Supervisory Board Members for failing to veto the Merger.

[31] The Trustee cannot claim that the "costs . . . caused by bankruptcy proceedings" are cognizable harms without also accepting that any benefits also "caused by" the bankruptcy proceedings should also be taken into account in determining the quantum of "harm."   (*See* Schmitt Decl. ¶ 91.)

bankruptcies, must be offset by significant gains including through the reduction of LBI's debt that resulted from the bankruptcy. At the very least, the Trustee must address the issue of offsetting benefits to successfully plead cognizable harm.

## VII.    AIDING AND ABETTING LUXEMBOURG BREACHES UNDER TEXAS LAW

### A.    <u>Overview Of Claim</u>

In Count 18, the Trustee alleges that Access and AI Chemical aided and abetted the Supervisory Board Members' and the GP Managers' breach of their fiduciary duties owed to LBI. Specifically, the Trustee alleges that "[Access] and AI Chemical, through their officers and employees, participated in the structuring, financing, and approval of the Merger, including, without limitation, the solicitation lenders [*sic*] for participation in the Merger Financing, the financing and structuring of the Toe-Hold Transaction, and the provision (through Merrill) of analyses underlying the approval of the Merger" (SAC ¶ 502), and that Access and AI Chemical "knowingly participated in the Supervisory Board and GP Managers' breach of fiduciary duty." (*Id.* ¶ 503.) The Trustee does not clearly allege what that underlying breach was, but Judge Gerber noted that "the Trustee has seemingly alleged that the fiduciary relationships to [LBI] were in existence and were breached by the incurrence of approximately $22 billion in obligations in connection with the Merger . . . ." (*See* Decision And Order On Defendants' Motions To Dismiss Counts 2, 6, 7, 14, And 18, Jan. 4, 2016 (Docket No. 698) (the "<u>Luxembourg and Texas MTD Decision</u>"), at 33.)

The Trustee originally brought this claim against Nell, Access Industries, AI International, and Access under Luxembourg law and "applicable state law." (Am. Compl. at 134.) Judge Gerber dismissed the Trustee's claim for aiding and abetting under Luxembourg law, and dismissed the claim altogether against Nell, Access Industries, and AI International. (Luxembourg and Texas MTD Decision at 44-45.) Notably, in the version of the complaint on

90

which Judge Gerber ruled, the Trustee was asserting fiduciary duty claims; those claims are now gone, having been replaced with pure tort claims.  The absence of underlying breach of fiduciary duty claims is fatal to this claim.

**B.      The Trustee Cannot Prove The Elements Of An Aiding And Abetting Claim**

Judge Gerber held that Texas law applies to Count 18 because, while LBI and LBI GP are both Luxembourg entities, "they sit atop a global enterprise principally operating out of Texas" (Luxembourg and Texas MTD Decision at 29)—a factual assertion that was patently untrue for pre-Merger Basell and continued to be incorrect for LBI after the Merger.  To prevail on an aiding and abetting breach of fiduciary duty claim under Texas law, the Trustee must prove, by a preponderance of the evidence: (1) the existence of a fiduciary relationship; (2) that the third party knew of the fiduciary relationship; and (3) that the third party was aware that it was participating in the breach of that fiduciary relationship.  *See Meadows v. Hartford Life Ins. Co.,* 492 F.3d 634, 639 (5th Cir. 2007).

The Trustee can prevail only if he first establishes an underlying breach of the Supervisory Board Members' and the GP Managers' fiduciary duty to LBI.  *Id.*  The Trustee must then show that Access knew of those fiduciary duties, and further that Access knowingly participated in the alleged breach of the duties.  *See Darocy v. Abuildtrup* 345 S.W.3d 129, 138 (Tex. App. 2011); *Kastner v. Jenkens & Gilchrist, P.C.*, 231 S.W.3d 571, 580 (Tex. App. 2007).  This will be virtually impossible, because Access is a holding company with no employees.  Contrary to the Trustee's allegation that Philip Kassin was the Senior Vice President and Head of Mergers and Acquisitions and Financings at Access (SAC ¶ 92), Kassin was actually an employee of Access Industries.  Therefore, the Trustee will not be able to prove that Access knowingly participated in a breach of the Supervisory Board Members' and the GP Managers' duties.

91

Moreover, Kassin, who was both a Supervisory Board Member and a GP Manager, could not aid and abet an alleged breach of his own fiduciary duty. Yet the Trustee relies on the imputation of Kassin's knowledge and actions to Access as the basis for the aiding and abetting claim against Access. The very premise of an aiding and abetting claim is that a *third party* participates in the underlying breach, making that third party also liable for the breach. *See Kinzbach Tool Co. v. Corbett–Wallace Corp.*, 160 S.W.2d 509, 514 (Tex. 1942) ("It is settled as the law of this State that where a *third party* knowingly participates in the breach of duty of a fiduciary, such third party becomes a *joint tortfeasor* with the fiduciary and is liable as such.") (emphasis added).

Even if the Trustee could prove an aiding and abetting claim against Access, LBI has already waived and released the claim. (*See* JX0008, Merger Agreement § 8.10.) Section 8.10 of the Merger Agreement defines "Company Affiliate" to include "any direct or indirect holder of equity interests or securities in [Lyondell]" and provides that "[n]o Company Affiliate shall have any liability or obligation to [LBI] . . . of any nature whatsoever in connection with or under this Agreement or the transactions contemplated hereby or thereby (other than claims arising out of fraud), and [LBI] . . . hereby waive[s] and release[s] all claims of any such liability and obligation." (*Id.*) Access is a "direct or indirect holder of equity interests or securities" in Lyondell, and therefore is covered by this provision. And since the entire basis of the aiding and abetting claim is that the Supervisory Board Members and the GP Managers breached their duties to LBI by negotiating and entering into the Merger Agreement and its related financing, the claim has been waived and released under Section 8.10 of the Merger Agreement. (*See id.*) The claim also is subject to the release granted in the Termination Agreement. (*See* JX0031 Termination Agreement ¶ 2.)

Finally, the Trustee has not articulated any cognizable damages on account of this claim. While damages should be calculated according to Luxembourg law, *see* Section VI.C, *supra*, U.S. law would similarly take the effect of the bankruptcy into account to determine whether damages are recoverable for incurring obligations that have since been settled or discharged. *See*, *e.g.*, *McClarty v. Gudenau*, 176 B.R. 788, 790-92 (E.D. Mich. 1995); *In re R.H.N. Realty Corp.*, 84 B.R. 356 (Bankr. S.D.N.Y. 1988); *Murphy v. Stein*, 549 N.Y.S.2d 53, 55 (2d Dep't 1989), *app. dismissed without op.*, 555 N.Y.S.2d 692 (1990).

## VIII.   BREACH OF CONTRACT UNDER NEW YORK LAW

### A.      Overview Of Applicable Law

Under New York law, "in order to recover from a defendant for breach of contract, a plaintiff must prove: (1) the existence of a contract between itself and that defendant; (2) performance of the plaintiff's obligations under the contract; (3) breach of the contract by that defendant; and (4) damages to the plaintiff caused by that defendant's breach." *Diesel Props S.r.l. v. Greystone Bus. Credit II LLC*, 631 F.3d 42, 52 (2d Cir. 2011).

### B.      Overview Of Count 12

Count 12 is a breach of contract claim against Access and AI International for failing to fund under the Access Revolver.  New York law applies to this claim.  (*See* JX0051, Access Revolver § 9.15.)  The Access Revolver was originally between LBI, Lyondell, and Basell Finance, on the one hand, and Access, on the other.  On December 17, 2008, Access assigned the Access Revolver to AI International.  According to the Trustee, on December 30, 2008, LBI requested a draw down of the entire $750 million balance of the Access Revolver, and AI International denied that request.  The Trustee's claim will fail because an event or condition that had a "Material Adverse Effect" had occurred as of the date of the requested draw, which released AI International from its obligation to lend; therefore, its denial of the draw request was

93

not a breach of the contract.  Moreover, it is not apparent why the Trustee named Access as a defendant in this count, as it had assigned the Access Revolver to AI International before the alleged breach.  Finally, even if the Trustee could establish that AI International breached the terms of the Access Revolver, his recovery would be limited to restitution damages—namely, the fees and other payments AI International received for entering into and maintaining the Access Revolver.

### C.    The Trustee Cannot Prove Breach

The Access Revolver conditions the obligation to extend credit on the truth of certain borrower representations as of the date of any draw request.  (*See* JX0051, Access Revolver § 4.02; *id.* § 4.02(a).)  One such representation is that "[s]ince the Closing Date, there has been no event or circumstance that could, either individually or in the aggregate, reasonably be expected to have a Material Adverse Effect."  (*Id.* § 5.05(c).)  If, as the date of a draw, an "event or circumstance" had occurred that "could . . .  reasonably be expected to have a Material Adverse Effect," the lender was not obligated to extend any credit.  (*Id.* § 4.02(a).)  "Material Adverse Effect" includes "(a) a material adverse effect on the business, operations, assets, liabilities (actual or contingent) or financial condition of [LBI] and its Restricted Subsidiaries (taken as a whole)" and "(b) a material adverse effect on the ability of [Lyondell and Basell Finance] or the Loan Parties (taken as a whole) to perform their respective payment obligations under any Loan Document . . . ."  (JX0051, Access Revolver at 22.)  The Trustee alleges that, "[b]y mid-December 2008, LBI management was involved in emergency discussions with its lenders to prepare for a Chapter 11 filing and prepare for DIP financing . . . ."  (SAC ¶ 308.) Accordingly, as of December 30, 2008, a Material Adverse Event had occurred.

Failure to satisfy a contractual condition excuses a lender from the obligation to lend.  *See*, *e.g.*, *Rhinebeck Assocs., L.P. v. Marine Midland Bank*, 235 A.D.2d 308, 308 (1st

Dep't 1997); *Fort M Dev. Corp. v. Inland Credit Corp.*, 54 A.D.2d 862, 863 (1st Dep't 1976),

*aff'd*, 43 N.Y.2d 763 (1977).  For example, in *Pan Am Corp. v. Delta Air Lines*, the debtor and

creditors' committee sued for breach of contract, claiming that the defendant had repudiated its

contractual obligation to finance the debtor's reorganization plan.   175 B.R. 438 (S.D.N.Y.

1994).  As a precondition for lending, the agreement required that there be "no material adverse

change in the business, financial position, results of operations or prospects of the Retained

Assets."  *Id.* at 492.  The debtor's performance in fact deteriorated significantly and revenue

forecasts were reduced, constituting a material adverse change.  *Id.* at 492-93.  The court held

that no obligation to fund arose because the debtor did not satisfy the conditions precedent to

such obligation.  *Id.* at 507.

### D.      **Even If The Trustee Can Prove A Breach Of Contract Claim, Damages, If Any, Are Limited To Restitution**

The Access Revolver contains a "limitation on damages" clause.  Judge Gerber held this

limitations clause prevents the Trustee from seeking "special, indirect, punitive, indirect or

consequential damages."   (Recharacterization MTD Decision at 18-19.)   Accordingly, any

recovery would be limited to restitution, which "aims to restore the nonbreaching party to as

good a position as the one she occupied before the contract was made, without attempting to

compensate her for consequential harms."  *360Networks Corp. v. Geltzer (In re Asia Global

Crossing, Ltd.)*, 404 B.R. 335, 341 (S.D.N.Y. 2009).

## IX.   EQUITABLE SUBORDINATION

### A.      **Overview Of Applicable Law**

Equitable subordination is codified in Section 510(c), which authorizes a bankruptcy

court to "subordinate for purposes of distribution all or part of an allowed claim to all or part of

another allowed claim . . . ."  11 U.S.C.  § 510(c).  Notably, many courts view equitable

subordination as a "drastic and unusual remedy." *In re Enron Corp.*, 379 B.R. 425, 434 (S.D.N.Y. 2007); *In re SubMicron Sys. Corp.*, 291 B.R. 314, 327-29 (D. Del. 2003) ("Courts have recognized that equitable subordination is an unusual remedy which should be applied in limited circumstances.") (citations omitted); *In re Kenny*, 75 B.R. 515, 527 (Bankr. E.D. Mich. 1987) ("Equitable subordination is a harsh remedy. It is a remedy that is not to be lightly invoked.") (internal citations and quotation marks omitted).

Section 510(c) applies where: (1) "[t]he claimant engaged in some type of inequitable conduct"; (2) "[t]he misconduct caused injury to the creditors or conferred an unfair advantage on the claimant"; and (3) "[e]quitable subordination of the claim is consistent with bankruptcy law." *80 Nassau Assocs. v. Crossland Fed. Sav. Bank (In re 80 Nassau Assocs.)*, 169 B.R. 832, 837 (Bankr. S.D.N.Y. 1994) (quoting *Benjamin v. Diamond (In re Mobile Steel Co.)*, 563 F.2d 692, 700 (5th Cir. 1977)). Inequitable conduct includes lawful behavior that "shocks one's good conscience." *Dreier*, 452 B.R. at 483 (internal quotation marks omitted). Undercapitalization alone does not suffice without otherwise "suspicious, inequitable" conduct. *Official Comm. of Unsecured Creditors v. Blomen (In re Hydrogen, L.L.C.)*, 431 B.R. 337, 362 (Bankr. S.D.N.Y. 2010); *see also In re Lifschultz Fast Freight*, 132 F.3d 339, 345 (7th Cir. 1997) (same); *Wood v. Richmond (In re Branding Iron Steak House)*, 536 F.2d 299, 302 (9th Cir. 1976) (same).

The Trustee bears the burden of proof because proofs of claims are presumptively valid. *See In re Aeropostale, Inc.*, No. 16-11275, 2016 WL 4506712, at *19 (Bankr. S.D.N.Y. Aug. 26, 2016). Courts do impose a higher standard of conduct upon insiders such that less egregious conduct may support equitable subordination, *see Bayer Corp. v. MascoTech, Inc. (In re AutoStyle Plastics, Inc.)*, 269 F.3d 726, 744-45 (6th Cir. 2001), but they "use ***great caution*** in applying the remedy." *Id.* at 745 (rule that equitable subordination is an unusual remedy that

should be applied in limited circumstances "applies to claims involving both insiders and non-insiders") (emphasis added).

### B.    Overview Of Count 10

In Count 10, the Trustee seeks to equitably subordinate two proofs of claims filed by AI International.   He also argues that "because AI International's claims should be equitably subordinated, all of the consideration paid, including any liens granted, to AI International and/or Access as assignor under the Access Revolver, or the value of such consideration, should be disgorged."   (SAC ¶ 453.)   The Trustee asks that the Court enter a judgment against AI International for any payments made by the Debtors on account of the Access Revolver pursuant to Sections 550 and 510.  (*Id.* at 155.)  The Trustee does not explain the basis for his claim.

### C.    The Requested Remedies In Connection With This Claim Are Improper

The Trustee's requested remedies—"disgorgement" and recovery under Section 550—are both improper.   Section 550(a) states that a trustee may recover transferred property, "to the extent that a transfer is *avoided* under section 544, 545, 547, 548, 549, 553(b), or 724(a) of this title[.]"   11 U.S.C. § 550(a) (emphasis added).   A claim that is equitably subordinated is, by definition, not avoided, as evidenced by the fact that Section 510(c) is not included in the exclusive list of avoidance provisions to which Section 550(a) applies.   Thus, in the unlikely event the Trustee prevails, the remedy will be limited to equitable subordination.

Dated: October 3, 2016
New York, New York

QUINN EMANUEL URQUHART
& SULLIVAN, LLP

By: */s/ Susheel Kirpalani*
Richard I. Werder, Jr.
Susheel Kirpalani
Rex Lee
Kate Scherling

51 Madison Avenue, 22nd Floor
New York, New York 10010
(212) 849-7000

- and -

KLEE, TUCHIN, BOGDANOFF & STERN
LLP
Kenneth N. Klee
Whitman L. Holt

1999 Avenue of the Stars, 39th Floor
Los Angeles, California, 90067
(310) 407-4000

*Attorneys for Defendants Access Industries,
Inc.; Access Industries Holdings LLC; AI
International, S.à.r.l.; Nell Limited;  Len
Blavatnik; Lincoln Benet; Philip Kassin; NAG
Investments LLC; and Perella Weinberg
Partners LP*

98

# GLOSSARY

## GLOSSARY OF KEY TERMS

| | |
|---|---|
| **2007 Revolver** | $1.0 billion multicurrency revolving credit facility provided as part of the Senior Credit Facility |
| **ABL Facility** | $1.0 billion (subsequently increased to $1.6 billion) Inventory Credit Facility issued on December 20, 2007 to Basell USA Inc. and Lyondell and its subsidiaries; and $1.15 billion Accounts Receivable Facility issued on December 20, 2007 to LyondellBasell Receivables I, LLC and Lyondell [DX0264 and DX0265] |
| **Access** | Access Industries Holdings LLC; a Delaware entity that was the indirect owner of Basell and the initial lender under the Access Revolver |
| **Access Defendants** | Access Industries, Inc., Access Industries Holdings LLC, AI International, S.à.r.l., Nell Limited, Len Blavatnik, Lincoln Benet, Philip Kassin, and NAG Investments LLC |
| **Access Industries** | Access Industries, Inc.; an entity organized under New York law |
| **Access Revolver** | $750 million revolving credit facility between Access (as lender) and LBI, Lyondell, and Basell Finance, entered into on March 27, 2008  [JX0051] |
| **AI Chemical** | AI Chemical Investments LLC; a Delaware entity that acquired the Toehold position; dissolved on December 26, 2007 |
| **AI International** | AI International S.à.r.l.; a Luxembourg entity that was the assignee to the Access Revolver |
| **Amended Complaint** | The amended complaint filed by the Trustee dated July 23, 2010 (Docket No. 381). |
| **Amended NAG Complaint** | The amended complaint filed by the Trustee against NAG in Adversary Proceeding No. 11-1844, dated June 16, 2011. |
| **Basell** | Basell AF S.C.A.; the Luxembourg holding company Debtor established as part of the intermediate corporate ownership chain between Nell and Basell B.V.; renamed LBI upon the Merger |
| **Basell Borrowers/Transferors** | Basell Funding and LB Finance |

| | |
|---|---|
| **Basell Finance** | Basell Finance Company, B.V.; non-debtor entity organized under Dutch law and "Dutch Borrower" under the Senior Credit Facility |
| **Basell Funding** | Basell Funding S.à.r.l.; non-debtor Luxembourg entity that was the shareholder of Basell Holdings |
| **Basell Holdings** | Basell Holdings B.V.; non-debtor entity organized under Dutch law that was the entity through which Basell's business was run prior to the Merger |
| **Basell Germany** | Basell Germany Holdings GmbH; Debtor and "German borrower" under the Senior Credit Facility |
| **Benet, Lincoln** | CEO of Access Industries and a member of the post-Merger Supervisory Board of LBI |
| **Bigman, Alan** | Former Chief Financial Officer of LBI and a manager of the GP; member of the pre-Merger Supervisory Board of Basell Holdings |
| **BIS** | BI S.à.r.l.; a non-debtor Luxembourg entity that was the owner of Basell |
| **Blavatnik, Len** | Founder and Chairman of Access Industries; Chairman of the pre-Merger Supervisory Board of Basell Holdings; Chairman of the post-Merger Supervisory Board of LBI |
| **Bridge Loan** | The $8 billion bridge loan issued to LB Finance, dated December 20, 2007, amended and restated April 30, 2008, and further amended and restated as of October 17, 2008 [DX0414] |
| **Committee** | Official Committee of Unsecured Creditors of Lyondell Chemical Company, *et al*.; predecessor to the Trustee |
| **Debtors** | Lyondell Chemical Company, LBI, and certain of their affiliates that commenced reorganization cases under Chapter 11 |
| **Defendants** | The Access Defendants and Perella Weinberg |
| **Dutch Tranche A Term Loan** | $500 million loan issued to Basell Holdings on December 20, 2007 as part of the Senior Credit Facility |
| **Frangenberg, Gunter** | Director in the Chemicals Group, a subsection of the Global Industrials Group at Merrill Lynch |

| | |
|---|---|
| **Gallogly, James** | Former Chief Executive Officer of LBI and its direct and indirect subsidiaries, Manager of the Board of Managers of the GP, and member of the Supervisory Board of LBI from May 2009 until early 2015 |
| **German Tranche B Term Loan** | €1.3 billion loan issued to Basell Germany on December 20, 2007 as part of the Senior Credit Facility |
| **GP** | Pre-Merger, Basell AFGP S.à.r.l., the general partner of Basell; post-Merger, LyondellBasell AFGP S.à.r.l., the general partner of LBI; Debtor |
| **GP Managers** | Pre-Merger, the GP Managers were Alan Bigman, Phillip Kassin, Richard Floor and Kent Potter; post-Merger, the GP Managers were Volker Trautz, Anton de Vries, Bigman, Morris Gelb, Norm Phillips, Cees Los, Ed Dineen, and Bart de Jong |
| **Jeffries, Robert** | Former Managing Director in the Investment Banking Division of Citibank, N.A. and Global Head of the Chemicals Industry subgroup of the Natural Resources Division |
| **Kassin, Phillip** | Former Executive Vice President and Head of Mergers and Acquisitions and Financing at Access Industries, manager of the GP, and member of the post-Merger Supervisory Board of LBI |
| **LB Finance** | LyondellBasell Finance Company, Debtor |
| **LBI** | LyondellBasell Industries AF S.C.A.; known as Basell prior to the Merger; Debtor |
| **LBIH** | LBIH LLC, Debtor entity created to hold the shares of Lyondell common stock acquired by Basell in the Merger and assignee of AI Chemical's assets and liabilities |
| **Lender Settlement** | Amended and Restated Settlement Agreement Relating to Committee Litigation (*Official Committee of Unsecured Creditors v. Citibank N.A., et al*, Adv. P. No. 09-01375 (REG) (Bankr. S.D.N.Y.)) by and among LBI, the Committee, and various other parties including those that provided financing related to the Merger, dated March 10, 2010 (Docket No. 372) |
| **Lyondell** | Lyondell Chemical Company, Debtor |
| **Melvani, Anand** | Former Managing Director in the Leveraged Finance Group at Merrill Lynch |

| | |
|---|---|
| **Merger** | The business combination of Basell and Lyondell which closed on December 20, 2007 |
| **Merger Agreement** | Agreement and Plan of Merger, dated July 16, 2007, by and among Basell, BIL Acquisition Holdings Limited, and Lyondell  [JX0008] |
| **Merrill Lynch** | Merrill Lynch International, party to the Share Forward Contract; Merrill Lynch, Pierce, Fenner & Smith Incorporated, joint lead arranger, bookrunner, and transaction coordinator of the Senior Credit Agreement and Bridge Loan; and Merrill Lynch Capital Corporation, administrative agent on the Bridge Loan and joint lead arranger and bookrunner on the ABL Facility |
| **NAG** | NAG Investments LLC; a Delaware entity that owned the majority equity interest of Nell |
| **Nell** | Nell Limited; an entity organized under Gibraltar law and owner of BIS; transferee of Toehold Payment 1 |
| **October Draw** | $300 million revolving credit draw by Lyondell under the Access Revolver on Wednesday, October 15, 2008 |
| **October Repayments** | Three separate payments of $100 million each made by Lyondell on October 16, 17, and 20, 2008 to repay the October Draw |
| **Original Complaint** | The complaint filed by the Committee in Adversary Proceeding No. 09-1375, dated July 22, 2009  (Docket No. 1) |
| **Original NAG Complaint** | The complaint filed by the Trustee in Adversary Proceeding No. 11-1844, dated April 22, 2011 |
| **Perella Weinberg** | Perella Weinberg Partners LP; a Delaware limited partnership that acted as a financial advisor in connection with the Merger |
| **Plan** | Third Amended Joint Chapter 11 Plan Of Reorganization For The LyondellBasell Debtors, dated March 12, 2010, No. 09-10023 (Docket No. 3988)  [DX0482] |
| **SAC** | The second amended complaint filed by the Trustee in Adversary Proceeding No. 09-1375, dated May 13, 2016 (Docket No. 732) |
| **Senior Credit Facility** | Facility for term loans and revolving credit, which provided approximately $7.8 billion of funding for the Merger |

| | |
|---|---|
| **Share Forward Contract** | Postpaid Share Forward Contract, dated May 4, 2007, between AI Chemical and Merrill Lynch  [JX0005] |
| **Smith, Dan** | Pre-Merger Chief Executive Officer of Lyondell |
| **Stock Purchase Agreement** | Stock Purchase Agreement, dated December 20, 2007, by and between Nell and Basell Funding, whereby Nell sold 100% of its equity interests in AI Chemical to Basell Funding  [JX0036] |
| **Storey, Richard** | Chief Financial Officer of Access Industries |
| **Supervisory Board Members** | Post-Merger members of LBI's Supervisory Board were Blavatnik, Kassin, Floor, Benet, Potter, and Lynn Coleman |
| **Termination Agreement** | Termination Agreement, dated December 11, 2007, by and between BIS, Basell, Basell Funding, Basell Holdings, Nell Acquisition (US) LLC, and AI Petrochemicals LLC  [JX0031] |
| **Toehold Payment 1** | $523,822,505 transfer on December 20, 2007 from Basell Funding's account at Citibank to Nell's account at Chase Manhattan Bank pursuant to the Stock Purchase Agreement |
| **Toehold Payment 2** | $674,328,055 transfer on December 20, 2007 from LB Finance's escrow account at Citibank to Merrill Lynch's account at Chase Manhattan Bank |
| **Toehold Payments** | Toehold Payment 1 and Toehold Payment 2 |
| **Trautz, Volker** | Former Chief Executive Officer of LBI and Basell B.V. |
| **Trustee** | Edward S. Weisfelner, Litigation Trustee of the LB Litigation Trust; former lead counsel to the Committee |
| **Twitchell, Karen** | Former Vice-President and Treasurer of Lyondell and, post-Merger, LBI |
| **Vaske, John** | Former Managing Director in the Investment Banking Division of Goldman Sachs International, and Global Head of the Natural Resources Banking Group |